UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
UNITED STATES OF AMERICA,

      -against-                     <u>MEMORANDUM & ORDER</u>
                                           17-CR-0372(JS)
JEFFREY CHARTIER and LAWRENCE ISEN,

                         Defendants.
---------------------------------------X
APPEARANCES
For the
United States:         Whitman G.S. Knapp, Esq.
                   Kaitlin T. Farrell, Esq.
                   United States Attorney's Office
                   Eastern District of New York
                   271 Cadman Plaza East
                   Brooklyn, New York 11201

For Defendant
Jeffrey Chartier:     Robert P. LaRusso, Esq.
                   The LaRusso Law Firm, PLLC
                   666 Old Country Road, Suite 501
                   Garden City, New York 11530

                   Dorea H. Silverman, Esq.
                   80 Broad Street, Suite 1900
                   New York, New York 10004

For Defendant
Lawrence Isen:        John F. Kaley, Esq.
                   Doar Rieck Kaley & Mack
                   217 Broadway, Suite 707
                   New York, New York 10007

                   Gary M. Kaufman, Esq.
                   The Law Office of Gary Kaufman, PLLC
                   377 Broadway, 8th Floor
                   New York, New York 10013

SEYBERT, District Judge:

On March 18, 2020, a jury convicted defendants Jeffrey Chartier ("Chartier") and Lawrence Isen ("Isen," and together "Defendants") of conspiracy to commit securities fraud, conspiracy to commit wire fraud, conspiracy to commit money laundering, securities fraud, and money laundering, for their participation in stock manipulation schemes. Before the Court are Defendants' motions for judgments of acquittal or, in the alternative, new trials pursuant to Federal Rules of Criminal Procedure 29 and 33.[1] Separately, Defendants filed a joint motion for a new trial on the basis that COVID-19 unduly interfered with the jury's deliberations.[2] For the reasons that follow, Chartier's motion is GRANTED in part and DENIED in part; Isen's motion is DENIED; and the Defendants' joint motion is DENIED.

---

[1] Defendants did not seek permission to (1) file briefs in excess of this Court's page limitations; or (2) file a third, joint brief. Nonetheless, the Court considers the merits. (See Chartier Mot., ECF No. 887-1; Chartier Br., ECF No. 887; Chartier Reply, ECF No. 937-1; Isen Mot., ECF No. 885; Isen Br., ECF No. 885-1; Isen Reply, ECF No. 935; Gov't Opp., ECF No. 913.)

[2] (Defs. Joint Br., ECF No. 886; Defs. Joint Reply, ECF No. 936.)

BACKGROUND[3]

I.   The Superseding Indictment[4]

On August 5, 2019, Defendants, with co-defendants Michael Watts ("Watts") and Stephanie Lee ("Lee"), were charged in a seventeen-count Superseding Indictment for their participation in schemes to defraud investors and potential investors in publicly traded companies: (1) CES Synergies, Inc. ("CESX"); (2) Hydrocarb Energy Corporation ("HECC"); (3) Intelligent Content Enterprises, Inc. ("ICE"); and (4) National Waste Management Holdings, Inc. ("NWMH," and together the "Companies"). (ECF No. 465.)

As relevant here, Count One charged both Defendants with conspiracy to commit securities fraud in violation of 18 U.S.C. §§ 371, 3551 et seq.; Count Two charged both Defendants with conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349, 3551 et seq.; Counts Three, Four, and Five charged Chartier with securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 18 U.S.C. §§ 2, 3551 et seq., for the "First CESX Stock Manipulation

_____

[3] The facts are recited as relevant to the Court's analysis and are drawn from the Docket, the Superseding Indictment, pre-trial proceedings, and the Trial Transcript ("Tr."). Citations to "GX" refer to the Government's exhibits, "JC" refer to Chartier's exhibits, and "Isen" refer to Isen's exhibits. The Court presumes familiarity with the entire record.

[4] The operative indictment is the Superseding Indictment at ECF No. 465. However, the Government filed a Second Superseding Indictment to "correct a single typographical error and to delete one paragraph of the previous superseding indictment." (See ECF No. 629; Superseding (S-3) Indictment, ECF No. 631.)

Scheme," the "Second CESX Stock Manipulation Scheme," and the "NWMH Stock Manipulation Scheme," respectively; Counts Six and Seven charged Isen with securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 18 U.S.C. §§ 2, 3551 et seq., for the "HECC Stock Manipulation Scheme" and the "ICE[] Stock Manipulation Scheme," respectively; Count Eight charged both Defendants with conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h), 3551 et seq.; Counts Nine through Eleven charged Chartier with money laundering and Counts Twelve through Fifteen charged Isen with money laundering, in violation of 18 U.S.C. §§ 1957(a), 1957(b), 2, and 3551 et seq.; and Count Sixteen charged Chartier with attempted obstruction of an official proceeding in violation of 18 U.S.C. 1512(c)(2), 3551 et seq.[5]

Generally, the Superseding Indictment charged that Defendants "artificially controll[ed] the price and volume of traded shares" in the Companies by: (1) "artificially generating price movements and trading volume in the shares;" and (2) "material misrepresentations and omissions in their communications with victim investors about" the stock of the Companies. (Superseding Indictment ¶ 31.) To carry out this scheme, Defendants hired co-defendants Anthony Vassallo

---

[5] The Superseding Indictment charged Watts in Counts One, Two, Six, Eight, Twelve through Fourteen; and charged Lee in Counts One, Two, Three through Five, Eight, Nine through Eleven, and Seventeen.

("Vassallo"), who operated Elite Street Research ("Elite"), and/or Erik Matz ("Matz") and Ronald Hardy ("Hardy"), who operated "My Street Research," which were "purported financial services business[es]" that "promoted the stocks of publicly traded companies to individual investors, primarily through cold-call campaigns and the circulation of a newsletter." (Id. ¶¶ 1-2, 27-28, 32.)  In reality, Elite and My Street Research operated as "Boiler Rooms" that engaged in "manipulative trading patterns, including wash trades and matched trades, to drive up" the share prices of various publicly traded companies while its employees "aggressively and repeatedly called and emailed victim investors to purchase shares." (Id. ¶¶ 32-35.)  My Street Research operated under many names, including "Power Traders Press."  (Id. ¶ 1.) The Court refers to My Street Research, Power Traders Press, or any variation thereof, as the "Boiler Room," as it was referred throughout trial.

II.  Pre-Trial Proceedings

        Matz, Hardy, and Vassallo pled guilty on April 11, 2018, August 22, 2018, and December 14, 2018, respectively.  (ECF Nos. 195, 265, 329.)  Eight other Boiler Room employee/co-defendants also pled guilty.  Co-defendant Robert Gleckman ("Gleckman") pled guilty on August 2, 2019 for his involvement in the HECC scheme. (ECF No. 460.)  Chartier, Isen, Lee, and Watts did not, and the Government proceeded with the charges against them.

On August 6, 2019, the Court held a pre-trial conference and (1) granted Watts's motion to sever his trial so he could proceed to trial in October 2019; and (2) granted Isen's, Chartier's, and Lee's adjournment requests and scheduled their trial to begin on January 23, 2020.  (ECF No. 466.)  The trial against Watts began on October 7, 2019, and a jury convicted him of all charges on October 23, 2019.  (See ECF Nos. 556 & 580.)  On December 17, 2019, the Court denied Isen's motion to sever his trial from Chartier and Lee's trial.  United States v. Isen, No. 17-CR-0372, 2019 WL 6875369, at (E.D.N.Y. Dec. 17, 2019).  On January 23, 2020, the Court scheduled jury selection to begin on February 3, 2020, and trial to begin on February 10, 2020.  (ECF No. 667.)  On January 24, 2020, Lee pled guilty pursuant to a cooperation agreement with the Government.  (ECF No. 674.)

III. The Trial Evidence

Jury selection commenced on February 3, 2020 and trial began on February 10, 2020.  Trial continued for sixteen days, over the course of approximately six weeks, until March 18, 2020, when the jury convicted Defendants of all charges.

A.   Matz, Elite, and the Boiler Room

Matz testified at trial as a cooperating witness and explained that he worked as a licensed stockbroker from 1996 to 2007, when he was kicked out of the industry due to a regulatory finding that he was "churning a client's account and taking

6

excessive commissions." (Tr. 126:6-20, 637:5-39:9, 645:5-57:20, 947:11-16.)   In January 2014, he returned to the securities industry and worked for co-defendant Vassallo at Elite.   (Tr. 127:10-28:7, 230:6-24, 697:1-6.)   In July 2014, Matz and co-defendant Hardy, Matz's "right hand man," left Elite and established the Boiler Room, which operated under many names to evade online reviews that it was a "pump and dump shop," among other reasons. (Tr. 128:8-31:17, 239:25-40:19, 737:13-38:12, 1089:6-23.)   According to Matz, the Boiler Room operated as a carbon copy of Elite, such that it "pretended to be an investment research newsletter" but was a stock manipulation company:  he was "paid in stock and cash by different companies," such as CESX, HECC, ICE, and NWMH, "to push" victim/investors to purchase those companies' shares at the same time the Boiler Room, or Defendants, sold those companies' shares. (Tr. 116:24-17:5, 229:20-31:17.) With the Boiler Room's involvement, a company's stock price would rise.   However, it always "end[ed] the same way" and the price eventually "teeter[ed] and crater[ed] down." (Tr. 170:16-24.)

To raise stock prices, Matz manipulated stock through both wash and matched trading[6] and provided false consulting

---

[6] Deborah Oremland, an attorney with the Criminal Prosecution Assistance Group at the Financial Regulatory Authority ("FINRA"), testified as an expert witness in securities terminology and regulations.   (Tr. 2181-2290, 2300-2457.)   She explained that market manipulation is any type of artificial interference with normal market conditions and includes wash, matched, and

agreements and invoices in the amount that the Boiler Room, or the Defendants, generated from those manipulated trades. (Tr. 121:15-23.) Specifically, after the Boiler Room was hired to "push" a company's stock, Boiler Room employees cold-called victim/investors to convince them to subscribe to the Boiler Room's newsletter and website. (Tr. 143:14-15, 150:12-55:4; E.g., GX 20.) Once a victim/investor agreed to subscribe, Boiler Room account executives aggressively called those victim/investors to "push" them to purchase shares of stock that the Boiler Room was hired to promote, such as CESX, HECC, ICE, or NWMH. (Tr. 155:5-9.) Victim/investors were instructed to wait for the account executives to advise them of "what stock to buy, when to buy it, what price to buy it." (Tr. 144:18-45:3.) Armed with knowledge that the victim/investors were prepared to purchase shares at a certain time and price, Matz "navigate[d] the market" and sold his

---

coordinated trading, creating false documents to facilitate clearing shares, and "pump and dump" schemes. (Tr. 2194:21-95:2, 2440:7-12.) She also explained that units of stock are referred to as shares and can be purchased or sold (i.e., traded) over public markets. (Tr. 2185:14-86:22.) A wash trade occurs when "there's no material change in ownership" and a person "buy[s] and sell[s] stock with" oneself. (Tr. 2195:3-8.) A matched trade is a "coordinated trade where the buyers [and] sellers[] coordinate before the trade is executed." (Tr. 2434:6-36:14, 2195:22-96:8.) Wash and matched trading can manipulate the price of stock and can generate volume the "public might interpret [ ] as evidence of an active market in this stock." (Tr. 2195:9-96:17.) The volume and price generated by these trades is not sustainable because once those trades stop, "the real value of the company comes out and," the "stock price decline[s]." (Tr. 2196:18-97:2.)

own shares in the company (that he received as compensation) or relayed that information to someone else, like Lee, Chartier, or Isen, to sell their shares in the company at the same price, time, and volume. (Tr. 166:18-70:5, 779:10-19.) Account executives did not tell the victim/investors that the Boiler Room sold shares or coordinated with company shareholders to sell their shares at the same time that victim/investors purchased shares. (Tr. 170:6-10.) Several victim/investors testified at trial to the aggressive nature and volume of calls from the Boiler Room and described the ways that the Boiler Room instructed them to purchase shares of CESX, HECC, ICE, or NWMH. (E.g., Tr. 55-115, 465-78, 510-34, 545-95, 2097-2149.) They also testified to the financial losses they suffered in connection with their investments.

From July 2014 to July 2017, the Boiler Room pushed approximately twelve to thirteen penny stocks, including CESX, HECC, ICE, and NWMH. (Tr. 131:18-33:14.) During this time, Chartier visited both Elite's and the Boiler Room's offices at least once and Isen visited the Boiler Room's offices at least five or six times. (Tr. 157:5-20, 201:19-02:6, 357:7-58:4, 1706:17-07:11.) Matz informed both Isen and Chartier that he was barred from the securities industry and that he conducted his business through aliases, such as Keith Miller, Joseph John, Joseph

Matz, and Herman Matz.[7]   (Tr. 208:5-10:22.)   Matz and/or Hardy also created "nominee" trading accounts in the names of, for example, Herman Matz, Melissa Kurtzke, Brittany Ballestero, and Jahnzeb Chaudry, to support and manipulate the stocks the Boiler Room was hired to "push."   (Tr. 209:6-10:2, 1085:17-88:24, 1091:23-92:24; see also Tr. 2449:3-8.)

    B.   Defendants Lee, Watts, and Gleckman

Lee appeared at trial as a cooperating witness and testified that she met Chartier in 2002 when they were brokers with Series 7, 63, and 24 securities licenses.   (Tr. 1639:9-41:19.) They were best friends who worked together for almost 18 years, spoke several times a day, and "relied on each other for everything."   (Tr. 1641:17-46:23, 1964:12-65:11.)   Between the two, Chartier acted as the "salesperson" who made deals while Lee operated behind the scenes drafting emails, completing paperwork, conducting trades, and handling their bank and brokerage accounts. (Tr. 1641:24-42:6, 1963:7-71:22; e.g., compare JC 269 with JC 267.) Lee further testified that she loaned money to Chartier over the years and knew that he owed $350,000 to the Internal Revenue Service and approximately $100,000 to New York state.   (Tr. 1647:20-48:12, 1649:18-50:5.)   She also testified that in 2015,

---

[7] Keith Miller is Matz's friend (Tr. 1016:6-18:18); Joseph John is Matz's brother's first and middle names (Tr. 1034:2-9); Joseph Matz is Matz's brother's name (Tr. 208:20-21); Hermann Matz is Matz's father's name (Tr. 208:22-23).

Chartier generated income, and paid those debts, from the restaurants he owned and by selling shares of CESX and NWMH. (Tr. 1760:3-17.)

Co-defendant Gleckman appeared at trial as a cooperating witness and testified that he and Isen were best friends of 32 years. (Tr. 1129:4-6.) In the early 2000s, Gleckman introduced Isen to his friend Watts, with whom Gleckman conducted many successful business transactions. (Tr. 1129:11-30:5.) Watts's brother was HECC's chairman, and Watts significantly invested in HECC and served as a consultant through his company Geoserve Marketing LLP ("Geoserve"). (Tr. 1130:18-31:7.) Gleckman also invested "quite a bit of money" in HECC and worked to solicit investors. (Tr. 1596:21-25, 1131:14-32:14.)

C.  <u>CESX and NWMH, Generally</u>

Around 2013, Chartier met Charles Teelon ("Teelon"), NWMH's chairman, and Clyde "Al" Biston ("Biston"), CESX's president.[8] (Tr. 1195:11-25, 1197:3-98:8, 1315:15-21, 1383:10-14, 1387:15-88:10, 1650:6-52:22.) Citing his 20 years of experience at Morgan Stanley and experience taking companies public, among other things, Chartier proposed to Teelon and Biston that they

---

[8] The transcript available to the Court incorrectly indicates "Teelon – Redirect/Farrell" instead of "Biston – Redirect/Farrell". (Tr. 1315-21.) In addition to Teelon and Biston, John Tostanoski ("Tostanoski"), CES's vice president and CESX's CEO, and Louis "Tiny" Paveglio, NWMH's CEO, testified at trial. (Tr. 1322-1423, 1436-1524.)

take NWMH and CESX public with his help.  (Tr. 1199:1-10, 1225:15-26:1, 1325:1-27:8, 1383:23-84:6, 1389:5-25, 1415:20-16:5, 1420:5-14.)  Lee was also involved in these discussions and testified that Chartier and Lee held several meetings and Teelon and Biston agreed to take CESX and NWMH public after Chartier explained the benefits, which included generating capital and revenue through stock offerings.  (Tr. 1200:18-01:20, 1223:23-27:20, 1326:1-27:20, 1383:15-89:25, 1401:9-18, 1651:24-53:18.)

Thereafter, Chartier and Lee were hired to guide Teelon and Biston through the process of taking CESX and NWMH public in exchange for company stock, with Chartier taking the lead and Lee doing "whatever needed to be done in the background."  (Tr. 1653:16-24; see also Tr. 1263:22-64:8, 1326:22-27:8, 1422:7-16.)  Around August 2013, Lee and Chartier formed Strategic Capital Markets ("Strategic") to perform work for CESX and NWMH.  (Tr. 1655:2-17.)  Lee also formed her own company, Type A Partners ("Type A"), which was separate from Chartier "on paper."  (Tr. 1655:18-56:10.)

D.   Chartier and Lee Help Take CESX Public By Reverse Merger and Sell CESX Stock in Private Transactions

Initially, the parties agreed to take NWMH and CESX public at the same time and join the companies; but the companies did not merge, and CESX went public first.  (Tr. 1198:17-21, 1385:21-87:6, 1421:1-13, 1654:13-25.)  According to Tostanoski,

CESX was "desperately" in need of funding (Tr. 1327:18-28:6), and Strategic, by Chartier,[9] and CESX, by Biston, executed a consulting agreement whereby Chartier and Lee would guide CESX through the process of taking CESX public in exchange for CESX stock. (GX 953; see Tr. 1201:13-02:7, 1263:22-64:4, 1327:18-28:6, 1656:11-59:17.) Biston testified that, with Chartier's help, he hoped to "up list" CESX from trading as a penny stock to trading on the larger trading boards, such as the New York Stock Exchange. (Tr. 1287:18-88:11, 1311:23-12:4, 1342:6-43:25, 1350:7-12; JC 163.) While not stated in the agreement, Chartier negotiated that Strategic would incur the expenses associated with taking CESX public. (Tr. 1681:10-17.) Strategic financed those expenses using the proceeds generated by selling CESX stock. (Tr. 1681:18-82:2; GX 983.)

At Chartier's recommendation, CESX hired an attorney named Andrea Cataneo ("Ms. Cataneo").[10]  (Tr. 1202:25-03:13, 1222:19-23:2, 1316:15-17:4, 1661:18-25; JC 110 (May 6, 2013 retainer agreement between CESX and Ms. Cataneo).) According to Biston, Ms. Cataneo explained the different ways to take CESX from

---

[9] Lee signed the agreement for Chartier at his request. She frequently signed documents for Chartier with his consent. (Tr. 1657:8-58:23, 1986:14-87:24, 1992:2-95:4; 2009:23-10:8.)

[10] Chartier and Ms. Cataneo were friends; Chartier previously hired Ms. Cataneo as securities counsel. (Tr. 1662:1-11, 1976:1-8.)

a private company to a public company and, in discussion with Chartier, decided to take CESX public by reverse merger, in part because it was "cheaper."[11]  (Tr. 1232:6-36:25, 1317:19-29:18, 1659:18-60:13.)  In the course of taking CESX public, Chartier requested and was named to CESX'S board, primarily to present CESX as an investment opportunity to potential investors.  (Tr. 1208:1-3, 1332:2-4, 1660:14-61:3.)

In August 2013, Lee, Chartier, Ms. Cataneo, and Biston, among others, met to execute various documents to finalize the reverse merger.  (Tr. 1237:19-47:12 (testifying to JC 112, 113, and 114, executed at the August 2013 meeting), 1662:12-63:22, 1668:21-69:2.)  Out of those in attendance, only Chartier, Lee, and Ms. Cataneo had experience in the securities industry.  (Tr. 1663:12-18.)  According to Lee, at the meeting, Ms. Cataneo explained that Chartier, as a company insider, could not purchase or control the newly-issued free-trading CESX shares in the reverse merger because the shares would lose "their free trading status."[12]  (Tr. 1663:3-65:17.)  Therefore, Ms. Cataneo suggested that they

---

[11] Ms. Oremland explained that a reverse merger occurs when a private company takes over a publicly traded shell company.  (Tr. 2193:17-21; see also Tr. 1659:18-60:8.)

[12] A company (or company insiders) that obtain shares as a result of a reverse merger typically receive "restricted" or "control" shares that are subject to resale limitations and regulations. (Tr. 2189:9-91:5, 2191:15-22, 2193:22-94:5.)  Unrestricted shares, or free-trading shares, can be sold at any time.  (Tr. 2191:6-10.)

designate a company outsider as the Seller's Representative (the "Seller's Rep") -- the person who purchased CESX's free-trading shares from the "shell company" in the reverse merger and served as a liaison for the new shareholders -- to keep those shares a purported "arm's length" away from the company.  (Tr. 1671:2-22.) Chartier proposed Lee as the Seller's Rep.  (Tr. 1671:23-72:1.) However, Biston, and others, were not comfortable designating Lee as the Seller's Rep, so they designated Biston's friend Terry McKnight, an attorney who was at the August 2013 meeting.  (Tr. 1670:17-72:8.)

At the August 2013 meeting, Lee purchased free-trading CESX shares as a purported company outsider (but not as the Seller's Rep), per Ms. Cataneo's suggestion.  (Tr. 1663:23-64:2.) Lee did not pay for the shares; rather, at the meeting, CESX wired Lee $20,000 to purchase the shares from the shell company.  (Tr. 1664:3-65:17, 1669:9-70:16.)  Because CESX's Chief Financial Order requested "back up" for the transfer, Lee and CESX executed a "Business Consulting Agreement," back-dated to June 1, 2013, for $20,000 of purported consulting services.  (GX 980; JC 180; Tr. 1229:9-14, 1665:22-69:13, 1867:1-2, 1931:9-34:14.)  They executed the consulting agreement solely to create a paper trail to support the $20,000 transfer for the purchase of free-trading CESX shares, and not for consulting services.  (Tr. 1668:2-16.)

15

As a company insider, Chartier did not keep an arm's length distance from CESX's free-trading shares. (Tr. 1665:19-21.) For example, in the fall of 2013, after finalizing the reverse merger, Ms. Cataneo provided Chartier with the physical free-trading CESX share certificates, even though those certificates should have been with McKnight as the Seller's Rep.[13] (Tr. 1674:21-75:19.) Further, around the end of November 2013, CESX hosted an event where Chartier presented CESX as an investment opportunity to friends and family. (Tr. 1204:20-06:16, 1331:6-18, 1684:2-17.) Although McKnight was still the Seller's Rep, those interested in investing were told to send payment to a Strategic bank account (that both Chartier and Lee accessed) and to contact Chartier or Lee to complete the transfer of free-trading CESX shares. (Tr. 1684:17-85:11.) By early January 2014, McKnight transferred his Seller's Rep responsibilities to Lee (via Strategic and Type A) because he did not "know what to do with the shares." (Tr. 1672:9-75:12; GX 981; GX 982.) The paperwork transferring those responsibilities was back-dated to December 1, 2013 because Lee and Chartier had already sold CESX shares through private transactions, such as the friends and family event. (Tr. 1955:14-56:18; JC 308; JC 309; JC 324.)

---

[13] Chartier confronted Ms. Cataneo for keeping 500,000 free-trading shares. She returned 350,000 shares and kept 150,000 shares in an offshore account. (Tr. 1675:20-81:6, 1812:9-23; GX 970.)

From late 2013 to early 2014, Chartier and Lee raised approximately $400,000 to $450,000 by selling CESX shares to friends and family and via other private transactions.  They used those funds to pay CESX's expenses and their personal expenses. (Tr. 1685:12-88:13; GX 533B(1); GX 533C.)  For example, in January or February 2014, Chartier used those funds to purchase a RV for approximately $250,000.  (Tr. 1688:14-89:22; GX 533C; GX 945 through 948; see also Tr. 535-44, 1274:21-77:11.)

E.    Chartier and Lee Hire Elite to Push CESX

CESX first traded in January 2014.  At that time, Chartier and Lee held the "bulk" of CESX's free-trading shares in Type A or Strategic brokerage accounts, with the remaining shares disbursed among family and friends.  (Tr. 1698:13-99:1.)  As such, Chartier and Lee searched for institutional investors, but were largely unsuccessful  (Tr. 1209:13-10:5, 1282:14-84:7, 1290:20-91:5, 1301:1-16, 1331:25-34:12, 1338:3-42:5 see also JC 149; JC 153.)  For example, through Chartier and Lee, CESX hired different investment relation firms to generate public awareness regarding CESX, including Institutional Marketing Services ("IMS").  (Tr. 1210:6-23, 1269:2-6, 1695:14-96:23; see also JC 139.)  However, CESX's market stance did not change.  (Tr. 1696:1-23.)  Chartier also hired Craig Fisher ("Fisher"), a stock promoter, like Matz, with a "group of guys that" could "build positions in" public companies and "get the stock moving."  (Tr. 1696:24-98:12.)  Lee

17

explained that she matched trades with Fisher and, although his involvement lasted a few days, Lee frequently spoke to Chartier about Fisher's work.  (Tr. 1698:13-1701:3.)

In mid-March 2014, Ms. Cataneo organized a dinner at Rothman's Steakhouse in New York City where she introduced Lee and Chartier to Vassallo (the "Rothman's Steakhouse Dinner").  There, the parties discussed whether CESX, through Chartier and Lee, would hire Elite to promote and market CESX.  (Tr. 1701:4-02:21; JC 278.) According to Lee, Vassallo described how Elite could help CESX's stock "trade actively," per Chartier's request.  (Tr. 1703:4-12.) Specifically, Vassallo referenced Elite's newsletter, subscribers, that he "had guys he traded with frequently," and that he would call Lee when there was a "bid out there for [Lee] to hit," similar to her trading activity with Fisher.  (Tr. 1703:4-24.)  Although Chartier was a company insider, he negotiated a deal with Vassallo: Vassallo originally wanted 500,000 shares, but instead, Chartier agreed to give 250,000 free-trading CESX shares (1) as compensation for Elite "pushing" CESX to victim/investors, and (2) for helping Chartier and Lee "liquidate" 250,000 free-trading CESX shares from Strategic or Type A brokerage accounts.  (Tr. 1703:25-05:16, 1999:20-2000:1; compare JC 294 (Ms. Cataneo emailing Chartier and Lee, attaching an agreement between Elite and Lee for 500,000 CESX shares, and writing "I used your name, Stephanie, rather than [Strategic's] name. If you prefer to use

18

the name of another entity that Jeff is not a part of, that is fine as well").)  By "liquidate," they agreed that Vassallo would call Lee when Elite lined up a victim/investor to purchase shares of CESX and, in turn, Lee would sell shares of CESX at the same price, time, and volume.  (Tr. 1705:2-06:16.)  A few days after the Rothman's Steakhouse Dinner, Chartier visited Elite's offices, where he met Matz.  (Tr. 1706:17-07:11; see Tr. 232:21-33:17.)

On or around March 25, 2014, Elite and Type A, by Lee, entered into a consulting agreement, reflecting that Type A paid Elite 250,000 CESX shares as compensation for various consulting services.  (GX 952.)  They executed this agreement to "liquidate" Chartier and Lee's CESX shares and not for consulting services. (Tr. 1708:9-09:6.)  To transfer the CESX shares to Vassallo, Chartier provided Lee with the physical stock certificates and Lee completed the paperwork to clear the shares with a brokerage firm. (Tr. 1709:10-10:5.)  Elite started to "push" CESX and the stock price "skyrocketed" to almost double the price.  (Tr. 233:18-23, 767:6-68:13, 1710:6-8.)

While at Elite, Matz "pushed" CESX by pressuring victim/investors to place "limit orders on CESX"[14] and relaying those limit orders to Vassallo, who in turn sold the CESX shares

_____

[14] Ms. Oremland and Dr. Filante, Isen's expert, explained that a person buying or selling stock sets a "limit order" by designating a specific price to buy or sell.  (Tr. 2318:6-16, 2320:13-24, 2451:22-52:24, 3161:20-62:11.)

he received as compensation or contacted someone on Chartier's behalf "to get their shares [of CESX] sold." (Tr. 237:12-18; see also Tr. 232:10-14, 765:1-66:13; see JC 326 (March 25, 2014 email from Lee to Chartier, wherein Lee writes to Chartier to call Vassallo and "get him going to do some more trades").) However, Chartier and Lee's relationship with Elite ended after Vassallo became nonresponsive. (Tr. 1711:9-16.) Indeed, by May 2014, Chartier and Lee complained to Ms. Cataneo that Vassallo and Elite were not performing as expected. (Tr. 1715:22-24; GX 971 (May 8, 2014 email chain between Lee and Ms. Cataneo, copying Chartier, wherein, among other things, Lee notes that Elite is "not listed on the NOBO list and I cannot see the rate in which they are selling shares").) Chartier and Vassallo also each accused the other of selling shares of CESX behind the other's back. (Tr. 236:1-6, 237:7-38:1, 1878:14-79:1; JC 291; JC 292.) Chartier and a female "accountant or attorney," i.e., Ms. Cataneo, met with Vassallo and Matz at Elite's offices and reviewed CESX's shareholder lists and trading data. At the meeting, they determined that a third-party sold shares of CESX that Chartier had previously transferred as compensation for "pushing" CESX. (Tr. 234:7-37:6.)

        In June 2014, CESX's stock price declined. (Tr. 1718:22-21:6.) The rise and decline in the price caused concern; indeed, in June 2014, an investor relations firm suggested to Lee that

CESX's trading pattern reflected a "classic" pump and dump.  (See JC 327; Tr. 1710:6-20, 1894:15-1903:16, 2001:2-03:13.)  By that time, Lee and Chartier sold 157,000 CESX shares, and they used the proceeds from those sales to pay their business and personal expenses and CESX's expenses.  (Tr. 1718:22-21:22.)

> F.   <u>Isen and Watts Hire the Boiler Room to Push HECC</u>

In July 2014, Matz and Hardy left Elite and opened the Boiler Room.  Around that time, Isen met Matz when visiting Steve Simon and Vince Caruso who had suites in the same building as the Boiler Room.  Simon and Caruso had previously worked with Matz and represented that Matz had "serious buying power" and was "able to put away a lot of stock."  (Tr. 348:21-49:23, 933:16-34:5.)  Matz explained the Boiler Room's operations to Isen, including cold-calling victim/investors "all day" with "stock picks," such as "high value" companies and "one or two" penny stocks,[15] and the subscription newsletter.  (Tr. 349:24-50:23, 934:3-36:15.)  According to Matz, Isen asked if the Boiler Room had interest in promoting HECC, an oil producing company located in Texas and Africa.  (Tr. 350:24-51:7, 934:6-18.)

---

[15] The Boiler Room was not paid to promote the "well-known companies" and did not "push" or trade in those companies' stock.  (Tr. 1107:5-10:7, 1124:3-16; <u>see</u> Tr. 993:21-94:24 (Matz testifying to Isen J and a non-penny stock company the Boiler Room "promoted"); Tr. 1000:5-02:12 (same for Isen X).)

The following week, Isen scheduled a conference call between Isen, Matz, and Watts. (Tr. 351:22-52:7.) According to Matz, Watts wanted to increase HECC's trading volume and "get some shares traded, make it a little more active, support the stock if needed." (Tr. 353:19-54:2.) As he did with Isen, Matz explained the Boiler Room's subscription-based business to Watts. (Tr. 352:17-25, 962:12-24.) He further explained that the Boiler Room could "support[ ] the stock" when "the stock had a bad day" because Matz and/or the Boiler Room had nominee brokerage accounts to "buy the stock . . . and later dump it out on a shareholder down the line." (Tr. 354:1-55:2.) Matz also conveyed that he would not sign any paperwork because he was barred from the securities industry. (Tr. 353:9-14.) By the end of the call, Watts deferred to Isen and Matz to "hash out the details." (Tr. 353:6-8.)

The Boiler room started to push HECC to victim/investors in late July 2014/early August 2014. (Tr. 149:14-20, 355:3-19.) Matz described the Boiler Room's activity in two phases. During both phases, Isen served as the "point of contact." (Tr. 355:20-57:6, 420:19-25, 1565:1-14.)

1.   HECC – First Phase

During the first phase, the Boiler Room supported HECC's stock price by "go[ing] in and get[ting] some orders, increas[ing] some volume, giv[ing] support when needed a handful of times, [and] relay[ing] a couple of trades to [Isen]," but "not that often."

(Tr. 414:5-8; see Tr. 355:23-56:5.)  After the July 2014 conference call, Isen and Matz reached an agreement:  the Boiler Room "pushed" HECC stock in exchange for 75,000 restricted shares of HECC and $25,000 (in bi-weekly installments of $12,500).  (Tr. 355:3-14, 358:20-59:5; see GX 101A.)  On July 30, 2014, Isen emailed Watts, copying Matz, via a Boiler Room email address, memorializing the deal and stating "I believe this covers all the points."  (GX 101.) The email included a consulting agreement between the Boiler Room, by Keith Miller, and Geoserve, by Watts, effective August 1, 2014. (GX 101; GX 101A at 2.)  Although the consulting agreement states that the Boiler Room was an "independent consultant and has knowledge and experience to provide marketing as the Client believes can assist it in furthering execution of its public awareness" (e.g., GX 101A at 1), Matz testified that the Boiler Room was not an independent consultant and did not perform the services outlined in the agreement (Tr. 361:25-62:15).  Isen facilitated three similar consulting agreements between the Boiler Room, by Keith Miller or Joseph Matz, and Geoserve:  (1) effective November 1, 2014, for 50,000 restricted HECC shares and $25,000 per month, in six bi-weekly installments of $12,500 (GX 161; GX 161A); (2) effective February 1, 2015, for 125,000 restricted HECC shares (GX 155; GX 155A); and (3) effective July 17, 2015 for 400,000 restricted HECC shares (GX 144; GX 144A).

A few months after executing the first consulting agreement, Matz "threatened to scrap the project" due to non-payment. (Tr. 364:12-16, 368:18-69:7.) Isen was involved with getting funds to the Boiler Room and in an email dated November 12, 2014, he requested that Geoserve "confirm you are getting the $25k to" the Boiler Room. (GX 160.) According to Matz, at some point thereafter, Isen offered to pay $25,000, the amount due under a consulting agreement, if the Boiler Room got Isen "out of enough [HECC] stock" to "cover the invoice," i.e., matched trading. (Tr. 368:18-70:12.) Consistent with this agreement, on December 16, 2014, Matz sent Isen an invoice for $12,500 from the Boiler Room to MarketByte LLC ("MarketByte"), Isen's company, dated December 16, 2014, for "Investor Relations on Behalf of" HECC from December 1 to 15, 2014. (GX 111; GX 111A.) On January 14, 2015, Matz sent Isen an invoice for $12,500 from the Boiler Room to MarketByte, dated January 14, 2015, for "Investor Relations on Behalf of" HECC from January 16 to 31, 2015. (GX 112; GX 112A.) Matz testified that the Boiler Room did not provide MarketByte with investor relations services on behalf of HECC; rather, the invoices reflect the amount that Isen agreed to pay on behalf of Watts and that he generated from the Boiler Room "calling people[,] jamming stock down their throat," and "push[ing] them to buy stock." (Tr. 367:10-70:21, 1040:9-43:18.)

Gleckman also testified that HECC was short on cash and, around December 2014, Isen and Watts approached him to finance $25,000 for a "PR campaign" in exchange for additional HECC shares. (Tr. 1130:6-33:13, 1562:6-25.)   Gleckman agreed, and on January 14, 2015, Isen sent Gleckman an invoice from MarketByte, dated January 6, 2015, for "Services on Behalf of HECC" in the amount of $25,000.   (GX 209; GX 209A.)   Gleckman paid Isen with the understanding that Isen would "pass [it] on" to Matz, and not because MarketByte provided Gleckman any services.   (Tr. 1564:8-65:24; see Tr. 1133:10-36:9.)

By the end of January 2015, Isen and Watts were still indebted to Matz and the Boiler Room.   (Tr. 385:2-86:5.)   Around that time, Watts, Isen, and Gleckman came to another agreement: Gleckman would sell free-trading HECC shares to the Boiler Room and the Boiler Room would sell those shares "to generate money." (Tr. 385:2-24, 1045:10-21.)   Isen facilitated this transaction and, on February 25, 2015, sent Matz a consulting agreement between the Boiler Room, by Keith Miller, and Snap or Tap Productions LLC ("Snap or Tap"), Gleckman's company, for 70,000 free-trading HECC shares.   (GX 114; GX 114A.)   Matz testified that the Boiler Room did not provide any of the services listed in the agreement; rather, the 70,000 shares were compensation for "pushing [HECC] stock."   (Tr. 384:6-88:23; see Tr. 1047:14-51:19.)   The shares

25

were never transferred due to "a lot of red flags" and the Boiler Room stopped pushing HECC.  (Tr. 388:24-89:7.)

### 2.   HECC – Second Phase

By the spring of 2015, Watts approached Matz with a "game plan" for the Boiler Room to "continue pushing" HECC, thus kicking off the "second phase."  (Tr. 389:8-91:5, 410:4-9.)   This phase had "no comparison" to the first phase.  (Tr. 413:23-14:16.)   Matz described it as a "wild fire, just call after call, text after text, just blowing out [] millions of shares for different people who had put up those shares for" the Boiler Room to help liquidate; Matz also sent invoices for fifty percent of the amount generated from his trade instructions.  (Tr. 414:9-15:21; see Tr. 356:6-20, 417:6-25.)   During this phase, Isen and Matz were always in communication (Tr. 406:1-2) and Isen remained involved in two ways: (1) Gleckman was "very slow" so Matz relayed trade instructions directly to Isen; and (2) Isen had a "bigger hand" with invoices and paperwork between Watts, Gleckman, and the Boiler Room.  (Tr. 414:17-15:8; see, e.g., Tr. 397:11-98:1, 420:19-23:3; e.g., GX 139; GX 151; GX 151A; GX 154.)

As part of the "game plan," Watts and Isen approached Gleckman in May or June 2015 for a two-part financing request for "PR with" Matz.  (Tr. 1136:12-39:12, 1614:12-15:12.)   First, (1) Watts transferred 262,751 restricted HECC shares to Gleckman; (2) Gleckman sold those shares; and (3) Gleckman used the proceeds

26

from those sales to pay Matz and the Boiler Room.[16]   (Tr. 1137:7-16, 1139:1-18.)   Isen facilitated the conversion of those restricted shares into free-trading shares: on July 9, 2015, Isen emailed certain documents to Gleckman, including a consulting agreement and an attorney opinion letter.[17]   (Tr. 1139:19-47:15; GX 229; GX 229A through C.)   Gleckman testified that Isen completed the paperwork and falsely stated that Gleckman acquired the shares on December 16, 2014 pursuant to a "consulting arrangement" with Geoserve, even though the shares were not issued on that date. (GX 229A; Tr. 1142:16-44:24, 1146:20-25.)   Gleckman further testified that he signed the paperwork "solely to free up the shares to give to" Matz, and not for consulting services.   (Tr. 1146:1-47:17, 1575:22-76:9.)   With Isen as the conduit, the brokerage firm Wilson-Davis & Company ("Wilson Davis") cleared and "freed up" the 262,751 HECC shares.   (Tr. 1147:10-15, 1615:20-17:1; GX 125; GX 125A.)

Gleckman sold the 262,751 free-trading HECC shares over six to seven weeks through his broker and based on Isen's trade instructions that "buyers were coming in from New York to the

---

[16] The 262,751 shares represented a portion of the amount Watts owed to Gleckman from prior transactions.   (Tr. 1572:11-73:16; see also Tr. 1136:12-37:16.)

[17] Pursuant to SEC regulations, certain documents are required to convert restricted shares into unrestricted, or free-trading, shares, including an attorney opinion letter.   (Tr. 2191:23-92:9.)

boiler room." (Tr. 1147:18-48:9.)  For example, on August 7, 2015, Isen told Matz, via a Joseph John email address, to "prepare an invoice for $61k made out to [Gleckman] for PR services" and that "the total proceeds from [Gleckman's] trades yesterday was $61,130.43." (GX 133.)  Matz, using a Joseph John email address, emailed Gleckman and Isen an invoice for $61,000 from the Boiler Room to Gleckman for "PR Services." (GX 134; GX 134A; Tr. 394:12-15, 1055:14-57:10.)  Gleckman paid the invoice, which was not for "PR Services" but represented the amount he generated by selling a portion of the 262,751 shares at the same time victim/investors purchased shares of HECC.  (Tr. 394:2-95:2.)  Following this pattern, the Boiler Room (or Isen) sent Gleckman, with a copy to Isen, additional invoices from the Boiler Room for purported "PR services" on:  August 28, 2015 for $64,000 (GX 71); September 9, 2015 for $81,000 (GX 72; GX 241; GX 241A); September 29, 2015 for $75,000 (GX 73; GX 246; GX 246A); and October 15, 2015 for $68,500 (GX 74; GX 249; GX 249A).  Gleckman and Matz testified that these invoices were not for "PR Services" but represented the amount Gleckman generated by selling the 262,751 HECC shares based on Isen's and Matz's trade instructions. (Tr. 395:18-96:10, 1057:11-59:9, 1151:7-59:7, 1617:2-20; compare GX 817 (summary chart reflecting the proceeds Gleckman generated from trading shares of HECC) with Tr. 2249:9-14 and GX 134A, GX 72 through 74.)

28

As for Watts's and Isen's second financing request, Watts sold Gleckman 50,000 HECC shares for $500, and Gleckman sold those shares to Matz for $500.   (Tr. 1137:17-24, 1159:24-63:1, 1617:21-19:12.)   To finalize this agreement, Gleckman and the Boiler Room received or executed certain documents, including an attorney opinion letter and a stock purchase agreement.  (GX 131A.) A brokerage firm denied the transfer because, among other reasons, "the name of the customer suggests that the customer may be involved in stock promotion or analysis." (GX 131.)

In August 2015, Isen forwarded Gleckman an email wherein Watts loosely summarized the many deals between Watts, Isen, Gleckman, and Matz, including transactions recited above and subsequent transactions between HECC, Isen, and Gleckman.   (GX 235; Tr. 1163:2-73:20; see also GX 247; GX 247A; GX 251; GX 251A; Tr. 1606:1-22.)   Isen also continued to closely monitor and track the HECC trading data.  (See GX 140; GX 140A.)  By way of example, in October 2015, an unknown individual sold a large block of HECC shares.  (Tr. 403:9-23.)  To determine the "offender," Isen sent Matz and Watts a "DTC Stock Position Report"[18] and calculated the total number of remaining HECC shares that the "offender" could sell.  (Tr. 405:8-07:7; GX 141; GX 141A; see also Tr. 411:7-14:3

---

[18] A DTC list delineates the total number of shares held by a brokerage firm.  (Tr. 404:5-05:7.)

(discussing GX 385 and GX 385A, email and excel spreadsheet created by Isen tracking HECC trading data).)  Furthermore, on October 12, 2015, Isen emailed Matz, writing "we are on the right track," noting HECC's trading volume, and observing that approximately "20% of the volume is short."[19]  (GX 142; Tr. 407:21-09:21.)  Isen continued to facilitate paperwork and trades between Watts and the Boiler Room for HECC.  On November 4, 2015, Isen emailed Matz and instructed him to send an invoice to Geoserve for $59,500.  (GX 147.)  Matz complied and sent Isen, among others, an invoice for $59,500 worth of "PR Services."  (GX 149; GX 149A.)  Matz testified that the invoice was not for "PR Services" but represented half of the amount Watts generated by trading HECC based on Matz's trade instructions.  (Tr. 416:24-21:4; compare GX 830-3 with GX 149A; see also GX 150 (December 1, 2015 email from Joseph John to Isen, attaching GX 150A, an invoice from the Boiler Room to Geoserve for $195,000 for "PR Services").)

On December 14, 2015, Matz forwarded Isen an email that listed the names of victim/investors along with the number of HECC shares that the Boiler Room "pushed" them to purchase.  (GX 152 (email list identifying, among others, David Sproul and Cliff Jenne, who both testified at trial); Tr. 425:10-26:25.)  While the

---

[19] Matz explained at a high level that "shorting a stock" occurs when an individual sells stock and then buys it back at a lower price.  (Tr. 409:7-13.)

price of oil (and HECC's stock price) increased in December 2015, HECC stopped oil production in late January 2016.  (Tr. 1069:19-70:3, 1174:2-10.)  Nonetheless, the Boiler Room pushed HECC until March/April 2016 when (1) there was no more stock to sell; (2) the stock "collaps[ed]" and "crash[ed]"; and (3) HECC retracted its financing statements which "created a death spiral of the stock." (Tr. 429:10-30:1.)  HECC filed for bankruptcy in April 2016.  (Tr. 1173:23-74:1.)

G.   <u>Chartier and Lee Hire the Boiler Room to Push CESX</u>

After Matz left Elite, established the Boiler Room, and started pushing HECC, he contacted Chartier to discuss CESX.  (Tr. 242:4-43:19, 1721:23-22:12.)  Around August 2014, Chartier visited Matz and Hardy and toured the Boiler Room's offices where Chartier introduced Lee as his "right-hand woman."  (Tr. 243:20-46:13, 1722:10-21.)  According to Lee, Matz explained that he operated the Boiler Room the same way that Vassallo operated Elite and "he had investors that he traded with regularly and that he would call when there w[ere] bids out there to hit for [Lee and Chartier] to sell some stock." (Tr. 1722:22-23:6, 248:3-49:9.)  Matz also cited HECC's price and volume as an example of the Boiler Room's capabilities.  (Tr. 1723:7-22.)

Chartier and Lee agreed to hire the Boiler Room to push CESX.  Matz and Lee both testified to the working relationship between Matz, Chartier, and Lee.  First, Chartier and Matz

exclusively negotiated the split as to: (1) the Boiler Room's compensation; and (2) the number of shares that the Boiler Room would help Chartier and Lee liquidate. Second, after they reached an agreement, Chartier provided Lee with CESX stock certificates. Third, Lee completed the paperwork to transfer the CESX shares from Lee, as Seller's Rep, to Matz and/or the Boiler Room. (Tr. 247:19-50:6, 1723:23-26:2, 1732:25-33:9; accord Tr. 836:17-40:1 (Matz testifying to JC 37 and JC 38, wherein Lee directed Matz to clear stock through Wilson Davis), 811-20, 831-35.) According to Lee, Chartier knew that she completed the paperwork to keep the free-trading shares at a purported arm's length from Chartier, a CESX company insider. (Tr. 1731:18-32:12.) Fourth, Chartier told Matz to relay trade information to Lee, and Lee and Matz then executed wash and matched trades.[20] (Tr. 248:18-22, 249:19-50:13, 770:12-71:10.)

Following this pattern, Matz and Chartier negotiated their first deal: (1) Chartier would compensate the Boiler Room $15,000 and with 100,000 CESX shares,[21] and (2) the Boiler Room would help Chartier and Lee liquidate approximately 250,000 CESX

---

[20] According to Matz, Chartier paid another individual in stock and asked Matz to coordinate to get that person "out of those shares." (Tr. 776:1-20.)

[21] These shares came from the physical share certificates that Ms. Cataneo provided to Chartier, notwithstanding his status as a company insider. (Tr. 1725:21-26:2.)

shares.  (Tr. 246:22-48:2, 1723:23-24:16.)  Matz used the HECC
consulting  agreement  as  a  template[22]  and  drafted  the  first
consulting agreement for CESX.  (Tr. 248:6-17, 1724:15-16; GX 316;
316A.)  The first agreement, effective August 7, 2014 and between
the Boiler Room, by Keith Miller,[23] and Type A, by Lee, provided
that Type A issued 100,000 free-trading CESX shares and $15,000 to
the Boiler Room in exchange for consulting services.  (GX 316A at
1-2.)  Matz testified that the Boiler Room did not provide any of
the services outlined in the agreement; rather, the Boiler Room
"push[ed]  shares  of  CESX  on  people"  by  "call[ing]  people  and
try[ing] to slam them into buying shares of CESX."  (Tr. 259:13-
61:10.)  To transfer the shares, on August 22, 2014, Lee sent Matz
certain paperwork, including a stock purchase agreement ("SPA"),
which reflected that the Boiler Room purchased 100,000 shares of
CESX from Lee as the Seller's Rep for $10,000.  (GX 322; GX 322A.)
Matz did not pay $10,000 for these shares but received them to get
Chartier and Lee "out of" the approximate 250,000 CESX shares.
(Tr. 269:22-70:21.)  All of the consulting agreements and SPAs
between the Boiler Room and Lee or Chartier contained similar
"false information," as described above.  (Tr. 251:16-52:7.)

---

[22]  Matz  sought  Isen's  input  regarding  the  CESX  consulting
agreement.  (Tr. 286:12-87:12.)

[23] Hardy may have signed the agreement.  (JC 28; Tr. 820:20-24:8.)

Matz was "very successful" in selling both the Boiler Room's and Chartier and Lee's CESX shares. (Tr. 271:5-11.) Lee testified that Matz called her when he had "orders coming in" and relayed the price and volume at which she should sell shares of CESX. (Tr. 1724:17-25:2, 1733:10-18.) To that extent, Matz and Lee were in "nonstop" contact via phone, text messaging, or messaging application called "Viber." If Lee was unavailable, Matz contacted Chartier to relay trade instructions a "handful of times." (Tr. 250:7-13, 254:4-14, 768:16-69:10, 1725:3-13, 1733:19-34:2.)

Within two to three weeks, Chartier and Matz negotiated that Chartier would transfer 200,000 shares of CESX to the Boiler Room on a "two-to-one" ratio. (Tr. 271:12-72:5.) In context of NWMH, Matz explained that "ratios were always part of the negotiation" and defined "a two-to-one ratio" as: "[f]or every one share [the Boiler Room] sold [the Boiler Room] had to sell two shares to [Chartier]." (Tr. 314:9-13.) This agreement was memorialized in a "consulting agreement extension," effective September 8, 2014, between the Boiler Room, by Keith Miller,[24] and Type A, by Lee. (GX 324; GX 324A; Tr. 274:16-25; see also JC 35.) The agreement was identical to the first consulting agreement such

---

[24] Hardy signed this consulting agreement as Keith Miller. (Tr. 833:16-35:8.)

that neither Matz nor the Boiler Room provided the services detailed therein.  (See generally GX 324A; Tr. 275:1-12.)  On September 15, 2014, Lee provided Matz, via a Keith Miller email address, the paperwork required to transfer the 200,000 shares to the Boiler Room.  (GX 327; GX 327A; JC 36; Tr. 277:2-78:16, 1735:11-36:10.)  The email included another SPA, dated September 10, 2014, reflecting that the Boiler Room purchased 200,000 shares of CESX from Lee as the Seller's Rep for $20,000.  (GX 327A.)  Matz did not pay for the CESX shares; rather, they were provided as compensation for liquidating Chartier's 400,000 shares of CESX. (Tr. 279:8-80:21.)

On September 15, 2014, Lee emailed Matz a "power point and press releases and other info [he] can use to educate [himself] on" CESX.[25]  (GX 457; JC 39.)  Matz forwarded this email to Isen because Isen offered to help draft company reports.  (Tr. 285:6-86:2.)  Around this time, Matz monitored CESX trading activity and tracked "how many shares we got done, who sold the shares, [whether] it was myself or whether I had passed the instructions on to somebody else like [Lee] and she had gotten out of stock." (Tr. 288:2-13.)  Matz realized his trading figures were off, and on September 10, 2014, he asked Isen for CESX "time and sales"

---

[25] Matz often received information like this to post to the Boiler Room's website or to "ramp up" calls to victim/investors before press releases became public.  (Tr. 283:21-85:5.)

data to determine the "issue."   (See GX 460; GX 460A; Tr. 289:21-
91:6.)   In October 2014, Matz introduced Lee and Chartier to Isen
for investor relations opportunities.   (Tr. 1783:8-87:14; GX 464.)
While Lee "heard" of Isen, she never met or hired him.   (Tr.
1783:8-87:14.)   Like Matz, Lee also tracked CESX's trading data.
For example, on October 14, 2014, Lee emailed Chartier and Matz,
via a Keith Miller email address, detailing "all the stock that is
accounted for."   (GX 333.)   Lee also created and attached a "NOBO
List,"[26] which had certain names highlighted, like Christopher
Marchitelli (a victim/investor who testified at trial). (GX 333A.)
Chartier and Lee were "responsible" for those highlighted
individuals because they "got [them] to purchase the stock" without
the Boiler Room's involvement.   (Tr. 295:5-97:3.)

Around November 2014, Matz and Chartier negotiated
another deal whereby Chartier transferred 150,000 CESX shares to
the Boiler Room.   (Tr. 305:25-06:7.)   Matz requested, and Chartier
agreed, to split the shares between accounts in the Boiler Room's
name and Matz's father's name. (Tr. 308:17-09:12, 1730:4-24.)   On
December 2, 2014, Lee finalized the paperwork and in one email,
she prepared documents between Lee, as Seller's Rep, and the Boiler
Room, reflecting that the Boiler Room purchased 100,000 shares of

---

[26] Matz explained that a "NOBO List" details the number of shares
owned by each individual shareholder. (Tr. 292:11-17.)   Lee traded
CESX in Type A or Strategic accounts and selected not to have Type
A or Strategic appear on the NOBO List.   (Tr. 1738:23-39:15.)

CESX for $10,000.  (GX 339; GX 339A; GX 339B.)  In another email, she prepared documents between Lee, as Seller's Rep, and Herman Matz, reflecting that Herman Matz purchased 50,000 shares of CESX for $5,000 (GX 340; GX 340A; GX 340B; GX 342A.)  Neither the Boiler Room nor Herman Matz paid for the shares, and the shares were intended for Matz, not his father.  (Tr. 304:9-09:1, 1731:4-32:12.)

With the Boiler Room's help, the Boiler Room and Chartier sold all of their CESX shares.  (Tr. 310:11-16.)  The Boiler Room stopped pushing CESX after Chartier and Lee had no additional stock to transfer.  As a result, CESX "hit a downward spiral and just came crashing down over time."  (Tr. 310:16-19.)  Neither Lee nor Chartier informed CESX's board that they hired Elite or the Boiler Room or that they sold shares of CESX.  (Tr. 1210:11-12:3, 1334:4-21, 1737:20-38:1; but see Tr. 1738:4-12.)  Ultimately, Biston and Tostanoski testified that there were no benefits to taking CESX public.  (Tr. 1208:1-09:7, 1212:22-15:22, 1334:22-36:11.)

H.  Chartier and Lee Help Take NWMH Public By Reverse Merger and Hire the Boiler Room to Push NWMH

Chartier, Lee, and Ms. Cataneo were also responsible for taking NWMH public by reverse merger.  (Tr. 1389:23-91:6, 1739:20-40:3.)  Teelon, NWMH's chairman, paid Chartier in shares of NWMH, approximately a fifteen percent ownership interest.  (Tr. 1391:7-13.)  As with CESX, Chartier requested and received an executive

title and a seat on NWMH's board, primarily to promote NWMH to investors.  (Tr. 1661:4-17, 1391:14-92:9, 1740:22-41:6.)

From approximately January 2015 to April 2016, Chartier and Lee hired the Boiler Room to promote NWMH stock.  (Tr. 1739:16-19, 1743:23-44:2.)  Specifically, in late 2014, Chartier approached Matz regarding a "clean slate" with NWMH, meaning that "there was no stock in the system" and "nobody owned any shares" so the Boiler Room could "control [the NWMH stock price] how [they] wanted and . . . walk it up," and "have free reign[]" over the stock.  (Tr. 312:5-13:22, 1743:16-22.)  With NWMH, Matz negotiated every deal with Chartier the same way he negotiated every CESX deal.  After Chartier and Matz agreed to a "ratio," Lee transferred the shares to Matz, who "relay[ed] the trades to [Lee] for their shares and obviously s[old] [his] own shares."  (Tr. 313:23-14:23, 1744:3-12, 1753:23-54:15.)  By February 2015, Chartier and Matz negotiated the first of many agreements with respect to NWMH.  (Tr. 313:23-14:6; see also GX 951 (chart summarizing the various SPAs between Matz, or an alias, and Lee for NWMH, discussed infra).)  Lee handled the paperwork, and on February 18, 2015, sent Matz, via a Herman Matz email address, the paperwork necessary to deposit those shares, including a SPA reflecting that Herman Matz purchased 50,000 shares of NWMH from Type A for $5,000.  (GX 352; GX 352A; GX 352B.)  Neither Matz nor Herman Matz paid for these shares.  (Tr. 321:4-22.)

Between April 2015 and February 2016, Matz and Chartier negotiated at least eight similar deals, while Lee worked behind the scenes to complete the paperwork necessary to transfer the shares from Type A or Strategic accounts to Boiler Room or Herman Matz accounts.[27]  (GX 366; GX 366A; GX 376; GX 376A; GX 377; GX 377A; GX 382; GX 382A; GX 383; GX 383A; GX 399; GX 399A; GX 400; GX 400A; GX 407; GX 407A; GX 407B; see Tr. 319:8-20:2.)  Matz and Lee both testified that these documents were false: neither the Boiler Room nor Herman Matz paid Type A or Strategic for the NWMH shares as indicated in the various documents.  (Tr. 323:3-25:24, 1744:17-75:3.)  Rather, after the stock was transferred, the Boiler Room "got orders on the phone and [then] dumped those shares" while Lee, Chartier, and Matz matched the sale of their NWMH shares.  (Tr. 325:13-16, 1111:8-12:20; accord JC 58; JC 59; JC 61; JC 62.)  Although Chartier purported to resign from Strategic in April 2016, he continued to access and discuss Strategic's bank accounts and operations.  (GX 374B; JC 250; Tr. 1741:7-43:3, 2009:7-22.)  Indeed, the proceeds Chartier and Lee generated from the sale of NWMH shares were deposited into Strategic or Type A bank accounts and used to pay NWMH's expenses and Lee's and Chartier's expenses, including Chartier's debt to the IRS.  (Tr. 1759:18-60:9.)

---

[27] Matz asked to split the shares between accounts in the Boiler Room's name and his father's name.  (Tr. 324:22-25:12.)

Matz and Lee continued to use the Viber messaging application to communicate and relay trade information. (Tr. 335:12-20; see GX 918.) For example, on March 31, 2016, Matz sent Lee a Viber message, stating "2800 @ $.49" (GX 918 at 25), which, as he explained, directed Lee to sell a specific volume of NWMH at a specific price. (Tr. 337:6-21, 340:9-41:3; see also GX 918 at 32-33.) They also discussed Matz's negotiations with Chartier and HECC's price, including that "Chapter 11 [is] coming." (See GX 918 at 25-27, 37-40, 44; Tr. 338:4-39:11, 341:4-22, 343:23-44:25.)

Around mid-November 2015, Matz met with Chartier in New York City where, according to Matz, Chartier agreed to transfer 50,000 restricted shares of NWMH to the Boiler Room in exchange for the Boiler Room's help liquidating a certain number of NWMH shares. (Tr. 331:22-33:17.) As part of this deal, on December 1, 2015, Lee sent Matz, via a Joseph John email address, a consulting agreement between the Boiler Room, signed by Joseph Matz, and NWMH, signed by Chartier, effective December 1, 2015, for 50,000 restricted NWMH shares. (GX 392; GX 392A.) Matz testified that the Boiler Room did not provide any of the services outlined in the agreement; rather, he received shares to get Chartier "out of a certain amount of shares." (Tr. 330:13-31:11, 333:3-17.) To convert the restricted shares into free-trading shares, Matz, Chartier, and Lee submitted paperwork to the brokerage firm

"Alpine," where Lee knew a broker.[28]  (See Tr. 1761:10-64:1; JC 73; GX 405; GX 405E; GX 427; GX 427A; GX 427B; GX 427D; GX 429.)  They switched from Wilson Davis because Wilson Davis stopped accepting NWMH stock certificates and capped the number of shares they could sell in a day.  (Tr. 333:18-34:23, 776:21-77:5, 1761:10-15.)  Thereafter, Chartier, Lee, and Matz used Alpine accounts, Lee's TD Ameritrade Account, and Wilson Davis accounts to "work" around the trade limitations.  (Tr. 334:10-23, 777:6-16, 1746:10-48:14; see GX 635C-4 at 10.)  Lee also provided Matz with her TD Ameritrade account login information so Matz could execute trades.  (Tr. 1748:15-50:7.)  Lee realized that Matz cross (or wash) traded in her account and told Chartier, stressing that "if I ever get in trouble one day, I'll remember this phone conversation."  (Tr. 1750:8-53:22.)

The Boiler Room stopped pushing NWMH by Spring 2016 because Chartier "had no more stock to pay."  Soon after, NWMH's stock price "downwardly spiraled and went penniless." (Tr. 347:24-48:9, 1111:14-21, 1764:2-10.)  To generate funds, Chartier asked Lee to take out a cash loan through Strategic, which proved unsuccessful because they had "no true revenue stream," and sold restricted shares of NWMH in private transactions, including to Carl Arens, a victim/investor who testified at trial.  (Tr.

---

[28] Matz forwarded this email to Isen for Isen's review.  (Tr. 347:10-23; GX 427.)

1765:11-68:23, 1775:3-78:11; see also Tr. 2097-2133 (Arens testimony); GX 430; GX 449.)   Teelon, NWMH's chairman, testified that he did not know Chartier hired the Boiler Room and there was no benefit to taking NWMH public. (Tr. 1392:10-95:11, 1411:8-23.)

I.   Isen Hires the Boiler Room to Push ICE

In January or February 2016, Isen approached Matz regarding ICE, a global website containing pop culture content comparable to BuzzFeed, that would "make up for everything." (Tr. 430:2-31:12; see Tr. 974:20-76:1.)   In February 2016, Matz, Isen, and Jim Cassina ("Cassina"), ICE's chairman and/or president, met at the Boiler Room's offices and discussed ICE, its "Alexa" rankings,[29] the website's value. (Tr. 431:9-33:19; Tr. 111:15-18.)   Cassina also explained that investors in India owned millions of ICE shares, and that those shares were controlled by an attorney named Erwin Sui ("Sui"). (Tr. 433:20-34:9.)   FBI Special Agent Craig Minsky introduced evidence that Sui controlled four accounts that sold shares of ICE through Canadian brokerage houses in March and April 2016: (1) Eternal Viceroy ("Eternal") and (2) Galaxy Dragon ("Galaxy"), with brokerage accounts at Haywood Securities, located in Canada and benefitting Indian citizens; (3) Terama Company Limited ("Terama"), a private holding company incorporated in the Cayman Islands (GX 643C-1), with a brokerage account at PI

---

[29] Alexa rankings track user traffic to websites. (Tr. 433:2-19.)

Financial, located in Canada and benefitting an Italian citizen; and (4) Tendall Capital Limited ("Tendall"), with a brokerage account at Velocity Trading Capital, also located in Canada and benefitting an Italian citizen.  (Tr. 2470:16-83:3, 2691:20-96:9, 2705:12-06:6; GX 614C-1 & 2; GX 633B; GX 633C-1; GX 643C-1; GX 646B; GX 646C-1.)

After negotiations, Matz, Isen, and Cassina agreed to a "50-50 split" whereby the Boiler Room would help Isen and Cassina sell approximately one million of the Indian investors' ICE shares and split the proceeds from those sales with Matz.  (Tr. 434:11-36:25, 440:15-19.)  Matz also agreed to give Isen ten percent of his profits.  (Tr. 440:4-14.)  Matz testified that Isen suggested to reverse engineer invoices to "make it look like [they] were doing consulting and PR services" at hourly rates.  (Tr. 434:16-35:25, 632:2-11; see generally GX 950; GX 950A (chart summarizing the ICE invoices); see also Tr. 1079:13-80:25, 1084:4-24.) Following the first meeting, Isen, Matz, and Sui participated in a conference call and Isen asked Matz to download a messaging application called "Wickr."[30]  (Tr. 436:1-37:11; GX 717C-1; GX 717C-3.)  During this call, they decided that Matz would relay

---

[30] Wickr is an encrypted communications application that does not retain messages.  (Tr. 2707:16-09:2.)  Records reflect that the accounts were created in August 2016.  (GX 717C-1; GX 717C-3.)

trade instructions via Wickr to a group chat with Sui and Isen and that Sui would execute trades.  (Tr. 437:12-18.)

ICE first traded on March 7, 2016.  Prior to the first day of trading, on March 2, 2016, Sui requested that Haywood Securities grant Isen trading authority over certain Eternal and Galaxy accounts, but that request was denied.  (GX 410.)  Phone records also reveal that on March 6, 2016, Sui's and Isen's phone registered four phone contacts and Cassina's and Isen's phone registered one contact that lasted for over an hour.  (GX 891.)  On March 6, 2016, Sui emailed his broker and instructed him to sell shares of ICE at certain prices the following day.  (Isen JJ.)  On March 7, 2016, the first day of trading, the Boiler Room started to "push" ICE to victim/investors (Tr. 205:2), and Matz/the Boiler Room's and Isen's phones registered fifteen contacts, Cassina's and Isen's phones registered twelve contacts, and Sui's and Isen's phones registered two contacts (GX 892).

After three weeks of trading, Matz yelled at Isen because Sui "was terrible" and did not execute trades.  (Tr. 437:23-38:9.)  Thereafter, Matz relayed trade instructions directly to Isen.  (Tr. 438:10-19.)  By May 2016, Matz and Isen agreed "it would be easier" to provide a broker with a "standing order" and, as such, they conferenced every morning to agree upon a price to sell shares of ICE.  (Tr. 604:1-24, 611:10-12.)  For example, on May 18, 2016, Isen emailed Matz that his "internet had crashed, so [he] couldn't

see the 10k bid." (GX 424.) The body of the email included a chat between Robert Cordes,[31] Terama's president, and "Vince Tendall," and discussed a "$1.80 limit." (GX 424; Tr. 603:4-06:1; see also GX 422 (April 12, 2016 email wherein Terama's vice president provided Isen with login information, originally provided by Vincent Pellizzari who is associated with Tendall); Tr. 2692:14-25 (Special Agent Minsky testifying to GX 614C-1, account opening information for Tendall at Velocity Trade Capital, noting Vincent Pellizzari as a listed trader).) Although Matz did not know Cordes or "Vince Tendall," he explained that Isen's email, and the chat, related to a standing order that he and Isen relayed to their brokers. (Tr. 604:1-06:6.) Further, in June 2016, Matz sent Isen trade instructions when Isen asked to FaceTime. (Tr. 446:7-11, 601:18-02:3.) Over FaceTime, Matz watched Isen relay those trade instructions to an individual overseas via an online video platform. (Tr. 602:5-23.)

Both Isen and Matz tracked ICE's trading data and performance to calculate their profits. (Tr. 438:20-40:14; GX 419.) On May 2, 2016, Isen sent Matz an excel spreadsheet that included the number of ICE shares that the Boiler Room sold to victim/investors, including the amount generated between March 7, 2016 and April 29, 2016. (GX 423; GX 423A; Tr. 441:18-44:11,

---

[31] Between April 7, 2016 and November 10, 2016, Isen's phone registered fifteen contacts with Cordes's phone. (GX 881.)

2712:19-13:17.)   A large portion of the proceeds from the sale of ICE shares from Eternal, Galaxy, Terama, and Tendall accounts were transferred to Isen and/or the Boiler Room.   (Tr. 2495:25-2504:4, 2690:15-2706:6; GX 521C-4; GX 614C-2; GX 504C-2.)   For example, in March 2016, Galaxy's and Eternal's brokerage accounts reflected income generated by trading shares of ICE.   (GX 646C-1 at 249 through 251; GX 633C-1 at 296 through 298.)   On March 15, 2016: (1) Matz sent Isen an invoice for $76,500 from the Boiler Room to MarketByte, for 425 hours of purported "Consulting" at $180 an hour (GX 950 at 1-2); (2) Isen sent Matz an invoice for $126,000 from Joseph Matz to MarketByte for 700 hours of purported "Consulting Services" at $180 an hour (GX 417; GX 417A); and (3) Sui transferred $111,000 from Galaxy's brokerage account and $160,000 from Eternal's brokerage account to his account at the Royal Bank of Canada (GX 415; GX 415A; GX 646C-1 at 250; GX 633C-1 at 297; Tr. 2495:13-98:7).   On March 16, 2016, MarketByte's bank account received two wire transfers from Sui's Royal Bank of Canada account for:  (1) $114,980, with the note "Invoice No. 293, Eternal Viceroy"; and (2) $109,980, with the note "Invoice No. 292, Galaxy Dragon."   (GX 521C-4 at 116-17.)   On March 17, 2016, MarketByte wired $76,500 to the Boiler Room and $126,000 to Joseph Matz.   (GX 521C-4 at 118-19; see GX 830-6.)   Similarly, between March 31, 2016 and June 20, 2016, Tendall transferred the proceeds generated from trading shares of ICE to a Terama account at a Cayman Islands

46

bank.  (GX 504C-2.)  On June 14, 2016, the Boiler Room sent Isen an invoice for $67,500 for 225 hours of purported "Consulting" at $300 an hour.  (GX 950 at 29-30.)  On June 14, 2016, MarketByte received a $237,000 wire transfer from Terama's Cayman Island bank account and, in turn, wired $67,500 to the Boiler Room.  (GX 521C-4 at 163-64.)

Throughout the ICE scheme, Matz sent Isen many additional invoices for "consulting services" on behalf of the Boiler Room or other aliases.[32]  (See generally GX 950; GX 950A.) While all of the invoices were for purported "consulting" services, Matz did not provide consulting services; rather, Matz sent reverse engineered invoices for an amount equal to half of the proceeds generated from the sale of ICE shares based on Matz's trade instructions.  (Tr. 632:2-37:4.)

In mid-June 2016, the investors in India sought to change the profit sharing split from a 50-50 split to a 40-60 split.  (Tr. 613:15-18, 616:9-17; GX 428.)  Matz was not "going to have it" (Tr. 616:12), and Isen proposed solution:

> E - I'm so sick of this shit. I want this
> finalized and over with. . . .
>          ***
> Last week you beat the boys up pretty good. I
> really thought the project would come to an
> end. They were really adamant about 40/60- but
> I pounded them on 45/55 and told them if they

---

[32] Matz used names such as Joseph Matz, Herman Matz, Big Little Consulting, a corporation Matz operated under his brother's name, in addition to other companies owned by Hardy.  (Tr. 635:10-37:4.)

put all the nonsense and whining behind them, this project could really move forward. I kept telling them it was impossible to quantify all this intangible shit, and they kept coming back with they are short $700k- fuzzy math.

\*\*\*

The way it works- I work something out with our boy [Cassina], and he really does have to talk to people in India -- . . . . Then he explains what he wants to do and gets the go ahead. . . .

They agreed to everything you asked for, 45/55 from here, 50/50 last week, 50/50 over 2.50.

. . . Based on the numbers, the amount I paid last week was supposed to be reduced another $70k to get to the agreed upon 25%. Your proposal was forfeit the week of the 30th, which was a short week with Memorial day, 50/50 for last week, 45/55 moving forward. . . .

I've ground them down to a rebate of $50k, and I'm asking you on a personal basis to consider this . . .

\*\*\*

. . . There's no worry about this outcome, because they realize you are holding all the cards, and they want you happy . . .

Except for this side bickering, this has been really smooth. You don't need to do any filing or paperwork for transfers -- nothing but work and generate invoices weekly. They have been very good about moving the capital . . .

They are grinding me as well to make some concessions, . . . . I got zero when everyone else got paid last time.

\*\*\*

Luv ya man,
Larry Isen

48

(GX 428[33].)  Matz responded:

> I don't have time to deal with this every week.
> . . . It was a Klean [sic] slate and it took
> me a lot to not walk away as a favor to you.
> I have plenty of other work and will terminate
> this project w a 2 week notice if Full Amount
> is not received and it will end badly. . . .
> They can go find someone else who can raise
> $3millilon a month but you and I know it
> doesn't Exist!!! . . . . I have others begging
> me w a much better ratio I am getting right
> now and there will Be Zero Issues. . . .

(GX 428.)  Matz agreed to deduct $50,000 (Tr. 622:5-12) and subsequent payments to the Boiler Room followed the percentages outlined in the email (Tr. 2716:16-21).

At some point after June 2016, Matz stopped pushing ICE. (Tr. 623:10-12.)  In September 2016, Isen and Cassina met Matz at the Boiler Room's offices to reengage Matz's services.  (Tr. 622:23-23:23; GX 455; GX 925)  Isen continued to track ICE's progress and emailed Cassina a spreadsheet reflecting that they generated $7,809,256.70 by selling shares of ICE between March 7, 2016 and September 16, 2016.  (GX 439; GX 439A.)  The spreadsheet also calculated the profits and amount due to the Boiler Room, Galaxy, Eternal, and other associated accounts.  (GX 439; GX 439A; Tr. 2719:2-22:7.)  By March 2017, Matz stopped pushing ICE after learning that ICE reclaimed 15 to 20 million shares after reports

---

[33] Special Agent Minsky testified that this email did not appear in the search warrant production for Isen's emails.  (Tr. 2716:25-17:23.)

that the Alexa rankings were fabricated.  (Tr. 149:21-50:1, 430:2-16, 625:3-27:15, 1071:25-74:3.)

J.   The Trading Data[34]

In addition to her testimony regarding market manipulation (e.g., supra, Note 6), Ms. Oremland testified that Chartier and Isen were registered brokers with FINRA.  Chartier held Series 7, 63, 24, and 31 licenses and Isen held Series 7, 63, and 24 licenses.  (Tr. 2197:11-2201:19; GX 910; GX 912.)  However, Isen was barred from the industry in the 1990s for securities fraud.  (Tr. 2201:20-02:2; GX 912.)

She also reviewed phone records and trading data for CESX, HECC, ICE, and NWMH and prepared many summary charts.[35]  (Tr.

---

[34] The Court discusses the charts and testimony necessary to resolve the pending motions.  Ms. Oremland also prepared charts summarizing the phone and trading data for CESX and NWMH.  (GX 801 through 805; GX 807 through 810; GX 822-1 through 3, 5, 6, & 8; GX 823-6 & 7; GX 825-1; GX 826; GX 818 & 819 (additional HECC charts).)  The Government also called Christopher Petrellese, a forensic accountant for the FBI, who prepared charts and spreadsheets based on his review of various bank records and brokerage accounts.  (Tr. 2567-2689; GX 834 to 836 & 836-1; GX 837 through 847; GX 853 through 855; GX 830-1 through -6; GX 888-1 & 2; GX 861, 867-1 & 2, 869 through 871; GX 868-1 & 2.)

[35] The trading data included blue sheet data, excel spreadsheets and documents from brokerage firms, and Bloomberg data.  (Tr. 2204:11-05:5; GX 901 through 906).  Blue sheet data, available to regulators, contains "trading data for a stock for a set time" with "detailed information about the trades such as which customer accounts were trading," and trade date, price, time, and volume.  (Tr. 2205:6-21.)  For international trades, the data shows only the brokerage firms that sold shares and does not include customer information.  (Tr. 2205:22-06:10.)  Bloomberg data is a widely

2203:18-2456:23.)  As for HECC, two charts summarized the trading data from (1) July 1, 2014 through April 29, 2016, reflecting that HECC traded at over $5 per share in August 2014 (GX 824-2; Tr. 2237:23-38:7);  and  (2) October  29, 2015  to  April 15, 2016, reflecting a rise in price and volume around November 2015 and a decrease to $0 by April 2016 (GX 815; Tr. 2238:8-16).  Other charts analyzed HECC phone records and trading data to compare Isen's and Watts's  sales  of  HECC  shares  with  the  Boiler  Room's  and/or victim/investors' purchases of HECC shares.  As for Isen, one chart illustrated that he profited $12,425 from the sale of HECC shares through the following pattern:  first, Isen and the Boiler Room exchanged calls; second, Isen called a brokerage firm; third, a Boiler Room account or a victim/investor purchased a certain number of HECC shares; and fourth, MarketByte, Isen's company, sold shares of HECC close in price, time, and volume to the Boiler Room's or a victim/investor's purchase of HECC shares.  (GX 824-1; Tr. 2238:17-41:21.)  As for Watts, charts illustrated the same pattern and reflected that Watts sold shares of HECC close in price, time, and volume to the Boiler Room's or victim/investors' purchase of HECC.  (Tr. 2243:13-49:5, 2436:15-37:19; GX 811; GX 812; GX 814; GX 813-1 through 6.)  Another chart listed the amount that Gleckman profited  from  selling  shares  of  HECC  on  August  6,  2015

---

used "subscription service," which contains "historical trading information," such as price and volume data.  (Tr. 2206:11-16.)

($61,130.43); August 24, 2015 ($65,583.46); August 26 through September 4, 2015 ($81,212.06); September 21 through 28, 2015 ($75,616.88); and September 30 through October 12, 2015 ($69,484.00). (GX 817; Tr. 2249:9-14.)

As for ICE, Ms. Oremland prepared a chart summarizing the trading data from January 5, 2016 to December 30, 2016. (GX 823-5.) This chart reflected a rise in ICE's stock price and volume in March 2016 from $0.50 to $1.50 a share. (GX 823-5; GX 825-3; Tr. 2250:6-51:11.) Other charts reviewed ICE trading data between March 7, 2016 and March 15, 2016 and in April 2016, and compared victim/investors' accounts against select accounts trading shares of ICE, including Eternal, Galaxy, Terama, Tendall, and Herman Matz accounts. (GX 827; GX 823-3.) These charts demonstrated that the selected accounts sold shares of ICE around the same price, time, and volume as the victim/investors purchased shares of ICE. (E.g., Tr. 2253:1-55:5; GX 823-2; GX 823-4.)

K.   Matz's Background

Matz also testified to his extensive criminal history, including that he pled guilty to: a 2001 arrest for driving under the influence; a 2002 charge for resisting arrest; a 2005 charge for assault; a 2008 charge for conspiracy to commit a felony; a 2010 criminal contempt charge; and, a 2010 charge for possession of cocaine. (Tr. 639:10-40:7, 684:23-87:9.) He also testified that he participated in insurance fraud and that he no longer

52

carried an unregistered handgun because he "had a temper." (Tr. 644:1-18, 657:21-59:18, 661:2-62:17, 952:3-10.) Matz further testified that he: sold both marijuana and pain killers and was previously addicted to pain killers (Tr. 640:8-42:13); engaged in illegal gambling and the collection of illegal gambling debts (Tr. 642:17-43:4, 665:23-75:20, 950:2-52:2); operated a business with Hardy that promoted prostitution and did not report those profits to the IRS (Tr. 643:5-25, 687:10-92:9); received a general discharge from the Air Force because, among other reasons, he gave someone a "good beating" (Tr. 676:8-77:1); and moved property to a trust in his father's name (Tr. 726:7-27:7).

L.  <u>The Defense</u>

Neither Chartier nor Isen testified at trial. However, they elicited testimony that they served as legitimate investor relations professionals and consultants. Chartier recalled Lee and Matz as defense witnesses and sought testimony to suggest that Lee and Matz participated in the CESX and NWMH schemes without Chartier's knowledge. Chartier also elicited testimony that Biston and Teelon were shrewd businessmen and that Chartier was not the driving force behind the decision to take CESX and NWMH public.

Isen established that he recommended and enlisted attorneys to review various agreements, presentations, and/or disclaimers, none of which Matz believed to contain false

information.  (See, e.g., Isen B; Isen D & D1; Isen I; Tr. 962:25-65:23, 969:22-24, 976:22-77:9, 979:5-86:19.)  He further elicited testimony that Isen and Watts believed that HECC was a sound investment because HECC secured financing, the price of oil would rebound, and a project in Africa and seismic readings "looked good."  (Tr. 418:3-14; see Tr. 1067:13-71:7; see also Isen P; Isen Q.)  He also argued that it is common to engage investor relation firms to generate market interest and drew testimony that over-the-counter investments are inherently risky and that outside influences caused HECC's and ICE's decline, including "shorting," the price of oil, and a loss of capital.

Isen called Dr. Ronald Filante to testify as a defense expert in securities trading and the economics of companies that trade in the marketplace.  (Tr. 3104:12-91:18.)  Similar to Ms. Oremland's testimony, Dr. Filante explained that matched trading refers to "a situation in which the buyer and seller coordinate their activities," and is possible if an individual "knew who was going to be on the other side of a trade."  (Tr. 3169:1-70:20.)  However, Dr. Filante opined that "the opportunity" to manipulate a stock by way of matched trading in today's market is "much reduced" because all trades are facilitated through "market makers," and therefore, traded shares are "mixed with all the other orders and who ends up on the other side of the trade is unpredictable."  (Tr. 3165:3-70:6.)  Dr. Filante reviewed the data

and opined that "other" market participants rendered matched
trading "impossible" and that there was no manipulation in HECC or
ICE stock.  (Tr. 3170:15-71:2, 3191:15-18.)

DISCUSSION

I.   <u>Legal Standards</u>

     A.   <u>Rule 29 Motion for a Judgment of Acquittal</u>

          Pursuant to Federal Rule of Criminal Procedure Rule
29(a), a district court shall enter a judgment of acquittal as to
"any offense for which the evidence is insufficient to sustain a
conviction."  Rule 29(c) permits a defendant to "move for a
judgment of acquittal, or renew such a motion, within 14 days after
a guilty verdict or after the court discharges the jury, whichever
is later."  "Under Rule 29, the standard is whether, after viewing
the evidence in the light most favorable to the prosecution, <u>any</u>
rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt."  <u>United States v. Kenner</u>,
No. 13-CR-0607, 2019 WL 6498699, at *3 (E.D.N.Y. Dec. 3, 2019)
("<u>Kenner I</u>") (emphasis in original; internal quotation marks and
citations omitted).  "[V]iewing the evidence in the light most
favorable to the government means drawing all inferences in the
government's favor and deferring to the jury's assessments of the
witnesses' credibility."  <u>Id.</u> (internal quotation marks and
citation omitted).  Further, "when evaluating the evidence under
this standard, 'courts must be careful to avoid usurping the role

55

of the jury when confronted with a motion for acquittal.'"   Id.
(quoting United States v. Jackson, 335 F.3d 170, 180 (2d Cir.
2003), and collecting cases).

    B.   Rule 33 Motion for a New Trial

        Federal Rule of Criminal Procedure 33(a) states, in
relevant part, that "[u]pon the defendant's motion, the court may
vacate any judgment and grant a new trial if the interest of
justice so requires."   "Because motions for a new trial are
disfavored in this Circuit the standard for granting such a motion
is strict."   United States v. Gambino, 59 F.3d 353, 364 (2d Cir.
1995).   A court may, in its discretion, grant a Rule 33 motion
only in "extraordinary circumstances," United States v. McCourty,
562 F.3d 458, 475 (2d Cir. 2009) (quotation marks and citation
omitted), and only if there exists "a real concern that an innocent
person may have been convicted," United States v. Parkes, 497
F.3d 220, 232 (2d Cir. 2007) (quoting United States v. Ferguson,
246 F.3d 129, 134 (2d Cir. 2001)).   "The ultimate test" is whether
"letting a guilty verdict stand would be a manifest injustice."
Ferguson, 246 F.3d at 134.   When deciding such a motion, the Court
"must examine the entire case, take into account all facts and
circumstances, and make an objective evaluation."   Id.

II.  <u>Analysis</u>

   A.  <u>Chartier's Motion</u>

      Chartier moves for a judgment of acquittal or a new
trial, pursuant to Rules 29 and 33, arguing that (1) the Government
denied him the right to present a defense when it intimidated
Ms. Cataneo into invoking the Fifth Amendment privilege against
self-incrimination, and the Court erred when it "refused to grant
immunity"; (2) the Government violated its <u>Brady/Giglio</u>
obligations; (3) the Government improperly cross-examined Lee; and
(4) the evidence was insufficient to establish his <u>mens rea</u>.
Chartier also moves to dismiss Count 16 of the Superseding
Indictment -- Attempted Obstruction of an Official Proceeding in
violation of 18 U.S.C. § 1512(c)(2) -- pursuant to (1) Federal
Rule of Criminal Procedure 12(b)(2) for lack of jurisdiction; or,
in the alternative, (2) Rule 29 for failure to prove a nexus
between Chartier's actions and an official proceeding.  The motion
is granted insofar as Chartier is entitled to a judgment of
acquittal on Count 16.  The motion is otherwise denied.

      1.  <u>The Sixth Amendment Due Process Right to Present a</u>
          <u>Defense and Compelled Immunity</u>

      Chartier argues that a judgment of acquittal or a new
trial is warranted because the Government violated his Sixth
Amendment right to present a defense when it intimidated
Ms. Cataneo, who allegedly would have offered material and

exculpatory testimony, into invoking the Fifth Amendment privilege. (Chartier Br. at 2-32.) He also argues that the Court should have granted Ms. Cataneo immunity. (Id. at 34-36.) The Government responds that Ms. Cataneo would not have offered "material and exculpatory" testimony, "no unfairness resulted," and it was not inappropriate for the Court to grant immunity. (Gov't Opp. at 34-42.) Chartier's arguments are without merit.[36]

a. The Government Did Not Violate Chartier's Sixth Amendment Right to Present a Defense

According to Chartier, notwithstanding knowledge that Ms. Cataneo was a "significant and important" player (Chartier Br. at 3-11), the Government intimidated Ms. Cataneo into invoking the Fifth Amendment privilege because: (1) on March 4, 2020, shortly after he confirmed his intent to call Ms. Cataneo as a defense witness, an FBI agent contacted her "for the first time" (id. at 17); and (2) on March 9, 2020, an Assistant United States Attorney ("AUSA") prosecuting this case spoke to Michael Bachner,

---

[36] Chartier has not requested a ruling on whether Ms. Cataneo properly invoked the Fifth Amendment. The Court declines to do so at this juncture. To the extent asserted, the Court rejects the argument that Ms. Cataneo improperly asserted the Fifth Amendment privilege because she claimed innocence. United States v. Avenatti, No. 19-CR-0373, 2020 WL 418453, at *11 (S.D.N.Y. Jan. 26, 2020) (the defense witness's "claim of innocence does not undermine his assertion of his Fifth Amendment privilege."); id. at *7-8 (describing the circumstances in which a witness claiming innocence may assert a Fifth Amendment privilege). Accordingly, the Court's inquiry is limited to whether the Government violated Chartier's right to present a defense.

Ms. Cataneo's counsel, and stated there was "some testimony that puts [Ms. Cataneo] in positions" and she "should be advised of the nature of that testimony" (id. at 18 (citing Tr. 3079)).

"The Sixth Amendment guarantees criminal defendants the right to present a defense, which includes a right to call witnesses." Rigas v. United States, No. 02-CR-1236, 2020 WL 2521530, at *22 (S.D.N.Y. May 15, 2020) (citing United States v. Williams, 205 F.3d 23, 29 (2d Cir. 2000)), aff'd, 848 F. App'x 464 (2d Cir. 2021). However, "judicial or prosecutorial intimidation that dissuades a potential defense witness from testifying for the defense can, under certain circumstances, violate the defendant's right to present a defense." Williams, 205 F.3d at 29. "To demonstrate a due process violation based on the government's intimidation of witnesses, the defendant must show three elements: (1) 'that he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means,' (2) 'bad faith on the part of the government,' and (3) that 'the absence of fundamental fairness infected the trial.'" United States v. Lebedev, 932 F.3d 40, 55 (2d Cir. 2019) (quoting id.).

Chartier's due process claim fails because he has not established that Ms. Cataneo "was unable to testify because of government 'intimidation,' thus depriving him of material and exculpatory evidence." Id. Indeed, Chartier's speculation that Ms. Cataneo was intimidated into invoking her Fifth Amendment

privilege is contradicted by the record.  Throughout trial, defense counsel advised the Court that he was in communication with Ms. Cataneo regarding potential testimony.  (See Tr. 3075:9-11; see also Tr. 49:21-53:5, 1187:9-19, 1944:9-13.)  The Government never identified Ms. Cataneo as a prosecution witness and, on March 3, 2020, ten days into the Government's case-in-chief, Chartier confirmed Ms. Cataneo as a defense witness. (Tr. 2087:5-17.)  The Government objected, raising concerns regarding the attorney-client privilege (e.g., Tr. 2527:18-28:15).  Shortly thereafter, an FBI agent briefly contacted Ms. Cataneo regarding "this particular matter" (Tr. 3075:11-19), and she engaged Mr. Bachner. On March 6, 2020, the Court directed defense counsel to "get in touch and make sure Ms. Cataneo is here and then the Court will [ ] advise her if she wants an attorney, to represent herself[.]"[37] (Tr. 2844:14-24.)

On March 10, 2020, outside the presence of the jury, the defense alleged that the Government intimidated Ms. Cataneo and the Court heard argument and offers of proof from the parties. Mr. Bachner and Ms. Cataneo also appeared and participated in a

---

[37] On March 5, 2020, the Court held an ex parte hearing with the Government.  During trial, the Court denied Chartier's request to release the minutes from the ex parte proceeding.  (Tr. 2845:3-13.)  Chartier renews this request. (Chartier Br. at 33-34.)  The request is denied because the Court does not rely on the ex parte proceeding in reaching its conclusion that the Government did not interfere with the right to present a defense, discussed infra.

colloquy with the Court. (Tr. 3073:5-80:14.) Mr. Bachner represented that he had "extensive conversations with [defense counsel] about areas" of anticipated testimony and, having reviewed the transcript, had concerns "[g]iven the nature of the testimony." (Tr. 3078:4-79:1.) Mr. Bachner informed the Court that he contacted the AUSA "yesterday," and the AUSA returned his call and relayed, "in a rather perfunctory way[, that] . . . there was some testimony that puts [Ms. Cataneo] in positions. We just thought, and the Court thought, that she should be advised of the nature of that testimony so you can make an evaluation as to whether or not your client should be asserting a privilege . . . and whatever you decide you essentially decide." (Tr. 3079:1-8.) Mr. Bachner and Ms. Cataneo "thought about it" and, in his "professional opinion, even though . . . [Ms. Cataneo is innocent], [she] should be protected by the Fifth" Amendment. (Tr. 3079:9-80:8.) Mr. Bachner clarified that the AUSA was "very matter of fact" and did not convey an intention to "bring charges or arrest" Ms. Cataneo. (Tr. 3079:17-80:3.)

Thus, Mr. Bachner's representations persuade the Court that Ms. Cataneo's decision to invoke the Fifth Amendment privilege against self-incrimination was a strategic choice between Ms. Cataneo and her counsel, and not the result of prosecutorial intimidation. United States v. Polanco, 510 F. App'x 10, 12 (2d Cir. 2013) (finding the district court did not abuse

its discretion in denying a Rule 33 motion based upon claims of prosecutorial misconduct where, among other reasons, there was "no indication that the government threatened the witness" and the witness had an "opportunity to consult with his own appointed counsel"). Further, Chartier's hyperbole regarding the AUSA's "unequivocal message" –– "testify and face the possibility of prosecution, or invoke" the Fifth Amendment and "avoid arrest and possible imprisonment" (Chartier Reply at 7) –– is belied by Mr. Bachner's explicit representation that the AUSA did not articulate an "intention" to "bring charges or arrest" Ms. Cataneo. (Tr. 3079:17-80:3.)

Moreover, the Government's decision to contact Ms. Cataneo mid-trial, shortly after Chartier identified her as a defense witness, does not constitute prosecutorial intimidation or bad faith. See, e.g., United States v. Ortiz, 367 F. Supp. 2d 536, 547 (S.D.N.Y. 2005) (finding the "timing of [the Government's] subpoena [to a defense witness] does not establish that [the Government's] decision to issue it was in bad faith."); (see Chartier Br. at 23-32; Chartier Reply at 3-4.) Furthermore, Mr. Bachner initiated the conversation with the AUSA (Tr. 3079:1-2), and to the extent the AUSA's comments can be construed as informing him "of the potential for criminal liability," those comments serve "to 'dispel[ ] the clouds of suspicion that the government agents intended to intimidate [the potential defense

witness].'"   Ortiz, 367 F. Supp. 2d at 547 (alterations in
original) (quoting Williams, 205 F.3d at 32).  Finally, "there is
no evidence that the government's concern about [Ms. Cataneo's]
potential criminal exposure," if any, "was designed to prevent
[Chartier] from calling witnesses in his defense."  Lebedev, 932
F.3d at 55.

Thus, Chartier failed to show that the Government
deprived him of material and exculpatory evidence in bad faith.[38]
As such, the Government did not deprive Chartier of his right to
present a defense.  United States v. Bin Laden, 116 F. Supp. 2d
489, 495 (S.D.N.Y. 2000) ("suspicions [of bad faith], without more,
cannot carry the day"); Ortiz, 367 F. Supp. 2d at 547.

> b. The Court Did Not Err By Not *Sua Sponte*
>    Compelling the Government to Grant Immunity

Chartier also argues that "based on the evidence
presented during the defendant's proffer of Government
intimidation, the Court should have granted Ms. Cataneo immunity."
(Chartier Br. at 34.)  At the outset, this argument is a non-
starter because "[n]o court has authority to immunize a witness.
That responsibility . . . is peculiarly an executive one, and only
the Attorney General or a designated officer of the Department of
Justice has authority to grant use immunity."  Pillsbury Co. v.

---

[38] Because the Court finds that Chartier cannot show bad faith, it
is unnecessary to address the remaining factors.

Conboy, 459 U.S. 248, 261 (1983); Avenatti, 2020 WL 418453, at
*12-13 (discussing 18 U.S.C. § 6003, which authorizes a court to
order testimony from a witness over claims of self-incrimination,
inter alia).   Moreover, while Chartier made an offer of proof
regarding Ms. Cataneo's anticipated testimony, he never requested
an order compelling the Government to grant immunity to
Ms. Cataneo, notwithstanding the Court's comments and the
Government's arguments regarding immunity.   (See Tr. 3080:9-14,
3091:18-94:9.)   Accordingly, the Court did not err by failing to
sua sponte order the Government to grant immunity to Ms. Cataneo,
especially where that request was never before the Court.

The request for compelled immunity fails even if it were
properly before the Court.   "The government is under no general
obligation to grant use immunity to witnesses the defense
designates as potentially helpful to its cause but who will invoke
the Fifth Amendment if not immunized."   United States v. Ebbers,
458 F.3d 110, 118 (2d Cir. 2006).   "Nevertheless, 'under
"extraordinary circumstances," due process may require that the
government confer use immunity on a witness for the defendant.'"
United States v. Stewart, 907 F.3d 677, 685 (2d Cir. 2018) (quoting
United States v. Praetorius, 622 F.2d 1054, 1064 (2d Cir. 1979)).
To request such relief:

> First, the defendant must show that the
> government has used immunity in a
> discriminatory way, has forced a potential

> witness to invoke the Fifth Amendment through
> overreaching, or has deliberately denied
> immunity for the purpose of withholding
> exculpatory evidence and gaining tactical
> advantage through such manipulation. . . .
> Second, the defendant must show that the
> evidence to be given by an immunized witness
> will be material, exculpatory and not
> cumulative and is not obtainable from any
> other source.

Id. (alterations in original) (quoting Ebbers, 458 F.3d at 119).

Chartier's request for an order compelling immunity fails for many reasons. At a minimum, he cannot satisfy the first factor because "[t]he government did not offer immunity to any potential witness, so it could not have engaged in discriminatory use of immunity to gain a tactical advantage." United States v. Tavarez, 648 F. App'x 16, 19 (2d Cir. 2016) (summary order). Further, and for the same reasons articulated above, the timeline developed at trial dispels Chartier's accusations of prosecutorial "overreach." Importantly, Mr. Bachner represented that he and Ms. Cataneo "came to the conclusion that the smarter route to go, unless the client was immunized, was to assert the privilege." (Tr. 3079:9-11.) As such, Ms. Cataneo's decision to invoke the Fifth Amendment was not the result of prosecutorial "overreach." Tavarez, 648 F. App'x at 19; United States v. Bello, No. 12-CR-0084, 2013 WL 11330643, at *1 (D. Conn. Aug. 6, 2013) (finding claims of government overreach and intimidation unsupported because, among other reasons, "[c]ounsel for the government

65

communicated with counsel for [the witness], not with [the witness] herself" and the witness "was never told that [she] would be prosecuted if she testified"), aff'd sub nom. United States v. Platt, 608 F. App'x 22 (2d Cir. 2015).

Moreover, the Court is not persuaded that Ms. Cataneo would provide material and exculpatory testimony if immunized. Chartier proffers that Ms. Cataneo would "exonerate" Chartier and "directly contradict[]" Lee and Matz by denying: (1) she proposed that Lee should purchase free-trading CESX shares to keep Chartier at an "arm's-length" from the company (Chartier Br. at 15); (2) knowledge that Lee backdated the re-assignment of Seller's Rep responsibilities from McKnight to Lee (id. at 15-16); (3) Matz was at the meeting with Ms. Cataneo, Chartier, and Vassallo at Elite's offices, or that they discussed a "2:1 ratio" (id. at 9); and (4) Chartier was at the Rothman's Steakhouse Dinner or that she discussed a "one-to-one ratio" (id. at 10-11, 16).

While this proposed testimony would be "beneficial" (Tr. 3093:4), it does not absolve Chartier from his involvement with Lee and the CESX scheme, including documentary evidence linking Chartier to communications and meetings with the CESX board members, Matz, Vassallo, Lee, Elite, and the Boiler Room. (See, e.g., JC 294 (Ms. Cataneo emailing Chartier and Lee, writing "I used your name, Stephanie, rather than [Strategic's] name. If you prefer to use the name of another entity that Jeff is not a part

66

of, that is fine as well" (emphasis added).) Nor does it exonerate Chartier in any way from his involvement with Lee and the NWMH scheme. Moreover, Ms. Cataneo's testimony would not be "materially helpful" to prove Chartier's absence from the Rothman's Steakhouse Dinner because Chartier conceded in summation that he "was there[.]" Ebbers, 458 F.3d at 122; (Tr. 3365:7-66:4; see also Tr. 3087:13-24 (defense counsel proffering that Ms. Cataneo "would not be able to say one way or another" whether Chartier attended the Rothman's Steakhouse Dinner (emphasis added)).) At best, the proposed testimony would have contradicted Lee's and Matz's testimony and Chartier offers "no reason why [Ms. Cataneo's] testimony would have been more credible[.]" United States v. Figueroa, No. 92-CR-0019, 1995 WL 354893, at *4 (S.D.N.Y. June 13, 1995). In any event, Ms. Cataneo's testimony "would have been highly self-serving and of dubious credibility." Ebbers, 458 F.3d at 121.

The Court also concludes that Ms. Cataneo was not the sole source of this evidence. Chartier was free to question and/or recall (as he did with Lee and Matz) other individuals, including: (1) anyone in attendance at the August 2013 meeting regarding the transfer of free-trading CESX shares to Lee; (2) Terry McKnight, regarding the transfer of Seller's Rep responsibilities; and (3) Anthony Vassallo, regarding the second meeting at Elite's offices and the Rothman's Steakhouse Dinner. That defense counsel

did not contact Vassallo due to a mistaken belief that Vassallo "may have signed a cooperation [agreement] with the Government" reflects both a strategic choice by counsel and another witness as an available source of evidence.  (See Chartier Br. at 25 n.7.)

For all of these reasons, the Court denies Chartier's motion for a judgment of acquittal or a new trial on the grounds that (1) Government overreach and/or intimidation forced Ms. Cataneo to invoke the Fifth Amendment privilege; or (2) the Court erred in failing to sua sponte compel the Government to grant immunity to Ms. Cataneo.  The alternative request for an order directing the Government to grant immunity to Ms. Cataneo is likewise denied.[39]

### 2.   There Was No *Brady/Giglio* Violation

Chartier next argues that he is entitled to a judgment of acquittal or a new trial because the Government failed to turn over recordings of Lee's prison video and phone calls (together, the "Prison Calls"), allegedly containing "significant impeachment evidence," in time for their "effective use" at trial in violation of Brady v. Maryland, 373 U.S 83 (1963) and Giglio v. United

---

[39] At trial, Chartier's counsel did not ask "for a full blown hearing" and agreed to "accept the representations of both the Government and [Mr. Bachner] if the Court" entertained "a brief factual basis about the contact the Government had both with the witness and" Mr. Bachner.  (Tr. 3074:15-22.)  The Court did just that and, as stated above, heard offers of proof from all parties.  (Tr. 3074:5-96:17.)   The request for additional hearings or disclosures is thus denied.  (See Chartier Br. at 33-34.)

States, 405 U.S. 150 (1972).   (Chartier Br. at 37-47.)   As explained below, the Court agrees with the Government that "Chartier made prominent use of these recordings at trial" and thus, there was no Brady/Giglio violation.   (Gov't Opp. at 42-45.)

       a.   Background Relevant to the *Brady/Giglio* Claim

On August 6, 2019, the Court (1) granted Watts's severance motion so he could proceed to trial in October 2019; and (2) granted Isen's, Chartier's, and Lee's adjournment requests and scheduled their trial to begin on January 23, 2020.   (ECF No. 466.) As relevant here, on December 23, 2019, Defendants requested to adjourn trial to late February or early March 2020, due to the "arduous task of reviewing" the Government's exhibits and 18 U.S.C. § 3500 material.   (ECF No. 627.)   The Court granted the request and scheduled jury selection and trial to begin on February 3, 2020.   (ECF No. 632.)   On January 23, 2020, Defendants requested another two-week adjournment, noting their inability to proceed on February 3, 2020 because reviewing the Government's charts and exhibits was "a herculean task."   (ECF Nos. 660 & 663.)   On January 23, 2020, the Court scheduled jury selection to begin on February 3, 2020, and trial to begin on February 10, 2020.   (ECF No. 667.)

According to Chartier, at that time, Lee and Chartier were "preparing for trial under the terms of an oral joint defense agreement," with Lee's counsel leading the review of emails and documents because "Lee maintained the[ir] personal and business

records," including records relevant to Matz, Vassallo, NWMH, and CESX. (Chartier Br. at 40-41.)  However, on January 24, 2020, Lee pled guilty (ECF No. 674) and Chartier requested that the Government turn over the contents of Lee's computer, including emails. (see Ex. 18, ECF No. 887-19, attached to Chartier Mot.) On January 27, 2020, the parties appeared before the undersigned and discussed the production of Lee's emails. (Jan. 27, 2020 Hr'g Excerpts, Ex. 19, ECF No. 887-20, attached to Chartier Mot.)

On January 28, 2020, the Government turned over the Prison Calls in a production containing:  (1) "Lee Jail Call Recordings"; (2) "Lee Jail Visit Recordings"; and (3) "Records for Tendall Capital Markets LTD[.]"  (ECF No. 685.)  Jury selection commenced on February 3, 2020, and trial began on February 10, 2020.  The Government called Lee to testify on February 26, 2020 and Chartier cross-examined Lee on February 26  and 27, 2020, but did not ask her about the Prison Calls.  (Tr. 1789:3-1813:21, 1819:8-1995:15.)  On March 3, 2020, Chartier advised the Court that he intended to recall Lee as a defense witness. (Tr. 2086:22; Chartier Br. at 43.)  Although the Court queried why the defense did not ask questions during cross-examination (Tr. 2298:7-8), the Court granted the request on March 5, 2020 (Tr. 2710:7-11, 2778:9-24), over the Government's objections (e.g., ECF No. 765).

By letter dated March 8, 2020, Chartier disclosed the "affirmative evidence" he intended to introduce:  four "video clips

of Stephanie Lee's 2017 [jail] meetings with her father," i.e., portions of the Prison Calls.  (ECF No. 784, at 2, 4-5.)  He also requested metadata evidence unrelated to the Prison Calls, pursuant to Brady/Giglio.  (Id. at 1-4.)  On March 9, 2020, outside the presence of the jury, Chartier reiterated his request to introduce portions of the Prison Calls, arguing that Lee's "demeanor and manner in which [she delivers statements has] a ring of tremendous accuracy and veracity and this jury has the right to see Ms. Lee and the manner in which she presents this information." (Tr. 2849:17-23, 2848:4-52:8.)  The Government objected to the Prison Calls as hearsay and noted that they were available during cross-examination.  (Tr. 2914:20-15:4, 2917:24-18:12, 2852:19-53:21.)  Chartier admitted that he "had the tape" but there was "no necessity for [him] to look into whether or not there was evidence favorable to" Chartier due to the "joint defense effort" with Lee.[40]  (Tr. 2915:17-16:1.)

The Court watched the selected Prison Calls, which were video recordings of conversations between Lee and her father while

---

[40] During the January 27, 2020 conference, the Government informed the Court that Lee's counsel "represented it was not a joint defense agreement."  (Jan. 27, 2020 Hr'g Excerpts at 18:9-11.) Whether Lee and Chartier agreed to a joint defense agreement is not relevant to this motion.

Lee was incarcerated after her arrest.[41]   (Tr. 2859:6-18; see JC 370; JC 373.)  In the Prison Calls, Lee clearly stated, inter alia:

> [Chartier] doesn't even know how to explain anything . . . he can explain the companies left right and back and forwards . . . but what's going on right now, the trading and stuff like that, [Chartier] doesn't know anything about that kind of shit. . . . [T]his is what makes us partners: I do trading, he does that. . . . He won't even know what to [ ] say. . . . They're going to ask him about monies being transferred . . . and he's going to be like "I don't even [ ] know"

(JC 370.)  She also stated:

> I hired this firm to do what they needed to do, to be an IR firm and get the story out, he said he had a database of 7,000 people that . . . always buys penny stocks . . . . [I]t was just like every other firm . . . but he showed results.   Did I ask him how he got those results all the time? No I probably should have . . . . I didn't know they were barred from the business . . . .

(JC 373.)

On March 9, 2020, Lee appeared as a defense witness, and Chartier played the selected Prison Calls.  (Tr. 2917:22-18:14, 2974:10-75:3 (playing JC 370 and JC 373).)

### b.   *Brady/Giglio* Legal Standard

In Brady, "the Supreme Court held that the government has a constitutional duty to timely disclose material, exculpatory

---

[41] During Chartier's oral application, he played two of the selected Prison Calls (JC 370 and JC 373), as compared to the four selected clips he proposed in his March 8 Letter.

evidence to criminal defendants." United States v. Tang Yuk, 885 F.3d 57, 86 (2d Cir. 2018).  "The Court extended that production duty in Giglio, 405 U.S. at 154 . . . to cover evidence that could be used to impeach a government witness." Id.  To prove a Brady or Giglio violation "and obtain a new trial, [the defendant] must show:  '(1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice.'" United States v. Thomas, 981 F. Supp. 2d 229, 238 (S.D.N.Y. 2013) (quoting United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001)).  "The Government's duty of disclosure, and the timing thereof, is assessed retrospectively, by reference to the likely effect that the suppression of particular evidence had on the outcome of the trial." United States v. Douglas, 415 F. Supp. 2d 329, 336 (S.D.N.Y. 2006) (citations omitted), aff'd, 525 F.3d 225 (2d Cir. 2008).  However, "[t]he law requires only that Brady material be disclosed in time for its effective use at trial." Id. at 337 (citing Coppa, 267 F.3d at 142).

c.  *Brady/Giglio* Analysis

As recited in detail above, the Government turned over the Prison Calls 4 days after Lee pled guilty; 6 days before jury selection; 13 days before trial; 29 days before the Government called Lee as a witness; and 41 days before Chartier recalled Lee as a defense witness.  Against this backdrop, there can be no

73

dispute that the Government produced the Prison Calls prior to trial,[42] and Chartier's argument that "the video recording was 'not' available for cross-examination of" Lee is simply without merit.   (Compare Chartier Br. at 45 with Tr. 2915:17-22.) Chartier's Brady/Giglio argument thus turns on whether the Government provided him with the Prison Calls in time for their effective use at trial.  Douglas, 415 F. Supp. 2d at 337-41.  As discussed below, the Court finds that they were.

First, Chartier argues that "[w]ere the evidence timely presented to the defendant before Ms. Lee cooperated, more effective use could have been made of the material." (Chartier Br. at 44 (emphases added).)  "More effective use" is not the relevant inquiry.  Rather, "the constitution requires only that the government disclose such evidence 'in time for its effective use at trial,' . . . and effective use can be made even when evidence is disclosed for the first time during trial." United States v. Singletary, 685 F. App'x 33, 34 (2d Cir. 2017) (emphasis added) (summary order) (citations omitted).

Second, as is readily apparent from the record, the Prison Calls "were disclosed in time for them to be used

_____

[42] To the extent argued, the Court rejects the argument that the Government buried the Prison Calls "within a production of a voluminous, undifferentiated open case file[.]"  Tang Yuk, 885 F.3d at 86 (recognizing that some courts "reasonably suggest[]" that burying exculpatory material "might violate the government's obligations"); (see Gov't Jan. 28, 2020 Ltr., ECF No. 685.)

effectively at trial: the proof of the pudding is that they were in fact used!" Douglas, 415 F. Supp. 2d at 339.  Chartier reviewed the Prison Calls and received permission to play the portions that he selected during his direct case and again in summation.  As such, there was "no 'suppression' of these documents within the meaning of Brady" or Giglio.  Id. at 339-40 (citations omitted); United States v. Ulbricht, No. 14-CR-0068, 2015 WL 13893992, at *6 (S.D.N.Y. Apr. 27, 2015) (no Brady violation where "the defense displayed great familiarity with the [Brady] Materials and used them repeatedly during cross examination" (citation omitted)), aff'd, 858 F.3d 71 (2d Cir. 2017); United States v. Rittweger, 524 F.3d 171, 182-83 (2d Cir. 2008) (same).

Third, the Court rejects the argument that Chartier was unable to effectively use the Prison Calls because the "belated production" foreclosed his chance to interview Lee's "associates to learn information about Ms. Lee and her relationship" with Chartier.  (Chartier Br. at 44.)  Notably, Chartier "never requested a continuance based on the late disclosure of [ ]Brady material," although he requested additional time to "flush [] out" Brady/Giglio issues related to email metadata.  Ulbricht, 2015 WL 13893992, at *6 (citing United States v. Menghi, 641 F.2d 72, 75 (2d Cir. 1981) for the proposition that "no Brady violation where, inter alia, defense counsel made no motion for a continuance to allow further investigation"); Douglas, 415 F. Supp. 2d at 340 (no

Brady violation, noting "defense counsel did not seek an adjournment of the proceedings so counsel or an investigator could try to speak with [the witnesses] prior to trial"); (see Tr. 3010:2-9.)   Fourth, the defense's decision to focus on other evidence, or to "with[o]ld two additional excerpts or 'clips' from the" Prison Calls due to the "pressures of the moment," reflect strategic choices by counsel, and not a Brady/Giglio violation. (See Chartier Reply at 15-16; Tr. 2918:18-21.)

Fifth, Chartier's argument that he was unable to "effectively use" the Prison Calls because he did not create transcripts during closings "to assist the jury in determining the importance of the tapes' contents" is untenable. (Chartier Reply at 15-16; Chartier Br. at 45.)   The Court cannot think of a more effective use of the Prison Calls than playing them to the jury in real time.   (Accord Tr. 2914:1-13 (the defense arguing that "[t]here's not a stronger piece of evidence" to prove that Lee lied during trial); Tr. 2917:19-21.)   Moreover, the Court finds that transcripts, while useful, would not have changed the verdict given the totality of the evidence against Chartier.[43]

Assuming, arguendo, that the Prison Calls were suppressed, Chartier fails "to prove or establish that the allegedly suppressed evidence produces a reasonable probability of

---

[43] Further, Chartier never requested time to prepare transcripts.

a different result." <u>United States v. Walsh</u>, No. 15-CR-0091, 2017 WL 3736747, at *4 (E.D.N.Y. Aug. 29, 2017), <u>aff'd</u>, 774 F. App'x 706 (2d Cir. 2019). Chartier cites to Lee's "favorable" statements in the Prison Calls that "would have exonerated" Chartier, including additional statements to her father, and to: (1) Al Reese and Lee's brother, that Chartier "doesn't know anything" and was "unaware of [Lee's] trading activity"; (2) Lee's brother, that Lee and Chartier were unaware that the Boiler Room used CESX and NWMH to defraud investors or that Vassallo and Matz were banned from the "business"; and (3) Kevin Cunningham, where Cunningham discussed SEC consequences for pledging shares of NWMH for Lee's bail and that he held shares of NWMH in his mother's name. (Chartier Reply at 17-21; Chartier Br. at 44, 46-47.)

The Court has again reviewed the Prison Calls and finds that Chartier successfully put Lee's contradictory statements and demeanor before the jury through the selected Prison Calls played at trial. (<u>Compare</u> Reply Br. at 17-21 <u>with</u> JC 370 and JC 373.) It follows that "there cannot be a reasonable probability of a different result where the impeaching evidence was introduced at the trial." <u>Walsh</u>, 2017 WL 3736747, at *4. Additionally, while the Cunningham conversation would have undermined Lee's credibility, it is not exculpatory. And where the "evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is

subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." United States v. Avellino, 136 F.3d 249, 257 (2d Cir. 1998). During trial, Chartier strenuously attacked Lee's credibility, eliciting evidence that Lee controlled all of their shared bank accounts, conducted most of the trading, and, at times, hid her criminal conduct from Chartier. Thus, additional Prison Calls "would have been duplicative of other evidence actually introduced at trial, and cumulative." Walsh, 2017 WL 3736747, at *4.

Finally, Chartier fails to show that he was prejudiced by the January 28, 2020 production of the Prison Calls. At trial, he recalled Lee as a defense witness and played the selected Prison Calls while Lee was under oath as a defense witness, (Tr. 2973:22-75:2), and multiple times in summation (Tr. 3364:25-65:3, 3387:12-15, 3478:25-79:4). "That the jury found [Lee] credible despite [Chartier's] best efforts to impeach [her] does not constitute cognizable prejudice, nor do [Chartier's] arguments suggest that earlier or more targeted disclosure would have changed the jury's evaluation of [Lee's] credibility." Tang Yuk, 885 F.3d at 87.

Thus, there was no suppression of material and exculpatory evidence in violation of Brady/Giglio and Chartier's motion for a judgment of acquittal or a new trial on this basis is denied.

78

3. Chartier is Entitled to a Judgment of Acquittal on Count 16 -- Attempting to Obstruct an Official Proceeding in Violation of 18 U.S.C. § 1512(c)(2)

Chartier argues that Count 16 of the Superseding Indictment, charging him with attempted obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2) ("Section 1512(c)(2)"), must be dismissed pursuant to (1) Rule 12(b)(2) for lack or jurisdiction or, alternatively, (2) Rule 29 for failure to prove a nexus between Chartier's actions and an official proceeding. (Chartier Br. at 48-53; Chartier Reply at 21-23.) Chartier is entitled to a judgment of acquittal on Count 16.

a. Background Relevant to Count 16

Chartier was arrested on July 12, 2017 by FBI Special Agent John Walthers.[44]   After he received Miranda warnings and agreed in writing to waive those rights, Chartier spoke with Agent Walthers and stated, among other things, that he did not engage in wash or matched trading and that he did not know the Boiler Room or Matz. (GX 958-1; GX 959-1; GX 962.) On August 5, 2019, the Government filed the operative Superseding Indictment and charged Chartier for the first time with attempted obstruction of an official proceeding, a federal grand jury and this indicted

---

[44] Agent Walthers is an FBI field agent in California.   His involvement in the case against Chartier was limited to executing the arrest warrant.   (Tr. 2151:22-52:13.)

criminal case, for making false statements during his post-arrest interview.  (Superseding Indictment ¶¶ 108-09.)

Agent Walthers testified at trial and introduced the video recording (and accompanying transcript) of the post-arrest interview. (Tr. 2150:17-76:25; GX 958-1; GX 959-1.)  In the video, Chartier spoke with Agent Walthers and, according to the Government, "attempted to obstruct the case by making the following false statements," among others:

> he had never heard of [the Boiler Room] . . .; he did not participate in matched trades or wash trades . . .; he sold NWMH shares only via purchase agreements . . .; he did not know Erik Matz. . . ; and Anthony Vassallo had never done any work for him . . . .

(Gov't Opp. at 25.)  The jury convicted Chartier on Count 16.

> **b.**   <u>Section 1512(c)(2) Is Not Limited to Tangible Evidence</u>

Chartier first argues that Count 16 must be dismissed for lack of jurisdiction because Section 1512(c)(2) is limited to conduct "involving tangible evidence." (Chartier Br. at 49 (citing <u>United States v. Pugh</u>, No. 15-CR-0116, 2015 WL 9450598, at *18 (E.D.N.Y. Dec. 21, 2015) ("<u>Pugh I</u>")); <u>id.</u> at 48-51.)  Chartier urges the Court to adopt the position that "Section 1512(c) articulates a single offense," with Section 1512(c)(2) criminalizing "difficult to enumerate conduct that would otherwise slip past 1512(c)(1)'s specific proscription." (<u>Id.</u> at 49 (quoting <u>Pugh I</u>, 2015 WL 9450598).)

The Court disagrees and joins the growing number of courts in finding that "[t]he plain language of the statute makes clear that § 1512(c)(2) criminalizes all obstructive conduct, not merely acts of tampering with tangible objects." United States v. Lin, 270 F. Supp. 3d 631, 636 (E.D.N.Y. 2017); see also United States v. Kumar, No. 04-CR-0846, 2006 WL 6589865, at *1-4 (E.D.N.Y. Feb. 21, 2006) (rejecting the argument that Section 1512(c)(2) only criminalizes allegations of "tampering with physical evidence"). While the Second Circuit has not yet opined on the issue, one district court recently surveyed the landscape and observed that "the most popular -- and increasingly prevalent -- interpretation of § 1512(c)(2) [among federal courts] is that it is an unlimited prohibition on obstructive behavior that extends beyond merely tampering with tangible items." United States v. De Bruhl-Daniels, 491 F. Supp. 3d 237, 250-51 (S.D. Tex. 2020) (subsequent history omitted); but see United States v. Pugh, 945 F.3d 9, 28-29 (2d Cir. 2019) ("Pugh II") (Calabresi, J., concurring) (noting "how dangerously far 18 U.S.C. § 1512(c) now extends" and that "[i]t is at least arguable that this law was never intended to be used so broadly."). Absent clear guidance from the Second Circuit, this Court adopts the position that Section 1512(c)(2) is not limited to the obstruction of physical or tangible evidence. Lin, 270 F. Supp. 3d at 636 (collecting

cases).  Chartier's motion to dismiss Count 16 of the Superseding Indictment pursuant to Rule 12(b)(2) is denied.

c.   <u>There Was Insufficient Evidence Supporting the Count 16 Conviction</u>

In the alternative, Chartier argues that he is entitled to a judgment of acquittal on Count 16.  (Chartier Br. at 51-53; Chartier Reply at 21-23.)  Specifically, he argues "[t]he proof in this case suffers from the same fatal defect at issue" in <u>United States v. Aguilar</u>, 515 U.S. 593 (1995) and in <u>United States v. Schwarz</u>, 283 F.3d 76 (2d Cir. 2002), because there was no evidence that his post-arrest statements would be used to "obstruct, influence, or impede an official proceeding."  (Chartier Br. at 52.)  The Government responds that Chartier's decision "to offer information related to the grand jury investigation and the pending criminal case, and his decision to provide false information," after indictment and <u>Miranda</u> warnings, "evinced his specific attempt to 'obstruct, influence and impede an official proceeding.'"  (Gov't Opp. at 58-60.)  Chartier is entitled to a judgment of acquittal on Count 16.

To convict Chartier of an attempt, the Government had to prove he "had the intent to commit the object crime and . . . engaged in conduct amounting to a substantial step towards its commission."  <u>United States v. Farhane</u>, 634 F.3d 127, 145 (2d Cir. 2011).  Here, "the object crime was 'corruptly . . .

82

obstruct[ing], influenc[ing], or imped[ing] any official proceeding.'" United States v. Desposito, 704 F.3d 221, 230 (2d Cir. 2013) (alterations in original) (quoting Section 1512(c)(2)). In Desposito, a defendant challenged his conviction for attempting to obstruct an official proceeding in violation of Section 1512(c)(2). Id. at 230-33. The Second Circuit explained:

> In construing the similar "Omnibus Clause" in 18 U.S.C. § 1503(a), the Supreme Court has held that "'a person is not sufficiently charged with obstructing or impeding the due administration of justice in a court unless it appears that he knew or had notice that justice was being administered in such court'" because, in the absence of such knowledge, that person "necessarily lacked the evil intent to obstruct." United States v. Aguilar, 515 U.S. 593, 599 [ ] (1995) (quoting Pettibone v. United States, 148 U.S. 197, 206 [ ] (1893)). Thus, to satisfy the element of intent, the government must show a "nexus" between the defendant's act and the judicial proceedings; that is, there must be "a relationship in time, causation, or logic" such that the act has "the natural and probable effect of interfering with the due administration of justice." Id. at 599-600 [ ] (internal quotation marks omitted). Because of its similarity to § 1503(a), we have previously incorporated Aguilar's "nexus requirement" into § 1512(c)(2). See United States v. Reich, 479 F.3d 179, 185-86 (2d Cir.2007) (citing Aguilar, 515 U.S. at 600 [ ]). Thus, to satisfy the first element of attempt in this case, the government had to show that [the defendant's conduct] had the natural and probable effect of obstructing his criminal trial.
>
> To satisfy the second element, the government had to show that the defendant took a substantial step toward committing the crime

> that was "'strongly corroborative of the
> firmness of the defendant's criminal intent.'"
> Farhane, 634 F.3d at 146-47 (quoting United
> States v. Stallworth, 543 F.2d 1038, 1040 &
> n.5 (2d Cir.1976)). . . . A "substantial step"
> must be "'something more than mere
> preparation, yet may be less than the last act
> necessary before the actual commission of the
> substantive crime.'" Id. at 147 (quoting
> United States v. Manley, 632 F.2d 978, 987 (2d
> Cir.1980)).  Whether specific conduct
> constitutes a substantial step depends on
> "'the particular facts of each case' viewed in
> light of the crime charged." Id. (internal
> quotation marks omitted) (quoting United
> States v. Ivic, 700 F.2d 51, 66 (2d
> Cir.1983)).

Id. at 230-31 (footnote and string citations omitted).

Against these standards, the Court concludes that the evidence, when viewed in the light most favorable to the Government, was insufficient to sustain a conviction for attempting to corruptly obstruct, influence, or impede an official proceeding in violation of Section 1512(c)(2).  As a preliminary matter, the Government is correct that "Sections 1503 and 1512(c)(2) are [not] one and the same," because "[t]he language of Section 1512(c), . . . denotes that obstruction of justice entails conduct that is geared not only towards a judicial proceeding but of the more expansive term, 'official proceeding.'" United States v. Hutcherson, No. 05-CR-0039, 2006 WL 1875955, at *2 (W.D. Va. July 5, 2006) (citations omitted); (see Gov't Opp. at 58-60.) Thus, it is indisputable that Chartier made false statements to Agent Walthers with knowledge that he was a defendant in an

indicted criminal case, i.e., an official proceeding.[45]   (Tr. 3698:7-8 (the Court instructing the jury that this case "is an official proceeding").)

The more difficult question, however, is whether Chartier's post-arrest statements "demonstrate his intent to do something that had the natural and probable effect of obstructing justice."  United States v. Batista, No. 06-CR-0265, 2010 WL 1193314, at *8 (E.D.N.Y. Mar. 24, 2010) (collecting cases).  The Court, guided by Aguilar and Schwarz, concludes that the evidence failed to meet this standard.  In Aguilar, a jury convicted a federal judge of, inter alia, endeavoring to obstruct the due administration of justice in violation of Section 1503 for lying to federal agents during a grand jury investigation.  The Supreme Court adopted and applied the "nexus requirement" and unequivocally determined that "uttering false statements to an investigating agent -- and that seems to be all that was proved here -- who might or might not testify before a grand jury is sufficient to make out a violation of the catchall provision of § 1503," which is substantially similar to the catchall provision found in Section 1512(c)(2).  Aguilar, 515 U.S. at 599-600; see

---

[45] The Court does not decide whether the Government proved Chartier's knowledge of a grand jury investigation because the Court concludes "that there was insufficient evidence to support a jury finding that [Chartier] intended to engage in conduct that would violate" Section 1512(c)(2).  Schwarz, 283 F.3d at 107.

Reich, 479 F.3d at 185-86.   In Schwarz, the defendants were convicted of conspiracy to obstruct a grand jury investigation in violation of Section 1503 for lying to state and federal prosecutors.  Schwarz, 283 F.3d at 80.  The Second Circuit, relying on Aguilar, reversed the conviction because the Government failed to establish that the defendant knew the allegedly false statements would be conveyed to a grand jury; and knowledge of a pending grand jury investigation "would not enable a rational trier of fact to conclude that respondent knew that his false statement would be provided to the grand jury."  Id. at 109 (emphasis in original) (quoting Aguilar, 515 U.S. at 601).

Here, like in Aguilar and Schwarz, the evidence "goes no further than showing that" Chartier made false statements to the arresting FBI agent.  Aguilar, 515 U.S. at 601.  The only evidence introduced at trial with respect to Count 16 was Agent Walther's testimony, a recording and transcript of Chartier's post-arrest interview, and the signed Miranda waiver.  In summation, the Government recounted the trial evidence to prove that Chartier's post-arrest statements to Agent Walthers were false and misleading.  (Tr. 3338:20-43:18, 3359:7-19.)  However, to prove Chartier's intent, it is not enough that his statements were false and misleading.  Rather, the "proper inquiry is whether the defendant knew his actions would result in the obstruction of a

specific judicial proceeding." Desposito, 704 F.3d at 231. This is where the evidence fell short.

Indeed, even if Chartier's post-arrest statements evidenced his "consciousness of guilt of all the other crimes" charged (Tr. 3343:2-6), those statements were not "strongly corroborative of [] a criminal purpose to obstruct, influence or impede an official proceeding." United States v. Jadue, 31 F. Supp. 3d 794, 799 (E.D. Va. 2014). Moreover, after Aguilar and Schwarz, the Second Circuit has found "the nexus requirement satisfied in situations where 'the discretionary actions of a third person are required to obstruct the judicial proceeding' if it was 'foreseeable to [the defendant] that the third party . . . would act on the [communication] in such a way as to obstruct the judicial proceeding.'" Desposito, 704 F.3d at 231-32 (alterations in original) (quoting Reich, 479 F.3d at 185). In summation, the Government argued that Chartier's false statements to Agent Walthers reflected "an attempt to get himself out of trouble" or to "minimize his own culpability in an attempt to talk his way out of trouble." (Tr. 3339:6-9, 3342:7-10.) However, there is no evidence -- either direct or circumstantial -- supporting the inference that Chartier "intended and believed that" Agent Walthers would use his false statements to obstruct his criminal trial or a grand jury investigation. Cf. Desposito, 704 F.3d at 223, 232 (finding the nexus requirement satisfied where the

defendant knew "the natural and probable consequence of sending" a series of letters "would obstruct his criminal trial" where, through the letters, the defendant tried to "persuade" friends and family to falsify evidence that he "hoped would raise a reasonable doubt at trial," demonstrating the defendant's belief that the recipients "would comply").  Chartier "may have hoped that" his false statements "would be provided to the grand jury, [or in the indicted criminal case,] and surely there was that possibility; but there was insufficient evidence to 'enable a rational trier of fact to conclude that [Chartier] knew' that this would happen or that he entertained any expectations on that score that were based on such knowledge."  Schwarz, 283 F.3d at 109.

Further, to the extent asserted, the Court rejects the argument that the reasonings in Aguilar and Schwarz have no application to convictions under Section 1512(c)(2).  As recited above, the Second Circuit extended Aguilar's nexus requirement to Section 1512(c)(2), which is "substantially similar" to Section 1503.  Reich, 479 F.3d at 185-86 (emphasis added) (citing Aguilar, 515 U.S. at 600) (further citations omitted).  Applying that standard here, as is required, compels a clear conclusion: where "uttering false statements to an investigating agent" when "that seems to be all that was proved" fails to satisfy the nexus requirement under the catchall provision of Section 1503, the same conduct fails to satisfy the nexus requirement under the

88

substantially similar catchall provision of Section 1512(c)(2). See Aguilar, 515 U.S. at 599-601; cf. Reich, 479 F.3d at 186 (affirming Section 1512(c)(2) conviction, finding the "relationship is much closer than those found insufficient in Aguilar or Schwarz, where the defendants merely made false statements to agents who might or might not later testify before a grand jury." (emphasis added)).

Finally, neither party addresses whether the jury could find beyond a reasonable doubt that Chartier's false statements to Agent Walthers constituted a "substantial step" toward corruptly obstructing, influencing, or impeding the indicted criminal case and/or a grand jury investigation. (Tr. 3695:18-99:18 (the Court instructing the jury regarding attempt and substantial step).) For the same reasons stated above, the Court concludes that Chartier's false statements to Agent Walthers do not constitute a substantial step to effect the object crime. Cf. Desposito, 704 F.3d at 233 (concluding that a rational jury could find beyond a reasonable doubt a substantial step where the defendant's "persistent writing and mailing of letters," which contained instructions to falsify evidence, demonstrated that he "tried to do everything he possibly could from jail to bring his plan to fruition and effect the obstruction of his trial").

In reaching this conclusion, the Court acknowledges that a defendant's knowingly false statements to federal agents without

the intent to obstruct an indicted criminal case (or a grand jury investigation) may violate other statutes, such as 18 U.S.C. § 1001(a). Schwarz, 283 F.3d at 110; United States v. Sutherland, 921 F.3d 421, 426 (4th Cir. 2019) (subsequent history omitted); United States v. Wysinger, No. 17-CR-0022, 2019 WL 2610120, at *6 (W.D. Va. June 25, 2019) (collecting cases). Such conduct does not, however, violate Section 1512(c)(2). Sutherland, 921 F.3d at 426; see Pugh II, 945 F.3d at 29 (Calabresi, J., concurring) ("[A]s judges, we should be careful, in examining obstruction of justice cases, to make our review searching and contextual").

Accordingly, at best, the Government proved that Chartier, "knowing of the existence of [the indicted criminal case], lied to federal investigators regarding issues pertinent to the" case. Schwarz, 283 F.3d at 109. Without more, the evidence was insufficient to support the jury's conclusion that Chartier attempted to corruptly obstruct, influence, or impede an official proceeding in violation of Section 1512(c)(2). Thus, Chartier's motion for a judgment of acquittal on Count 16 is granted.

### 4.   The Government Did Not Improperly Question Lee

Chartier argues a new trial is warranted on the basis that the Government committed prosecutorial misconduct because the Prison Calls were "the single most important piece of evidence" and, by asking Lee whether she pled guilty, the Government inferred Lee's "statements to her father were false," and "indirectly"

implied that Chartier's "claim of innocence was similarly false."
(Chartier Br. at 58-61.)   He also argues that the "curative
instructions were inconsequential[.]" (Id. at 61)  For the reasons
that follow, these arguments fail.

   a. Background Relevant to Lee's Testimony

   After Chartier recalled Lee as a defense witness and
played the Prison Calls, the Government cross-examined Lee:

| | | |
|---|---|---|
| Gov't: | And that's your dad in the video, right? | |
| Lee: | Correct. | |
| Gov't: | You didn't immediately fess up to your dad about your involvement in these crimes, did you? | |
| Lee: | No. | |
| Gov't: | But ultimately you pleaded guilty to all the crimes that you were charged with, right? | |
| Lee: | Yes. | |
| Gov't: | And you indicated to your dad on that video that you and Chartier were, quote, one in the same person, right? | |
| Lee: | Yes. | |
| Gov't: | And that he was, quote, the face of the company and that you handled the paperwork, right? | |
| Lee: | Correct. | |
| Gov't: | And that's the exact same thing that you told the jury when you | |

>               testified here a couple weeks ago,
>               right?
>
> Lee:          Yes.

(Tr. 2992:2-93:18; see generally Tr. 2992:23-95:20.)

Chartier did not object to the cross-examination and the trial continued. Prior to deliberations, the Court charged the jury regarding cooperating witnesses:

> Finally, the cooperating witnesses have pled guilty to the charges arising out of the same facts as this case. . . . [Y]ou are to draw no conclusions or inferences of any kind about the guilt of the defendants on trial here from the fact that a prosecution witness pled guilty to similar charges. That witness' decision to plead guilty was a personal decision about his or her own guilt[]. The fact that they pled guilty may not be used by you in any way as evidence against or unfavorable to the defendant on trial here.

(Tr. 3634:10-19.) During deliberations, the jury requested Lee's "testimony after the video. The redirect," and the court reporter read back the Government's cross-examination of Lee. (Tr. 3720:14-21:21.) The next day, Chartier argued that the jury's request for a readback "highlighted" the Government's improper cross-examination. (Tr. 3735:12-37:14.) Chartier moved for a mistrial and requested that the Court re-instruct the jury regarding cooperating witnesses. (Tr. 3737:15-40:10.) The Court denied the motion for a mistrial, finding no substantial harm, but re-instructed the jury regarding cooperating witnesses, and in doing so, referenced Lee's cross-examination. (Tr. 3740:13-43:3.)

>    b.   Chartier Is Not Entitled to a New Trial Based
>         on the Government's Cross-Examination of Lee

Chartier's claims of prosecutorial misconduct arising out of the Government's cross-examination of Lee are without merit. To "prevail on a motion for a new trial based on prosecutorial misconduct, a defendant bears the 'heavy burden' of demonstrating that the alleged misconduct is 'so severe and significant as to result in the denial of their right to a fair trial.'" United States v. Kenner, 272 F. Supp. 3d 342, 428 (E.D.N.Y. 2017) ("Kenner II") (quoting United States v. Locascio, 6 F.3d 924, 945 (2d Cir. 1993)).   The Court "should consider 'the severity of the misconduct, the measures adopted to cure it, and the certainty of conviction in the absence of the misconduct.'"   United States v. Mathieu, No. 16-CR-0763, 2019 WL 4267539, at *6 (S.D.N.Y. Sept. 10, 2019) (quoting United States v. Truman, 688 F.3d 129, 144 (2d Cir. 2012)), aff'd, 2021 WL 1783122 (2d Cir. May 5, 2021).  "A new trial is appropriate 'only when the statements, viewed against the entire argument before the jury, deprived the defendant of a fair trial.'"   Id. (quoting United States v. Bermudez, 529 F.3d 158, 165 (2d Cir. 2008)).

As an initial matter, the Court finds that Chartier waived this argument.  During its case-in-chief, the Government questioned Lee regarding her guilty plea and cooperation agreement

and Chartier did not object.[46] (See Tr. 1636:19-39:4.) During Chartier's direct case, the Government again asked Lee whether she pled guilty and Chartier did not object. The Court held a charge conference and adopted the Defendants' proposed changes regarding the "issue about others pleading guilty" by striking certain language and adding that guilty pleas "should not be considered evidence against the defendants. Their decision was a personal one." (Tr. 2802:4-14.) Chartier did not object or otherwise raise concerns that Lee's testimony was unduly prejudicial. Accordingly, Chartier's "present arguments thus have been waived." United States v. Martinez, 775 F.2d 31, 36 (2d Cir. 1985); United States v. Bellomo, 176 F.3d 580, 597 (2d Cir. 1999).

Nonetheless, the Court considers the merits and finds that the Government properly cross-examined Lee regarding her guilty plea. "'While it is impermissible for a prosecutor to suggest to a jury that the conviction of a testifying co-conspirator is evidence that a defendant on trial is guilty,' this rule does not preclude disclosure of cooperators' convictions for

---

[46] Chartier does not challenge the propriety of Lee's testimony during the Government's case-in-chief. The Court's inquiry is thus limited to whether the Government's cross-examination constituted prosecutorial misconduct. To the extent raised, the Government appropriately questioned Lee during its direct case. United States v. Prawl, 168 F.3d 622, 626 (2d Cir. 1999) ("A co-defendant's guilty plea . . . may upon occasion be brought out on the government's direct examination in order to anticipate and defuse a cross-examiner's effort to impeach credibility on that basis").

proper purposes." United States v. Kaplan, 758 F. App'x 34, 40 (2d Cir. 2018) (summary order) (quoting United States v. Louis, 814 F.2d 852, 856 (2d Cir. 1987)). Such purposes include "invit[ing] the jury to consider the implausibility of [a defendant's] claim that the witnesses were all committing perjury." United States v. Rodriguez, 587 F.3d 573, 583 (2d Cir. 2009).

That is exactly what happened here. Chartier recalled Lee during his direct case and played the Prison Calls in an effort to persuade the jury that Lee's statements in the Prison Calls were true, i.e., that she "lied during trial about the defendant's participation in the fraudulent scheme" and Chartier was "innocent of 'washed trading' and investor fraud." (Chartier Br. at 57-58.) Against this line of questioning, the Government was entitled to rehabilitate Lee's credibility by asking whether she pled guilty to argue to the jury that Lee told the truth during trial and that Lee lied to her father in the Prison Calls regarding her own criminal activity and culpability. See United States v. Weaver, 698 F. App'x 629, 633 (2d Cir. 2017) (summary order) (references to the cooperating witnesses' guilty pleas and "acknowledgement of participation in the scheme to defraud" were appropriate to, among other reasons, "combat the argument that the witnesses were lying about their guilt because they did not want to continue to fight the government at trial"); Martinez, 775 F.2d at 37-38.

In any event, whether Lee lied or told the truth in the Prison Calls was an issue for the jury to resolve.[47]  <u>McCourty</u>, 562 F.3d at 476 ("It was therefore well within the purview of the jury to resolve any discrepancies in the testimony . . . that [the defendant] now claims was perjured").  And while Chartier argues that the Government's cross-examination "<u>indirectly impl[ied]</u>" that his "claim of innocence was similarly false" (Chartier Br. at 59 (emphasis added)), he does not point to "any instance where the government attempted to suggest that [Lee's] guilty plea could be used as substantive evidence of [Chartier's] guilt."  <u>Giordano v. United States</u>, No. 11-CV-0009, 2015 WL 7777749, at *16 (D. Conn. Dec. 2, 2015) (denying ineffective assistance of counsel claim, finding the admission of a witness's guilty plea "was used for a proper purpose" where it "dampened" defense counsels attempt to challenge the witness's testimony "as biased in favor of the government."); <u>see also</u> <u>United States v. Nguyen</u>, 507 F. App'x 64, 66 (2d Cir. 2013) (unpublished).

Moreover, Chartier was not prejudiced by the Government's cross-examination.  It is well-established that "when a jury has been informed that a codefendant has pleaded guilty to a crime charged against the defendant on trial, the trial judge

---

[47] As addressed below, Lee's testimony was "not so patently incredible or defiant of physical realities as to justify intrusion upon the jury's verdict."  <u>McCourty</u>, 562 F.3d at 476.

should instruct the jury that they may not consider that guilty plea as evidence of the defendant's guilt." United States v. Ramirez, 973 F.2d 102, 105 (2d Cir. 1992).  Here, the Court instructed the jury twice -- once during the Court's charge and again during deliberations, at the defense's request -- "to draw no conclusions or inferences of any kind about the guilt of the defendants on trial by the fact that a prosecution witness pled guilty to similar charges." (Tr. 3634:10-19, 3742:8-34:3.)  These jury instructions were sufficient to cure any prejudice that may have resulted from Lee's testimony. United States v. Ganim, 256 F. App'x 399, 401-02 (2d Cir. 2007); United States v. Brown, No. 04-CR-0159, 2006 WL 898043, at *10-11 (E.D.N.Y. Apr. 4, 2006).

Finally, to the extent Chartier argues that the Court should have issued an earlier curative instruction, that request was never before the Court, and the Court did not err by "fail[ing] to issue such an instruction sua sponte." United States v. Milone, 208 F.3d 204, 2000 WL 288363, at *2 (2d Cir. Mar. 16, 2000) (unpublished) (citations omitted); Prawl, 168 F.3d at 626 (an instruction regarding a co-defendant's guilty plea "must be given if requested"); United States v. Hurtado, 47 F.3d 577, 585-86 (2d Cir. 1995) ("[T]he district court's failure to sua sponte issue such a limiting instruction is not plain error in light of the overwhelming evidence of his guilt" (internal citations omitted)).

Therefore, Chartier's motion for a new trial arising out of claims of prosecutorial misconduct based on the Government's cross-examination into Lee's guilty plea is denied.

5.   The Court Will Not Disregard Lee's Testimony

Chartier argues he is entitled to a judgment of acquittal or a new trial by asking the Court to "disregard" Lee's testimony and, in the absence of that testimony, conclude that the Government "lacked any plausible evidence to" convict, because the Government: (1) improperly bolstered Lee's testimony; (2) tainted Lee's testimony by failing to turn over the Prison Calls; and (3) improperly intimidated Ms. Cataneo. (Chartier Br. at 54-57.)

The Court does not disregard Lee's testimony because, as concluded above, the Government did not (1) violate its Brady/Giglio obligations; (2) intimidate or force Ms. Cataneo into invoking the Fifth Amendment privilege; or (3) improperly cross-examine Lee regarding her guilty plea. (See supra, Discussion § II.A.1, 2, & 4.) Chartier concedes that the Government met its burden in proving Chartier's knowledge of the "market manipulation" through Lee's testimony. (Chartier Br. at 57.) He does not challenge the sufficiency of the evidence on any other grounds. Accordingly, with the exception of Count 16 (supra, Discussion § II.A.3), the evidence sufficiently supported the jury's verdict and Chartier's Rule 29 motion on this basis is denied.

Chartier also argues that he is entitled to a new trial pursuant to Rule 33 because Lee's statements in the Prison Calls contradicted her testimony regarding Chartier's "knowledge" of market manipulation, which rendered her "testimony at trial [ ] inherently unbelievable." (See Chartier Br. at 57.) Chartier is not entitled to relief on this basis either.

"Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." McCourty, 562 F.3d at 475-76 (alterations and quotation marks omitted). "Exceptional circumstances may exist where testimony is 'patently incredible or defies physical realities,' while the district court's mere 'identification of problematic testimony does not automatically meet this standard.'" United States v. Aiyer, 470 F. Supp. 3d 383, 415 (S.D.N.Y. 2020) (quoting McCourty, 562 F.3d at 475-76).

Here, "[t]here are no such exceptional circumstances" and the "inconsistencies identified by" Chartier "are not, in fact, inconsistencies, but are functions of the defendant's theory of the case, which the jury was entitled to reject." Id. The Government's case against Chartier involved testimony that Chartier and Lee worked together as a partnership, with Chartier negotiating deals with the Boiler Room (and others) while Lee

99

worked behind the scenes to support those deals.  Chartier urged the jury to consider that Lee lied during trial and told the truth in the Prison Calls when she stated that Chartier did not know "anything" about the Boiler Room or trading.  (E.g., Tr. 3364:14-66:16, 3386:15-88:9.)  However, "[t]he jury was entitled to choose 'between competing inferences' suggested by the theories of the case pressed by the defendant and the Government." Aiyer, 470 F. Supp. 3d at 416 (quoting United States v. Rea, 958 F.2d 1206, 1221-22 (2d Cir. 1992)); United States v. Jabloun, No. 06-CR-0074, 2006 WL 2620391, at *2 (N.D.N.Y. Sept. 12, 2006) (ruling that the jury is "entitled to weigh [the witness's] testimony" and "determine whether [the witness] was a credible witness").

Further, Lee's trial testimony and statements in the Prison Calls were not as contradictory as Chartier suggests.  When reviewing the entire record, Lee consistently testified that she handled the back-end paperwork and most of the trading while Chartier served in a front-facing role.  The Prison Calls played at trial corroborate this testimony.  Thus, Lee's testimony was neither "patently incredible" nor did it defy "physical realities," and the "jury was entitled to credit" her testimony "when considered as a whole." Aiyer, 470 F. Supp. 3d at 416 (citation omitted); United States v. Serrano, No. 13-CR-0058, 2015 WL 81974, at *3 (S.D.N.Y. Jan. 6, 2015), aff'd, 640 F. App'x 94

100

(2d Cir. 2016).  Therefore, Chartier's motion pursuant to Rule 33 on this basis is similarly denied.

> B.   Isen's Motion

Isen asserts many arguments in support of his motion for a judgment of acquittal or, in the alternative, a new trial, pursuant to Rules 29 and 33.  As articulated below, none of these arguments entitle him to the relief sought.

> 1.   Isen's Rule 29 Motion

Isen seeks a judgment of acquittal on the basis that the Government failed to prove beyond a reasonable doubt that (1) Isen had the requisite intent to commit securities fraud; and (2) there was an agreement to enter into a conspiracy.  (Isen Br. at 4-30.) Isen and Chartier seek a judgment of acquittal as to the conspiracy charges (Counts One, Two, and Eight), arguing that the Government failed to prove a single overarching conspiracy.  (Id. at 30-35; Chartier Br. at 61.)  These arguments are without merit.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

a. There Was Sufficient Evidence Supporting the Securities Fraud and Conspiracy Convictions[48]

Isen argues that he is entitled to a judgment of acquittal on the substantive securities fraud counts (and the respective conspiracy charges based upon them) because the Government failed to prove Isen's criminal intent beyond a reasonable doubt. (Isen Br. at 5-30.) The Court disagrees.

First, Isen argues the Government was required, but failed, to prove that (1) he knew Matz was lying to investors and manipulating the market, or (2) he personally lied to investors. (Isen Br. at 5-10.) These arguments "completely ignore that the jury was entitled to find [Isen's] guilt under Section 10(b) and Rule 10b-5 based on fraudulent conduct beyond" untrue statements or omissions of material fact. United States v. Levy, No. 11-CR-0062, 2013 WL 3832718, at *3 (S.D.N.Y. July 15, 2013) (citing United States v. Royer, 549 F.3d 886, 900 (2d Cir. 2008)); (Tr. 3654:13-25.) Here, the securities fraud charges under Section 10(b), 15 U.S.C. § 78j(b) (and the conspiracy charges based upon them) were not limited to activity prohibited by Rule 10b-5(b),

---

[48] It is not clear whether Isen extends this argument to all counts of the Superseding Indictment, including the substantive wire fraud and money laundering counts (and corresponding conspiracy charges). (Isen Br. at 29-30.) As discussed below, because the evidence supported the jury's finding that Isen had the requisite criminal intent, these arguments cannot serve as a basis for a judgment of acquittal on the substantive wire fraud and money laundering counts (and respective conspiracy charges).

i.e., untrue statements of material fact or material omissions.
As charged, the securities fraud charges also included violations
of Rules 10b-5(a) (devices, schemes, or artifices to defraud) and
10b-5(c) (practices, or courses of business that operate as a fraud
or deceit). (Tr. 3650:17-51:15, 3653:4-54:25 (jury
instructions).) As such, regardless of whether the Government
proved Isen's knowledge that Matz lied to investors, or that Isen
lied to investors, the jury was entitled to consider whether the
evidence was sufficient to support the theory that Isen committed
securities fraud through other means, including by matched trading
with victim/investors and/or executing documents for the sole
purpose of manipulating the HECC and ICE markets in violation of
Rules 10b-5(a) & (c). United States v. Rutkoske, 506 F.3d 170,
176 (2d Cir. 2007) (noting "the Supreme Court has held that a
verdict should be affirmed when two theories of an offense are
submitted to the jury and the evidence supports one theory but not
the other"); see United States v. Nekritin, No. 10-CR-0491, 2012
WL 37536, at *4 (E.D.N.Y. Jan. 9, 2012); United States v. Greebel,
No. 15-CR-0637, 2017 WL 3610570, at *5 (E.D.N.Y. Aug. 4, 2017);
see also United States v. Watts, No. 17-CR-0372, 2020 WL 6136211,
at *10 (E.D.N.Y. Oct. 19, 2020) (Seybert, J.).

Second, Isen argues that he is entitled to a judgment of
acquittal on the securities fraud counts (and respective
conspiracy charges) because the Government failed to prove that he

103

engaged in matched trading or that he had knowledge of matched trading. (Isen Br. at 10-21.) The Court is not persuaded.

To the extent asserted, the Court rejects the argument that matched trading is not a form of securities fraud. Both the Government's expert and Isen's expert agreed that matched trading is a form of market manipulation and/or securities fraud. (Tr. 2194:21-96:8, 3168:23-69:5.) Moreover, the testimonial and documentary evidence supported the inference that Isen had knowledge of, and engaged in, matched trading. Indeed, Isen's argument, and by extension Dr. Filante's opinion, fails to account for the evidence that Isen, Watts, Gleckman, and others, traded shares of HECC and ICE based on knowledge that Matz and/or the Boiler Room lined up a victim/investor on the other side of the trade to purchase shares of HECC or ICE at a similar price, time, and volume. Put differently: there was evidence that the trades were not coincidental.

This was corroborated through phone records, emails, trading data, and Matz's and Gleckman's testimony. Indeed, Gleckman testified that Isen informed him when "buyers were coming in from New York to the [B]oiler [R]oom" to sell the 262,751 shares of HECC. (Tr. 1147:22-48:9.) Further, Ms. Oremland's summary charts corroborated Matz's testimony that he "pushed" victim/investors to purchase shares of HECC or ICE, that he relayed that information to Isen, Watts, or others, and that Isen, Watts,

or others, then sold shares of HECC or ICE at a similar price, time, and volume. The charts were not flawed because they did not include all market volume, as Isen suggests. (Isen Br. at 19; see GX 812.) Rather, the charts support the inference that even if Isen, Watts, Gleckman, or others, legitimately traded shares of HECC or ICE at other times, they also coordinated with the Boiler Room to match the sale of HECC or ICE against a victim/investor's purchase of HECC or ICE. (Tr. 2340:4-48:24.)

The Government also presented evidence that Isen personally matched trades against victim/investors. For example, Matz testified that Isen offered to pay the Boiler Room on behalf of HECC on the condition that Matz get him "out of enough [HECC] stock" to cover the amount owed to the Boiler Room. (Tr. 369:6-70:12.) On December 16, 2014, Matz sent Isen an invoice for $12,500 for "Investor Relations on Behalf of" HECC. (GX 111; GX 111A; GX 521C-4 at 65.) The invoice was not for "Investor Relations," but reflected the amount that Isen agreed to pay on behalf of HECC, which he generated by trading shares of HECC at Matz's direction. (Tr. 368:7-70:21.) This testimony was corroborated by the raw trading data, bank records, and a summary chart reflecting that between December 11 and 15, 2014, Isen generated $12,425 in proceeds from selling shares of HECC against victim/investors' and/or the Boiler Room's purchase of shares. (See GX 824-1 (summary chart); Tr. 2238:17-41:21.) As for ICE,

the evidence reflected that certain Boiler Room accounts and international accounts matched trades with victim/investors. (E.g., GX 827; GX 823-3 & 4.) Matz's testimony that he relayed trade instructions to Sui and/or Isen, or that Matz and Isen agreed to a standing order for the sale of ICE, was corroborated by the trading patterns established through the HECC scheme, emails, phone records, and ICE's available trading data. There was also evidence supporting the inference that Isen had access to those international brokerage accounts and traded shares of ICE in coordination with the Boiler Room to match trades against victim/investors. (GX 424; GX 422; Tr. 603:21-11:18; see also Tr. 2252:24-55:5, 2698:23-2701:16; GX 827; GX 823-3 & 4.)

The Court also considers Isen's reliance on Dr. Filante's opinion that there were no matched trades and that matched trading is "impossible" because, for example, a market maker conducted an intervening sale between a victim/investor's purchase of HECC and Isen's sale of HECC. (Isen Br. at 14-16.) Ms. Oremland testified, among other things, that Isen sold shares to victim/investors and acknowledged that there are "always" "intervening trades by market makers because" that is "how this market works." (Tr. 2441:5-42:3.) Here, the jury rejected Dr. Filante's opinion. While "there is testimony that supports . . . [Isen's] theory," as recited above, there was sufficient evidence that Isen knew of, and himself engaged in, matched

trading.  United States v. Lillemoe, 242 F. Supp. 3d 109, 122 (D.
Conn. 2017), aff'd sub nom. United States v. Calderon, 944 F.3d 72
(2d Cir. 2019).  In any event, "it is not the court's place to
choose between conflicting witness testimony."  Id. (citing
Ferguson, 246 F.3d at 133-34).  Thus, the evidence was sufficient
for the jury to conclude beyond a reasonable doubt that Isen
engaged in, and had knowledge of, matched trading.

     Third, Isen argues that the Government failed to prove
his intent to defraud, because, in addition to the arguments
rejected above:  (1) it was not unlawful or fraudulent for Isen,
and others, to sell shares of ICE or HECC after Matz created
"market interest" (Isen Br. at 21-22, 24-25); (2) the various
consulting agreements and invoices represented actual dealings
(id. at 22-23, 27); (3) it was not fraudulent for Isen, Watts, and
Gleckman to transfer HECC shares (id. at 24); and (4) there was no
evidence that ICE insiders traded on inside information (id. at
25).  Isen's arguments are without merit because they are
"functions of the defendant's theory of the case, which the jury
was entitled to reject."[49]  Aiyer, 470 F. Supp. 3d at 415.

---

[49] Isen asserts additional arguments, including that (1) his
criminal intent was negated by various disclaimers and Gleckman's
testimony that he did not intend to defraud; (2) victim/investors
exercised autonomy when purchasing HECC or ICE shares; or (3) he
did not "double-delete" GX 428, his email to Matz regarding a
solution to the split of profits with ICE investors.  These are
similarly arguments that the jury was entitled to reject.  And,
these "other possible inferences do[] not change the fact that the

107

Further, the trial evidence "is replete with hard evidence" that Isen intentionally embarked on a scheme with Matz, and others, to defraud investors by using the Boiler Room to artificially inflate the stock price of HECC and ICE through false documents and manipulative trading practices. United States v. Faibish, No. 12-CR-0265, 2014 WL 4273299, at *6 (E.D.N.Y. Aug. 28, 2014). Importantly, and in addition to the evidence recited above, Isen was a licensed securities broker until he was barred from the securities industry in the mid-1990s for securities fraud; he visited the Boiler Room on multiple occasions; and, he knew that Matz was barred from the securities industry and used many aliases to conduct his business, including in documents Isen prepared in connection with the HECC and ICE. Matz testified that he informed Isen that the Boiler Room was not a legitimate investor relations firm and that he sent Isen (or others) trade instructions to sell shares of HECC or ICE when victim/investors were lined up to purchase the same number of shares. (E.g., Tr. 414:17-15:8, 437:23-38:19.) Moreover, in both the HECC and ICE schemes, Isen was the "point person" who facilitated the transfer of shares

---

evidence presented by the Government was sufficient for a reasonable jury to conclude that" Isen acted with the requisite intent to defraud. United States v. Akefe, No. 09-CR-0196, 2010 WL 2899805, at *15 (S.D.N.Y. July 21, 2010) (citation omitted). The argument that the Government improperly inferred Isen's guilt from Gleckman's guilty plea (Isen Br. at 22-24) is also without merit, as discussed infra.

and/or funds between various individuals and the Boiler Room. (E.g., Tr. 356:22-57:2, 420:19-21:4; GX 428.) Gleckman similarly testified that Isen facilitated "all the transactions" for HECC and falsely completed the paperwork required to free-up the 262,751 HECC shares for the sole purpose of selling those shares to pay the Boiler Room to continue its corrupt operations. (Tr. 1142:16-44:24, 1565:1-11.)

        With both HECC and ICE, Isen created, or facilitated the creation of, sham invoices or agreements for "Consulting" or "Investor Relations" services to provide a false cover for the transfer of shares and funds. While the defense did elicit testimony that the Boiler Room technically provided certain services, Matz consistently testified that the agreements and invoices were false, and a more truthful explanation "would have been [that the Boiler Room was] calling people [and] jamming stock down their throat, but we couldn't put that on the description." (E.g., Tr. 1040:21-23, 634:19-36:11.) And, while Isen attacks Matz's testimony "as vigorously as it was attacked on cross-examination," all of the reasons why Matz might not be a trustworthy witness were presented to the jury. Faibish, 2014 WL 4273299, at *6; (see supra, Discussion § III.K (Matz's background).) "But, it is equally clear, the jury did believe him" and Matz's testimony was not "incredible on its face." Faibish, 2014 WL 4273299, at *6 (emphasis added) (quoting United

States v. Florez, 447 F.3d 145, 155 (2d Cir. 2006)).   Rather, Matz's "testimony gave zest to the plainness of the contrived process that was the fraud" and was largely in "harmony with the rest of the proof."   Id.   As such, these facts, in conjunction with evidence of matched trading recited above, supplied the jury with a reasonable basis to conclude beyond a reasonable doubt that Isen acted willfully and with the intent to defraud.   See 15 U.S.C. § 78ff(a) (to establish a criminal violation of the securities laws, the government must prove that a defendant acted "willfully"); United States v. McGinn, 787 F.3d 116, 124 (2d Cir. 2015) (defining "willfulness in this context as 'a realization on the defendant's part that he was doing a wrongful act under the securities laws, in a situation where the knowingly wrongful act involved a significant risk of effecting the violation that has occurred'" (quoting United States v. Cassese, 428 F.3d 92, 98 (2d Cir. 2005))).

Thus, Isen's motion on this basis is denied.

> b.   There Was Sufficient Evidence Supporting the
>       Conspiracy Convictions

According to Isen, the Government failed to prove an agreement between Isen and Matz to commit securities fraud, wire fraud, and money laundering, and therefore, he is entitled a

judgment of acquittal on the conspiracy convictions.[50]   (Isen Br. at 28-30.)   This argument is without merit.

"The gist of conspiracy is, of course, agreement." United States v. Scott, 979 F.3d 986, 990 (2d Cir. 2020) (quoting United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1191 (2d Cir. 1989)).   However, "to establish the existence of a conspiracy, the government 'need not present evidence of a formal or express agreement,' and may instead rely on proof the parties had a 'tacit understanding to engage in the offense.'"   Id. (quoting United States v. Amato, 15 F.3d 230, 235 (2d Cir. 1994)). "[T]he evidence must be sufficient to permit the jury to infer that the defendant and other alleged coconspirators entered into a joint enterprise with consciousness of its general nature and extent."   Id. (alterations in original) (quoting Beech-Nut Nutrition Corp., 871 F.2d at 1191).

Upon review of the record, the Court concludes that there was sufficient evidence to find that Isen and Matz, with others, entered into an unlawful agreement to commit securities fraud, wire fraud, and money laundering.   "The existence of a conspiracy must necessarily be determined by the facts at issue."   Scott, 979 F.3d at 990.   And here, the evidence demonstrated that Isen, with

---

[50] Isen also argues that he is entitled to a judgement of acquittal on all conspiracy charges because the Government failed to prove his intent with respect to the underlying substantive charges. (Isen Br. at 29-30.)   The Court rejected this argument, supra.

Matz, Watts, Gleckman, and others, entered into a "tacit agreement" to artificially inflate the market for HECC and/or ICE by hiring the Boiler Room and through manipulative trading practices. Id. There was ample proof, as recited above, that Isen, Watts, Matz, Gleckman, and others, "acted in concert" to generate trading volume (and consequently a profit) by "purposefully" executing wash or matched trades. To conceal their fraudulent conduct, they executed sham consulting agreements and invoices, which were full of falsehoods, including Keith Miller as a signatory on behalf of the Boiler Room, or by wiring funds between various nominee accounts. Taken together, and drawing all inferences in favor of the Government, there was sufficient evidence for a rational jury to find beyond a reasonable doubt that Isen entered into an unlawful agreement with Matz, and others, with the object of committing securities fraud, wire fraud, and money laundering. United States v. James, 239 F.3d 120, 123-24 (2d Cir. 2000); United States v. Riggi, 541 F.3d 94, 110 (2d Cir. 2008); Lillemoe, 242 F. Supp. 3d at 123-24. This portion of Isen's motion is thus denied.

c.   There Was Sufficient Evidence Supporting a
Single Conspiracy

Isen and Chartier argue that they are entitled to a
judgment of acquittal because the evidence proved, at best,
multiple conspiracies, rather than a single, overarching
conspiracy. (Isen Br. at 30-35; Chartier Br. at 61.)  They are
not entitled to relief on this basis.

Whether the Government has proved a single conspiracy or
multiple conspiracies is a question of fact for a properly
instructed jury. See United States v. Khalupsky, 5 F.4th 279, 288
(2d Cir. 2021) (citation omitted).  Defendants argued in summation
that the Government failed to prove a single, overarching
conspiracy. (E.g., Tr. 3494:23-95:24, 3579:21-81:4.)  At the
Defendants' request, the Court instructed the jury on multiple
conspiracies versus a single conspiracy.[51]  (Tr. 3693:18-95:17.)
Accordingly, the "jury heard, considered, and rejected" the
argument Defendants now assert, "and the jury's verdict may only
be disturbed if, viewing all the evidence in the light most
favorable to the Government and construing all possible inferences
in its favor, a 'rational trier of fact could [not] have found the
essential elements of the crime beyond a reasonable doubt.'"
United States v. Martinez, No. 04-CR-0048, 2007 WL 1791255, at *1

---

[51] Defendants do not challenge the Court's instructions.

113

(S.D.N.Y. June 18, 2007) (alteration in original) (quoting Jackson
v. Virginia, 443 U.S. 307, 319 (1979)).

Turning to the merits, Defendants argue that there was
no "evidence of a unifying 'rim' to the 'wheel' conspiracy" and
the activities related to HECC and ICE were separate from those
related to CESX and NWMH.  (Isen Br. at 30.)  To sustain a
conspiracy conviction, the Government must have proved "that two
or more persons entered into a joint enterprise for an unlawful
purpose, with awareness of its general nature and extent."
Khalupsky, 5 F.4th at 288 (quoting United States v. Torres, 604
F.3d 58, 65 (2d Cir. 2010)).  It must "show that each alleged
member agreed to participate in what he knew to be a collective
venture directed toward a common goal."  Id. (quoting United States
v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990)).  But "[t]he
government need not show that the defendant knew all of the details
of the conspiracy," "[n]or must the government prove that the
defendant knew the identities of all of the other conspirators."
Id. (alterations in original) (quoting United States v. Huezo, 546
F.3d 174, 180 (2d Cir. 2008)).  This is "'especially [true] where
the activity of a single person was central to the involvement of
all' conspirators," and "a defendant may be a co-conspirator if he
knows only one other member of the conspiracy[.]"  Id. (first
alteration in original) (first quoting Maldonado-Rivera, 922 F.2d
at 963; then quoting Huezo, 546 F.3d at 180).

114

"Courts often conceptualize single conspiracies using either a 'chain' or a 'hub-and-spoke' metaphor." United States v. Ulbricht, 31 F. Supp. 3d 540, 553 (S.D.N.Y. 2014) (citation omitted). "In a hub-and-spoke (or 'wheel') conspiracy, one person typically acts as a central point while others act as 'spokes' by virtue of their agreement with the central actor." Id. at 554. Put differently: "members of a 'core' group deal with a number of contacts who are analogized to the spokes of a wheel and are connected with each other only through the core conspirators." Id. (quoting United States v. Manarite, 448 F.2d 583, 589 (2d Cir.1971)). To prove a single conspiracy in this situation, "the Government must show that there was a 'rim' around the spokes, such that the 'spokes' became coconspirators with each other." Id. "To do so, the Government must prove that 'each defendant . . . participated in the conspiracy with the common goal or purpose of the other defendants.'" Id. (alteration in original) (quoting United States v. Taggert, No. 09-CR-0984, 2010 WL 532530, at *1 (S.D.N.Y. Feb. 11, 2010)). Absent a "rim," "the spokes are acting independently with the hub; while there may in fact be multiple separate conspiracies, there cannot be a single conspiracy." Id. (citations omitted).

Here, there was sufficient proof from which a rational juror could infer that each Defendant -- experienced in the securities industry -- engaged in a conspiracy to commit securities

fraud, money laundering, and wire fraud, with Matz (and the Boiler Room) serving as the hub.  It is "irrelevant" that Chartier's and Isen's "individual goals were limited in scope to their own trading activity," with Chartier focused on CESX and NWMH, and Isen focused on HECC and ICE.  Khalupsky, 5 F.4th at 288-89.  As recently articulated by the Second Circuit, "[c]o-conspirators' goals 'need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes.'"  Id. at 289 (quoting Maldonado-Rivera, 922 F.2d at 963).

It is clear that Isen and Chartier "not only agreed to participate in what [they] knew to be a collective venture directed toward a common goal" of defrauding investors by enlisting the Boiler Room to artificially inflate the value of CESX, HECC, ICE, and NWMH through manipulative trading practices, but also "had reason to know that in dealing with" Matz and the Boiler Room, they were "involved with a larger organization."  Id. (internal quotation marks and citations omitted).  For example, Matz explained to both Chartier and Isen that the Boiler Room profited by receiving cash or company stock in exchange for "pushing" victim/investors to purchase shares in those companies at the same time that the Boiler Room, or others, sold the shares they received as compensation or as company insiders.  Indeed, the first time Isen met Matz, it was conveyed that Matz had "serious buying power," was "able to put away a lot of stock," and that the Boiler

Room promoted a few penny stocks at a time.  (E.g., Tr. 348:21-49:23, 933:16-36:15.)  Isen sent Matz CESX trading data and also helped Matz finalize certain documents that were used to push CESX to victim/investors, similar or identical to those documents used in the HECC scheme.  (GX 460; GX 457; JC 39; Tr. 285:14-87:12.) Separately, Matz cited the Boiler Room's work for HECC when pitching his capabilities to Chartier and Lee and suggested that they engage Isen for investor relations work.  (Tr. 1722:22-23:22, 1783:8-87:14; GX 464.)  While Lee testified that she and Chartier did not hire Isen, Isen's phone registered 52 contacts with Chartier's phone during the relevant period.  (GX 881; GX 880.) Furthermore, Matz received a portion of the profits (e.g., a percentage, half, or a "ratio") that Defendants generated by trading shares of CESX, HECC, ICE, or NWMH against victim/investors at Matz's direction.  To that extent, the Boiler Room's success was dependent upon the various companies it pushed, such as CESX, HECC, ICE, and NWMH, at overlapping intervals.  Based on these interactions, a jury could conclude beyond a reasonable doubt that Defendants knew others were working with Matz and the Boiler Room to defraud investors by creating artificial markets for penny stock companies through manipulative trading practices.  See Manarite, 448 F.2d at 589 (individuals are "spokes" in a "wheel and spokes conspiracy" if they "knew or had reason to know of the existence,

117

but not necessarily the identity, of one or more of the other spoke participants in the wheel conspiracy").

The Court also rejects Defendants' contention that the Government failed to prove a single conspiracy because there were no direct transactions between Chartier and Lee, on the one hand, and Isen, on the other hand.  (Isen Br. at 30-31.)  There is no such requirement and "[a] single conspiracy may encompass members who neither know one another's identities, . . . nor specifically know of one another's involvement."  United States v. Sureff, 15 F.3d 225, 230 (2d Cir. 1994) (citations omitted).  Nonetheless, although largely circumstantial, the evidence was sufficient for the jury to conclude that Defendants were a part of a large conspiracy with Matz (and the Boiler Room) at the center.  Id.; see Khalupsky, 5 F.4th at 290 (the evidence sufficiently supported a single conspiracy where the defendant "knew that he depended on a large network of people to facilitate his illicit trading, and he agreed that the profits he generated would be shared with them"); United States v. McFadden, No. 13-CR-0284, 2015 WL 6506945, at *15-16 (E.D.N.Y. Oct. 27, 2015), aff'd, 689 F. App'x 76 (2d Cir. 2017); United States v. Figueroa, No. 08-CR-0749, 2010 WL 11463852, at *10 (E.D.N.Y. Mar. 2, 2010), aff'd, 464 F. App'x 35 (2d Cir. 2012).  Therefore, Defendants' motion for a judgment of acquittal on the conspiracy counts is denied.

2.   Isen's Rule 33 Motion[52]

In the alternative, Isen seeks a new trial pursuant to Rule 33 on the basis that (1) the jury was unfairly impacted by evidence of Gleckman's guilty plea and the Court's curtailment of cross-examination; (2) the jury was unfairly impacted by evidence of Isen's securities bar; (3) Isen's trial should have been severed from Chartier's trial; (4) the Government changed its theory of guilt throughout trial; and (5) Matz's testimony should be disregarded. (Isen Br. at 35-60.)

a.   Isen Is Not Entitled to a New Trial Based on Gleckman's Trial Testimony

Isen argues he is entitled to a new trial (or a judgment of acquittal) on the basis that he was denied his right to confront Gleckman, a government witness, because: (1) the Court improperly accepted Gleckman's guilty plea "without [an] adequate allocution"; (2) the Government prejudicially used Gleckman's guilty plea to infer Isen's guilt; and (3) the Court erred by curtailing cross-examination into Gleckman's motivation for pleading guilty. (Isen Br. at 22-23, 36-39; Isen Reply at 17-19.)

---

[52] Isen may argue that the same arguments supporting his Rule 29 motion also support his Rule 33 motion. To the extent argued, "the same reasons which counsel against the court entering an order of acquittal militate against granting a new trial" and, finding no manifest injustice, the Court denies Isen's motion for a new trial for the same reasons articulated in connection with his Rule 29 Motion. Lillemoe, 242 F. Supp. 3d at 124.

As a preliminary matter, Isen never objected or sought to preclude Gleckman's testimony on the basis that the Court erred in accepting Gleckman's guilty plea.  Even if Isen preserved this argument, the Court finds that he lacks standing to challenge the validity of Gleckman's guilty plea.  See United States v. Rodriguez, No. 01-CR-0024, 2021 WL 1873237, at *1 (E.D.N.Y. Mar. 24, 2021) (subsequent history omitted) (concluding the defendant lacked standing to challenge his co-defendant's guilty plea because the defendant failed to allege "any personal injury that would be redressable by a favorable ruling"); United States v. Elima, No. 16-CR-0037, 2016 WL 3546584, at *11 (C.D. Cal. June 22, 2016) (collecting cases); United States v. Barefoot, No. 05-CR-0166, 2006 WL 8442252, at *2 (E.D.N.C. Nov. 30, 2006) ("Defendant has no standing to challenge the convictions of third parties, who voluntarily entered into plea agreements").  In reaching this conclusion, the Court is guided by the discussion in United States v. Ivy, 83 F.3d 1266 (10th Cir. 1996), where the defendants sought to suppress the cooperating co-defendants' testimony on the basis that their plea agreements were invalid.  The court concluded that the challenge was improper because:

> [T]o accept [defendants'] position, we would
> be required to hold that in every case in which
> some defendants choose to plead guilty while
> others choose to stand trial, a very common
> situation indeed, those who go to trial have
> standing to challenge the validity of their
> codefendants' plea agreements and the factual

> bases of their guilty pleas.  Such challenges
> would require the government to prove the
> factual representations made in the plea
> agreements and during the plea colloquies of
> any codefendants from whom it planned to
> elicit testimony.  It would also force the
> district court and the court of appeals to
> entertain what would essentially be a
> collateral attack on a guilty plea by those
> who chose to stand trial, whether or not the
> party who pled guilty has any desire to
> challenge his conviction. . . .

Id. at 1282–83.  This reasoning is wholly applicable here.  Thus, Isen lacks standing to challenge Gleckman's guilty plea.

Considering the merits, Isen uses Gleckman's guilty plea and trial testimony as a shield and a sword.  On the one hand, he argues that the Government improperly inferred Isen's guilt from Gleckman's admission of guilt.  On the other hand, he argues that Gleckman's testimony that he did not "intend to defraud" established that Isen similarly lacked the requisite intent to defraud –– a theory the jury rejected.  (See supra, pp. 107-08 & Note 49; see also Isen Br. at 22-23, 36-39; Isen Reply at 18-19; Tr. 1610:13-11:10.)  First, the Government did not argue that the jury should infer Isen's guilt from Gleckman's decision to plead guilty.  During trial, Isen argued that the consulting agreements and invoices between the Boiler Room, Isen, Watts, and Gleckman related to legitimate services that Gleckman performed for HECC.  In summation, the Government properly referenced Gleckman's guilty plea to support the inference that Gleckman was truthful in his

trial testimony that he, Isen, and Watts executed false invoices and consulting agreements for the sole purpose of freeing-up the restricted HECC shares to pay the Boiler Room, notwithstanding the fact that Gleckman may have, at other times, performed legitimate consulting services for HECC.  (Tr. 3602:10-03:13, 3619:23-20:3); Rodriguez, 587 F.3d at 583.  Thus, Isen is not entitled to a judgment of acquittal or a new trial on this ground.

Second, the Court did not err in limiting cross-examination into Gleckman's motivation for pleading guilty.  Under the Sixth Amendment's Confrontation Clause, "a criminal defendant must have a meaningful opportunity to cross-examine witnesses against him."  Alvarez v. Ercole, 763 F.3d 223, 229-30 (2d Cir. 2014) (internal quotation marks and citation omitted).  However, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." United States v. Robinson, No. 16-CR-0545, 2021 WL 62076, at *18 (E.D.N.Y. Jan. 6, 2021) (emphasis in original) (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985)).  The Court has "broad discretion to impose reasonable limits on cross examination based on concerns about harassment, prejudice, confusion of the issues, or interrogation that is repetitive or only marginally relevant." Alvarez, 763 F.3d at 230 (cleaned up) (quoting Brinson v. Walker, 547 F.3d 387, 394 (2d Cir. 2008)).  "A trial judge abuses [her]

122

discretion in curtailing cross-examination of a government witness when the curtailment denies the jury sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government."  United States v. White, 692 F.3d 235, 248 (2d Cir. 2012) (quoting United States v. Blanco, 861 F.2d 773, 781 (2d Cir. 1988)).

As relevant here, the defense queried:

Defense:     And would it be fair to say, Mr. Gleckman, that at the time you pled you were feeling under a lot of pressure and you just wanted to get this behind you?

Gleckman:    I wanted to get it behind me and I was under pressure, but that is not why I pled out.

Defense:     Isn't that why you told your friend –

The Court:   Sustained.

Defense:     May I have a moment?

The Court:   Sure.

(Pause in proceedings.)

Defense:     I have no further questions, your Honor.

(Tr. 1612:4-15.)  Citing this exchange, Isen argues that he sought "to see if there was any inconsistency" between Gleckman's trial testimony and an FBI report to elicit the reasons that Gleckman "pled guilty to a crime he did not allocate to."  (Isen Reply at

18; Isen Br. at 38-39.)   The relevant portion of the FBI report (drafted by Special Agent Minsky and produced as Section 3500 material) states that "Gleckman told [a friend] that he wants this situation to be over."  (3500-RGL-3 at 12.)

Isen's argument fails for a number of reasons.  At the outset, the Court notes that Isen chose to conclude cross-examination of Gleckman, did not attempt to pursue this alleged inconsistency through additional questioning, and did not request to make an offer of proof.  Nonetheless, the Court did not abuse its discretion by limiting cross-examination.  As argued, Isen intended to use this line of questioning to challenge the validity of Gleckman's guilty plea and argue that if Gleckman had no intent to defraud, certainly Isen had no intent to defraud.  While "a defendant has the right to have a jury decide whether the prosecution has proved the elements of the charged crime," the Court, not the jury, must resolve questions of law, including the validity of Gleckman's plea agreement.  United States v. DiCristina, 726 F.3d 92, 105 (2d Cir. 2013).  Not only does Isen lack standing to assert this argument, see supra, admitting this evidence would necessarily lead to juror confusion regarding their role as arbiter of facts, not law.  Further, had Isen moved the Court for reconsideration of its evidentiary ruling, the Court would have adhered to its prior ruling limiting cross-examination, finding it would be cumulative to allow further questions regarding

Gleckman's testimony that he was "under pressure."  The Court would have also concluded that there were no inconsistencies between Gleckman's trial testimony and Special Agent Minsky's notes in the FBI report.  Moreover, there is nothing in the record reflecting that Gleckman adopted the FBI report as his own, and confronting Gleckman with the FBI report would have constituted inadmissible extrinsic impeachment evidence.  United States v. Leonardi, 623 F.2d 746, 757 (2d Cir. 1980) (FBI notes offered to impeach not attributable to witness because "a witness may not be charged with a third party's characterization of his statements unless the witness has subscribed to them" (citation omitted)).  Thus, there would have been no basis to allow Isen to blindly continue cross-examination "to see" if there were inconsistencies between Gleckman's trial testimony and the FBI report when there were none. (Isen Reply at 18 (emphasis added)); see Fed. R. Evid. 613(b) ("Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, . . .").

In any event, "it is firmly established that restricting the cross-examination of a witness creates no abuse of discretion issue, provided the jury has access to other material that would allow it to form some opinion as to the witness' credibility." United States v. Nosov, 221 F. Supp. 2d 445, 449 (S.D.N.Y. 2002),

aff'd, 119 F. App'x 311 (2d Cir. 2004).  Here, notwithstanding the Court's evidentiary rulings, Isen successfully elicited testimony that Gleckman was (1) unaware of the Boiler Room's and Matz's "criminal activities"; (2) unaware that the Boiler Room was lying to investors or manipulating stock; (3) not intending to defraud anyone; and (4) under pressure and "wanted to get it" behind him when he pled guilty.  (Tr. 1610:12-12:8.)  Furthermore, the Court's ruling did not prevent Isen from highlighting in summation that Gleckman did not intend to defraud anyone "just like Mr. Isen had no intention of defrauding anyone" and that he had "no idea why [Gleckman] pled guilty" but he "did say he was under pressure[.]" (Tr. 3480:15-21, 3584:13-85:8; see Tr. 3547:23-48:2, 3559:11-60:12, 3564:8-15.)  Thus, when reviewing the entire record, it is clear that the jury had sufficient information to properly weigh Gleckman's testimony.  Robinson, 2021 WL 62076, at *20–21; United States v. Ashburn, No. 11-CR-0303, 2015 WL 5098607, at *29-32 (E.D.N.Y. Aug. 31, 2015).

The portion of Isen's motion seeking a judgment of acquittal or a new trial arising out of Gleckman's guilty plea, his testimony, or the Court's evidentiary rulings during Gleckman's cross-examination, is denied.

b.   The Government Properly Referenced Isen's
Securities Industry Bar in Summation

Isen argues that the Government improperly referenced his securities industry bar as propensity evidence and the jury may have relied on those references in reaching a verdict.  (Isen Br. at 39-44; Isen Reply at 19-22.)  This argument is unpersuasive.

i.   Background Relevant to the Industry Bar

Before trial, the Government moved to admit evidence that Isen had been subjected to disciplinary proceedings by the Securities and Exchange Commission and barred from acting as a broker as proof of his knowledge and intent.  (Gov't Mot. in Limine, ECF No. 624, at 1, 6-7.)  Isen argued, among other things, that his disciplinary history constituted improper propensity evidence.  (Isen Limine Opp., ECF No. 651, at 2-3.)

On March 3, 2020, outside the presence of the jury, the Court orally granted the Government's request to introduce Isen's securities disciplinary history pursuant to Federal Rule of Evidence 404(b).[53]   (Tr. 2075:4-79:3.)   In reaching this conclusion, the Court reviewed Rule 404(b) and found that Isen "put the issue of his knowledge and intent into play," stating:

> The Court is not persuaded by Mr. Isen's
> argument that his license alone is sufficient
> for the [G]overnment's stated purpose of

---

[53] The Court also ruled that if Isen testified, the Government was permitted to introduce his FINRA disciplinary history but was precluded from introducing his 2000 securities fraud conviction in the Southern District of New York.  (Tr. 2079:4-82:14.)

showing knowledge and intent. [While] the
fact of his license sheds light on his
knowledge of the applicable rules and
regulations, the bar and [under]lying
finding[s] show he was not only aware of the
rules but he was aware of what conduct can
lead to liability.

It further contradicts the apparent defense
argument that Isen was unaware of the true
nature of Matz's dealings. The probative
value of this evidence will not be outweighed
by unfair prejudice[ because] the conduct does
not involve conduct more inflammatory than the
charged crime. The Court will issue an
appropriate limiting instruction.

(Tr. 2078:9-24; <u>see generally</u> Tr. 2077:3-79:3.)

The Government introduced Isen's securities industry bar
through Ms. Oremland. (Tr. 2201:23-02:2; GX 912.) It also cited
this evidence in summation to infer Isen's knowledge that Matz
operated a corrupt Boiler Room and/or that "coordinating trades in
this manner is securities fraud." (<u>E.g.</u>, Tr. 3254:23-55:1, 3270:1-
16, 3621:12-18.)

ii.  <u>Securities Industry Bar Discussion</u>

Isen does not challenge the Court's finding that he "put
the issue of his knowledge and intent into play." Nor does he
argue that the Court's ruling was in error or resulted in "manifest
injustice." Thus, the motion is denied to the extent Isen uses
"Rule 33 as a vehicle to relitigate [pretrial and] evidentiary
rulings with which he disagrees." <u>United States v. Smith</u>, No. 08-
CR-0390, 2009 WL 4249120, at *8 (S.D.N.Y. Nov.25, 2009); <u>see</u> <u>United</u>

128

States v. Barret, No. 10-CR-0809, 2012 WL 3229291, at *28 (E.D.N.Y. Aug. 6, 2012), aff'd, 677 F. App'x 21 (2d Cir. 2017).

Isen appears to complain that the Government committed prosecutorial misconduct because its citation to his industry bar in summation constituted a prejudicial and improper use of propensity evidence. (E.g., Isen Br. at 42.)  The Court disagrees and finds that Isen fails to meet the "'heavy burden' of demonstrating that the alleged misconduct is 'so severe and significant as to result in the denial of [his] right to a fair trial.'"  Kenner II, 272 F. Supp. 3d at 428 (quoting Locascio, 6 F.3d at 945).  As a threshold matter, Isen arguably waived this argument because he did not object to the admission of, or reference to, his securities industry bar after the Government rested or at any point in summations.  His failure "to make trial objections to the complained-of testimony constitutes a waiver of those objections."  United States v. Funaro, 222 F.R.D. 41, 45 (D. Conn. 2004) (citation omitted).

Assuming that Isen did not forfeit this argument, the Court concludes that the Government's arguments were "permissible commentary on the limited purpose for the evidence."  United States v. Shellef, 732 F. Supp. 2d 42, 78 (E.D.N.Y. 2010).  As stated, the Government drew upon Isen's disbarment to infer his knowledge that the Boiler Room was not a legitimate operation and/or that "coordinating trades in this manner is securities fraud."  Further,

129

Isen had "adequate opportunity in his summation to dispute the government's assertions," Parkes, 497 F.3d at 234, and, in fact, argued that the industry bar "happened" and that he "learned his lesson from that. And that's why when he was dealing with Matz he recommended that they have lawyers to view things," and "[h]e learned his lesson from what happened in '95, and it wasn't going to happen again" (Tr. 3499:14-23). Additionally, the Court instructed the jury that evidence of Isen's disbarment was admitted for a limited purpose and not "as proof that the defendant has a criminal propensity of bad character." (Tr. 3642:10-43:4); Shellef, 732 F. Supp. 2d at 78-79. Finally, the evidence that Isen acted with the requisite criminal intent "was sufficient due to the totality of witness testimony," and not solely from evidence of his industry bar. United States v. Davis, No. 17-CR-0610, 2020 WL 1233771, at *4 (S.D.N.Y. Mar. 12, 2020) (emphasis in original).

Therefore, the Government's reference to Isen's securities industry bar in summation does not warrant a new trial. See Parkes, 497 F.3d at 234; United States v. Galanis, 844 F. App'x 400, 402 (2d Cir. 2021) (summary order).

c.   The Defendants Were Properly Joined

Before trial, the Court denied Isen's motion for a severance, finding that Defendants were properly joined. See Isen, 2019 WL 6875369, at *1-2. Isen now moves for a new trial on the basis that his trial should have been severed from Chartier's trial

130

and, as a result, he was prejudiced by the length of trial and from the evidence admitted against Chartier.  (Isen Br. at 44-48.)

Under Rule 8, defendants may be jointly charged "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  FED. R. CRIM. P. 8(b).  "[J]oinder is proper where two or more persons' criminal acts are unified by some substantial identity of facts or participants or arise out of a common plan or scheme."  Rittweger, 524 F.3d at 177 (quotation marks and citation omitted).  Whether joinder is proper "must be determined on a case-by-case basis" and using "commonsense."  Id. at 177-78.  The Court must consider whether "joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice."  Id. at 177.

Pursuant to Federal Rule of Criminal Procedure 14, "[i]f the joinder of offenses or defendants in an indictment, . . . for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  FED. R. CRIM. P. 14(a).  The decision to sever a trial pursuant to Rule 14 is "confided to the sound discretion of the trial court."  United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003).  A trial court's severance decision is considered "virtually unreviewable," and the denial of a motion "will not be reversed unless appellants

establish that the trial court abused its discretion." <u>United States v. Cardascia</u>, 951 F.2d 474, 482 (2d Cir. 1991) (citations omitted). To challenge the denial of a severance request, a defendant "must establish prejudice so great as to deny him a fair trial." <u>Id.</u> "It is well established that a defendant cannot avoid the risks of a joint trial simply because he might have a better chance of acquittal in a separate trial." <u>United States v. Coley</u>, 498 F. Supp. 3d 415, 418 (W.D.N.Y. 2020) (quoting <u>United States v. Figueroa</u>, 618 F.2d 934, 944 (2d Cir. 1980)). Further, "[t]here is a powerful presumption in favor of joint trials of defendants indicted together based upon the underlying policies of efficiency, avoiding inconsistent verdicts, providing a 'more accurate assessment of relative culpability,' avoiding victims and witnesses having to testify repeatedly, and avoiding the random favoring of 'the last-tried defendants who have the advantage of knowing the prosecutor's case beforehand.'" <u>Id.</u> (quoting <u>Richardson v. Marsh</u>, 481 U.S. 200, 210, 219 n.7, (1987)).

Isen arguably waived this argument. After the Court ruled on his pre-trial severance motion, Isen did not request (until this motion) that the Court sever his trial on the basis that (1) the evidence failed to establish a single conspiracy, or (2) he was prejudiced by the evidence admitted against Chartier and the length of trial. (<u>Cf.</u> Tr. 2944:10-46:15 (Isen moving for a judgment of acquittal mid-trial, arguing that Matz's testimony

132

was unbelievable and the Government failed to establish a single conspiracy).) Thus, Isen "waived any argument that this Court should have sua sponte granted him a severance" at the close of the Government's case. United States v. Tuzman, No. 15-CR-0536, 2021 WL 1738530, at *36 (S.D.N.Y. May 3, 2021). Even if the Court granted his mid-trial Rule 29 motion on the basis that the Government failed to prove a single conspiracy, the "failure to sua sponte sever [Isen's trial] does not constitute plain error." Id. at *37.

Moreover, for the reasons already explained in the pre-trial order, which reasons are incorporated herein, the Court properly denied Isen's motion for a severance. Isen, 2019 WL 6875369, at *1-2. Other than arguing that the evidence was insufficient to support the conspiracy charges, Isen does not claim "there were any 'later developments' of the type identified by the Second Circuit" that "render[ed] the initial joinder" improper. Ashburn, 2015 WL 5098607, at *48 (citation omitted). As discussed supra, the Government presented sufficient evidence to sustain the conspiracy convictions. Thus, Isen's arguments that joinder was "plainly [] improper" because there was insufficient evidence of an overarching conspiracy are without merit. (Isen Reply at 22-23; Isen Br. at 45.)

Furthermore, having found that Isen was a member of the charged conspiracies, "evidence about the activities of the other

conspirators that were part and parcel of the operation of the conspiracy would have been admissible against [Isen], even were he tried separately." United States v. Brown, No. 04-CR-0801, 2006 WL 2724025, at *14 (S.D.N.Y. Sept. 22, 2006) (citation omitted). Such evidence includes Lee's testimony regarding her involvement with the Boiler Room at or around the same time that Isen engaged the Boiler Room. There were also witnesses who testified against both Isen and Chartier, including victim/investors, Matz, and law enforcement/government witnesses. Feyrer, 333 F.3d at 114 (joinder did not violate Rule 8 where "even if the district court had tried these two defendants separately, the evidence at one trial would essentially duplicate the evidence at the other"). Therefore, Isen and Chartier were properly joined for trial.

Next, Isen argues there was prejudicial spillover from the evidence admitted against Chartier, including evidence that Chartier purchased an expensive motorhome. However, "there is no indication of any prejudice against [Isen] from this evidence." United States v. Rittweger, No. 02-CR-0122, 2003 WL 22290228, at *10 (S.D.N.Y. Oct. 6, 2003). The Government separately presented evidence that Isen profited from the schemes and he "does not explain why the jury would have had any difficulty distinguishing between the stake that each of the defendants had in the transactions at issue." Id. In any event, "[t]he Second Circuit has repeatedly found that appropriate jury instructions are

adequate to address a risk of 'spillover' prejudice." United States v. Van Hise, No. 12-CR-0847, 2017 WL 3425750, at *47 (S.D.N.Y. Aug. 8, 2017) (citations omitted) (subsequent history omitted).  Throughout trial, Isen did not request limiting instructions that the jury should consider certain evidence only against Chartier.  In the charge, the Court instructed the jury to "consider each count of the Indictment separately," to "[c]onsider each defendant separately," and to "return a separate verdict on each count in which each defendant is charged."  (Tr. 3646:1-4.) The Court also instructed that "[w]hether you find a defendant guilty or not guilty as to one offense should not affect your verdict as to any other offense charged or defendant charged." (Tr. 3646:4-7, 3700:6-12.)  Isen does not meaningfully challenge these instructions, nor has he explained why they were insufficient to "ensure that he would not suffer unfair prejudice arising from the evidence introduced as" against Chartier.  Van Hise, 2017 WL 3425750, at *47.  At this juncture, there is nothing before the Court to warrant a departure from the "general assumption that juries follow the instructions they are given." United States v. Agrawal, 726 F.3d 235, 258 (2d Cir. 2013).  Finally, "[t]here is no support in caselaw or in logic for the proposition that a lengthy trial, a large number and variety of charges, and numerous defendants violate due process without a showing that the issues were actually beyond the jury's competence."  United States v.

135

DiNome, 954 F.2d 839, 842 (2d Cir. 1992).  And here, Isen makes no arguments that the issues at trial were "beyond the jury's competence."

Thus, Isen's motion for a new trial based on claims of improper joinder is denied.

d.   There Was No Constructive Amendment or Prejudicial Variance

Isen argues that a new trial is warranted because the Government changed its theory of guilt during trial, constituting a constructive amendment or prejudicial variance from the Superseding Indictment in violation of the Fifth Amendment.  (Isen Br. at 48-57; Isen Reply at 24-29.)  Specifically, he contends: (1) the Government failed to prove matched trading identified in the Superseding Indictment; and (2) the Superseding Indictment does not allege coordinated trading –- only matched trading –- and proof that individuals sold shares of HECC or ICE at the same time that victim/investors purchased shares of HECC or ICE does not meet the definition of matched trading as charged in the Superseding Indictment or as defined by Ms. Oremland.  (Isen Br. at 50-51.)  Isen is not entitled to relief on this basis.

"An indictment has been constructively amended 'when the government's presentation of evidence and the district court's jury instructions combine to modify essential elements of the offense charged to the point that there is a substantial likelihood

that the defendant may have been convicted of an offense other than the one charged by the grand jury.'" Kenner I, 2019 WL 6498699, at *9 (internal quotation marks omitted) (quoting United States v. Vebeliunas, 76 F.3d 1283, 1290 (2d Cir. 1996)). By contrast, "[a] variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." Lebedev, 932 F.3d at 54 (quoting United States v. Dove, 884 F.3d 138, 149 (2d Cir. 2018)). "The most significant difference between a variance and a constructive amendment is that the latter is a per se violation of the Fifth Amendment, whereas 'a defendant must show prejudice in order to prevail on a variance claim.'" Kenner I, 2019 WL 6498699, at *10 (quoting United States v. Frank, 156 F.3d 332, 338 n.5 (2d Cir. 1998)). "A defendant fails to show that he has been prejudiced by the variance when 'the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense.'" Id. (quoting United States v. Mucciante, 21 F.3d 1228, 1236 (2d Cir. 1994)).

After a careful review of the record, and having presided over Isen's trial, the Court finds that no constructive amendment or variance occurred here. From the filing of the Superseding

Indictment, through Watts's trial, and again at Isen's trial, the Government never departed from its core allegations that Isen, with others, engaged in schemes to defraud HECC and ICE investors by hiring and coordinating with the Boiler Room to create an artificial demand for HECC and ICE stock through aggressive cold calls to victim/investors and manipulative trading practices. To be sure, the Superseding Indictment charged that Isen, Watts, and others, engaged in schemes to defraud by "artificially controlling the price and volume of traded shares in [HECC and ICE] through, inter alia, (a) artificially generating price movements and trading volume in the shares . . . " (Superseding Indictment ¶ 31.) It further explains that a "matched trade" occurs when, for example, "Investor A bought 100 shares at $5.000 per share of Company A through a broker, while Investor B, who coordinated with Investor A, simultaneously sold 100 shares at $5.00 per share of Company A through a broker" and was "used to create the appearance that the stock price and volume rose as a result of genuine market demand for the securities." (Id. ¶ 19.) The Superseding Indictment continues:

> [Defendants] used their status as insiders at the [ ] Companies to obtain shares in the [ ] Companies for free or at below-market prices. [D]efendants enlisted the Boiler Room to artificially drive up the share prices of the [ ] Companies and thereafter sold the [D]efendants' shares to unsuspecting victim investors . . . .

> Once shares in the [ ] Companies were
> transferred to the Boiler Room . . ., the
> [Defendants], together with the Boiler Room
> Managers, engaged in manipulative trading
> patterns, including wash trades and matched
> trades, to drive up the price of the shares,
> while account executives at the Boiler Room .
> . . aggressively and repeatedly called and
> emailed victim investors to purchase shares in
> the [ ] Companies. When victim investors
> indicated a willingness to purchase a
> recommended stock, the Account Executives
> called the victim investors repeatedly,
> pressured them to follow through with their
> purchases and directed them to log into their
> trading accounts while still on the telephone
> to place purchase orders for the relevant
> stock. . . .
>
> The [D]efendants and their co-conspirators did
> not disclose to the victim investors that . .
> . at the same time or shortly after the Account
> Executives recommended the stocks of [HECC or
> ICE] to the victim investors, the defendants
> sold their own shares in the same companies.

(Id. ¶¶ 32-34 (emphasis added); see also id. ¶ 35.)

These allegations in the Superseding Indictment were
incorporated into the securities fraud charges. (Id. ¶¶ 98, 100.)
At trial, Matz testified that he "supported" HECC and ICE stock by
wash trading shares of HECC and/or ICE between nominee brokerage
accounts and by matched trading against victim/investors. The
documentary evidence, including trading data, corroborated this
testimony. Separately, the Government introduced evidence that
the Boiler Room artificially inflated the price of HECC and/or ICE
by aggressively pressuring victim/investors to purchase shares of
HECC and/or ICE. As recited in detail above, the evidence

139

established that Isen, Watts, Gleckman, Sui, and others, participated in the schemes by coordinating with the Boiler Room to sell their shares of HECC and/or ICE with knowledge that the Boiler Room lined up a victim/investor to purchase shares of HECC and/or ICE at around the same price, time, and volume. (Compare, e.g., Superseding Indictment ¶¶ 33-35, 70, 73-75 with GX 811; GX 812; GX 813-1 through 6; GX 817; GX 823-2 through 4; 824-1; GX 827; Tr. 355:23-56:12, 368:7-70:12, 1040:9-43:16, 1057:21-58:5.)

Thus, the Government's theory that Isen (or others) participated in the schemes by, among other means, selling shares of HECC and/or ICE at the same time that victim/investors purchased shares of HECC and/or ICE "did not change 'the essence of the crime, in general terms,' which remained throughout" all stages of the prosecution. United States v. Daugerdas, 837 F.3d 212, 225 (2d Cir. 2016) (quoting United States v. D'Amelio, 683 F.3d 412, 418 (2d Cir. 2012)). Rather, this evidence provided the "'particulars of how [Isen] effected the crime,' and the [G]overnment's reliance on this theory of liability did not amount to a constructive amendment." Id. (quoting D'Amelio, 683 F.3d at 417-18); see also United States v. Rigas, 490 F.3d 208, 228-30 (2d Cir. 2007); Khalupsky, 5 F.4th at 293-94 ("Even though the Business Wire hack was not charged as a standalone securities fraud count, Business Wire was identified as one of the victim newswires in the superseding indictment's introductory section, which was

incorporated by reference into all charged counts. . . ., [and these trades] are plainly within the charged core of criminality" (internal quotation marks and citation omitted)).

Isen asserts additional arguments that track his interpretation of the evidence and theories of innocence. Specifically, that (1) Dr. Filante conclusively established that matched trading is impossible in today's market because, among other reasons, all trades are facilitated through market makers; (2) he did not know he was selling to victim/investors; and (3) it is not illegal to sell stock "while it was being promoted" or when victim/investors "were interested in buying . . . where, as here, each side buys or sells through his or her own broker or trades in her own account." (Isen Br. at 52-53, 55.) The Court considered and rejected these arguments in connection with Isen's Rule 29 motion, <u>supra</u>. In any event, the question is not whether the evidence varied from the <u>defense's theory</u> of the case. Rather, the question is whether Isen "may have been charged with an offense other than the one charged by the jury." <u>Kenner I</u>, 2019 WL 6498699, at *9 (citation omitted). Here, the Court concludes that the evidence tracked the Government's theory of guilt, as charged in the Superseding Indictment through trial.

Isen may also argue that the Government constructively amended the Superseding Indictment because there was no proof of coordination between Isen (or the Boiler Room) and a

141

victim/investor -- only proof of coordination between Isen and the Boiler Room.   Thus, Isen argues, the Government changed its definition of matched trading to coordinated trading.   (Isen Br. at 53-56.)   Regardless of the terminology used, the evidence established that the Boiler Room, Isen, and others, engaged in matched trading with victim/investors by controlling both sides of the trades:   they intentionally sold shares of HECC and/or ICE with explicit knowledge of the price, time, and volume that victim/investors purchased shares of HECC and/or ICE.   This meets the definition of matched trading proffered by the Government in the Superseding Indictment, during Watts's trial, and throughout Isen's trial.   Therefore, no constructive amendment or variance occurred.

Even assuming that the introduction of evidence surrounding "coordinated trading" constituted a variance, Isen has not established that "he was 'substantial[ly] prejudice[d]' by this evidence." United States v. Gross, No. 15-CR-0769, 2017 WL 4685111, at *32 (S.D.N.Y. Oct. 18, 2017) (alterations in original) (quoting Rigas, 490 F.3d at 226), aff'd sub nom. Lebedev, cited supra.   Isen had sufficient notice -- from pre-trial conferences, the trial against co-defendant Watts, and opening statements -- that the Government intended to argue that Isen participated in the conspiracy and committed securities fraud by, among other ways, coordinating with the Boiler Room to match trades against the

victim/investors' purchase of HECC and/or ICE shares.  (E.g., Aug. 6, 2019 Tr., 14:14-15:7 (the Government responding to the request for matched trading evidence, pointing to the blue sheet data, and stating "the matched and wash trades . . . are self-evident <u>when comparing the trade that these defendants and their coconspirators conducted and then comparing it to the people who were buying the stock</u>" (emphasis added)); Tr. 24:18-25:14 (opening statements).) Counsel did not object to this argument before trial or to the evidence introduced in support of this theory at any point during trial.  <u>United States v. Kaplan</u>, 490 F.3d 110, 130 (2d Cir. 2007) (no constructive amendment or variance where "counsel did not object to the admission of the false statements not specified in the bill of particulars, nor did he request a continuance when they were introduced"); <u>United States v. Petit</u>, No. 19-CR-0850, 2021 WL 673461, at *10-12 (S.D.N.Y. Feb. 21, 2021); <u>United States v. Teman</u>, 465 F. Supp. 3d 277, 297-300 (S.D.N.Y. 2020).

In view of the above, the Government did not "ambush" the defense (<u>e.g.</u>, Isen Br. at 50) and Isen has "not shown the 'substantial prejudice' required to warrant reversal on variance grounds."  <u>Rigas</u>, 490 F.3d at 230; <u>United States v. Salameh</u>, 152 F.3d 88, 139-40 (2d Cir. 1998); <u>United States v. Miller</u>, No. 17-CR-0415, 2019 WL 2232124, at *9 (E.D.N.Y. May 23, 2019); <u>United States v. Ng Lap Seng</u>, No. 15-CR-0706, 2018 WL 2287101, at *11-15 (S.D.N.Y. May 9, 2018); <u>see also</u> <u>Gross</u>, 2017 WL 4685111, at *33-

35; cf. Siddiqi v. United States, 98 F.3d 1427 (2d Cir. 1996) (conviction vacated as a miscarriage of justice where the government shifted its theory of guilt during summation, again on remand to the district court, and again in response to defendant's habeas petition); cf. United States v. Sakoc, 115 F. Supp. 3d 475 (D. Vt. 2015) (constructive amendment or variance where the indictment charged defendant with failing to disclose conduct arising out of "a specific date and a specific category of violent crimes against a specific set of women" on immigration and naturalization forms but the government argued that the jury could convict for conduct that occurred on dates other than those charged).  Isen's Rule 33 motion on this ground is denied.

> e.   The Court Will Not Disturb the Jury's Credibility Assessment of Matz

Finally, Isen argues that he is entitled to a new trial because the Court should have "serious doubts" regarding Matz's credibility.  (Isen Br. at 58-60; Isen Reply at 29-30.)  Under Rule 33, however, "the Court cannot disturb a jury's credibility determination unless that witness's testimony is 'patently incredible or defies physical realities.'"  United States v. Pizarro, No. 17-CR-0151, 2019 WL 3406603, at *12 (S.D.N.Y. July 29, 2019) (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)).  The Court thus finds that it cannot disturb the jury's credibility determination of Matz.  See id.

Nonetheless, Isen argues that the Court should find Matz's testimony incredible and order a new trial because Matz (1) testified pursuant to a cooperation agreement and "knew how to play the 'cooperation game'"; (2) lied regarding his tax liabilities and income reporting obligations, illegal gambling collection activities, his discharge from the U.S. Army, and a confession in a state arrest; (3) hid assets from his ex-wife during a divorce proceeding; and (4) frustrated the Court by failing to read documents placed in front of him. (Isen Br. at 58-60.) Yet, Isen does not cite any authority for this Court to conclude that these factors render Matz's testimony "patently incredible." Pizarro, 2019 WL 3406603, at *12 (quoting Sanchez, 969 F.2d at 1414). The Second Circuit "has previously held that even when a witness testified under a cooperation agreement, breached that agreement, and had a criminal record and history of alcohol and drug abuse; when the government effectively repudiated the witness's testimony; and when the witness's attorney asserted that the witness had perjured himself, the district court should not have concluded that his testimony was incredible as a matter of law, and instead should have deferred to the jury's assessment of the witness' credibility." Id. (citing Truman, 688 F.3d at 139-40). When reviewed "against this high standard," there is no basis "to second-guess the jury's determination as to" Matz's credibility. Id.

Further, Isen argues that a new trial is warranted because the Government's case "rested largely on" Matz's testimony, which lacked integrity. (Isen Br. at 60.) However, as discussed in connection with Isen's Rule 29 motion, there was evidence that corroborated Matz's testimony, including Matz's testimony "where he alone was the only witness." (See Id.) Therefore, a new trial is not warranted on this basis.

C.    There Is No Evidence That the Onset of COVID-19 Unduly Influenced the Jury's Deliberations

Defendants jointly move for a new trial pursuant to Rule 33 arguing that they were denied a fair and impartial jury trial because (1) the COVID-19 pandemic constituted an outside influence that distracted the jury (Defs. Joint Br. at 26-28); (2) the Court failed to "assess or remedy the risk of jury distraction and rushed deliberations" (id. at 28-30); and (3) the jury rushed deliberations (id. at 30-31). In the alternative, Defendants request an evidentiary hearing or permission to question the jurors. (Id. at 35; see id. at 31-38.) The Government opposes the motion, arguing that Defendants waived this argument, were not prejudiced by the COVID-19 pandemic, and are not entitled to an evidentiary hearing. (Gov't Opp. at 86-93.) Defendants' arguments are denied in their entirety.

1.  There Is No Evidence That COVID-19 Interfered with
    Jury Deliberations or That the Court Failed to
    Assess the Effects of COVID-19 on Deliberations

Defendants have failed to establish that they are entitled to a new trial arising out of the undersigned's conduct or the jury's deliberations during the onset of the unprecedented COVID-19 pandemic.  To begin, the Court rejects the argument that there is "a universal presumption" that jurors serving during a pandemic are distracted and impatient.  (Defs. Joint Br. at 27-28; Defs. Joint Reply at 2, 4-5.)  The Court is unaware of any such "universal presumption."  Rather, "[t]he question is not whether the [C]ourt adhered to best practices," but "[w]hether Defendant[s] received a fair trial" and "that question turns on whether the jurors were able to continue deliberating under the circumstances."  United States v. Dermen, 452 F. Supp. 3d 1259, 1264 (D. Utah 2020) (denying motion for a mistrial and analyzing claims that jurors should not have deliberated after March 16, 2020).  The answer to that question is yes.

Throughout trial, the Court remained steadfast in its solemn responsibility to ensure that Defendants received a fair and impartial trial and deliberations, even when presented with concerns surrounding the novel COVID-19 virus.  To be sure, Defendants' trial lasted sixteen days (exclusive of the charge conference) and spanned seven weeks (inclusive of voir dire), primarily to accommodate the Defendants' many requests for

adjournments.  "Corona Virus" was first referenced on March 4, 2020, during the eleventh day of trial, when the defense asked Ms. Oremland whether external factors, such as the Corona Virus, could affect the success of a company's stock.  (Tr. 2304:9-19.) On March 6, 2020, the Government raised concerns regarding COVID-19 and scheduling (Tr. 2843:7-19) and, on March 10, 2020, the Court addressed concerns surrounding COVID-19 when responding to the Defendants' requests for another adjournment, noting that the Courthouse implemented safety measures and that the undersigned was "in the coronavirus's hands."  (Tr. 3050:22-51:2, 3100:20-02:9.)  Later that same day, outside the presence of the jury, the Court again addressed the COVID-19 pandemic and that the Courthouse implemented additional screening measures and discontinued certain proceedings.  (Tr. 3193:7-98:3.)  On March 12, 2020, the Court addressed COVID-19 and observed that "we have, fortunately, a [jury] that has not seemed at all wary of the Corona [V]irus situation.  Hopefully that will continue."  (Tr. 3215:2-21.)  At no point did the defense, or the Government, request to suspend the trial.

Shortly after 3 p.m. on Monday, March 16, 2020, the jury retired to deliberate in a nearby (more spacious) courtroom.  The jury deliberated until approximately 4:30 p.m. when they requested to leave for the day.  The jury promptly returned at 9:30 a.m. on

Tuesday, March 17, 2020 and continued deliberations.  That morning,

outside the presence of the jury, the Court noted "future plans":

> I don't know if you saw the article about Judge
> Nathan in the Southern District of New York.
> She had a juror who called in sick during a
> criminal trial.   The jury was deliberating.
> And she made arrangements for the particular
> juror to do Facetime, . . . and continue with
> deliberations. There was a guilty verdict. .
> . .
>
> . . . I have not had that issue yet, but as
> you are all well aware, the courts are making
> alternative plans to work from home remotely,
> and in view of the [P]resident's most recent
> decision, that everybody should go home for
> five weeks.
>
> I don't know where our trial will wind up. I'm
> doing everything I can not to put any pressure
> on the jury. I think it is essential that we
> proceed in an atmosphere of calm.
>
> And what I would like to do, because the jury
> has mentioned that they wanted a bigger jury
> room, and when you have 18 in one small room,
> that can be uncomfortable.   They do have a
> slightly larger room, . . . [and] . . . to
> make it an even greater social distance, . .
> . we could lock the courtroom, put paper on
> the outside door so no-one could look in
> through the small windows we have, and let
> them deliberate here. . . .

(Tr. 3715:14-17:11.)   The Defendants did not object to this plan

and deliberations continued until approximately 4:20 p.m. when the

jury was excused for the day.   (Tr. 3717:19-19:25, 3731:11-25.)

The jury returned at 9:30 a.m. on Wednesday, March 18, 2020 and

continued deliberations.   That morning, the Court dismissed an

alternate juror who had a "head cold" and whose landlady had the

flu.   The  Court  did  not  want  to  stop  deliberations  or
"unnecessarily alarm" the jury.  So the Court's courtroom deputy
informed the jury that the alternate juror was released, without
further elaboration.  (Tr. 3734:7-35:11.)  The Defendants did not
object to the dismissal or raise concerns regarding deliberations.
At around 3 p.m. on Wednesday, March 18, 2020, the jury reached
its verdict.  (Tr. 3752:18-21.)

Against this history, "there is absolutely no merit to
the  contention  that  the  COVID-19  pandemic  somehow  unduly
influenced the jury['s] deliberations in this case" or that they
were distracted and rushed to verdict.  United States v. Cooper,
No. 18-CR-0126, 2020 WL 4474071, at *10 (W.D.N.Y. Aug. 4, 2020).
The jury did not raise any concerns regarding COVID-19 to the Court
or to the Court's courtroom deputy.  Furthermore, the jury
deliberated for approximately two days and the many communications
to the Court reflect careful and thoughtful consideration of the
evidence and further demonstrate that the jurors "felt no time
pressure to reach a verdict and were making good progress in their
deliberations."  Dermen, 452 F. Supp. 3d at 1264; (see Court
Exhibits, ECF No. 799, at 6-15.)  The Court strongly rejects the
disingenuous argument that the "jury's conduct on March 18 clearly
illustrated  that  they  were  rushing  deliberations  where  it
repeatedly failed to wait for evidence it had requested."  (Defs.
Joint Br. at 30-31.)  To the contrary, the jury's communications

150

on March 18, 2020 squarely reflect that the jurors were considering the evidence and requested certain information but became satisfied with the information they received or "found." (See Court Exhibits.) Therefore, Defendants' arguments are purely speculative and must be denied where, as here, "[n]o juror raised any concern at any time with respect to the COVID-19 pandemic, and no party raised any concern" or requested that the Court conduct an inquiry into the effects of COVID-19 on deliberations. Cooper, 2020 WL 4474071, at *10.

Nor is there any merit to the contention that the Court failed to "assess or remedy the risk of juror distraction" from COVID-19. (Defs. Joint Br. at 28.) Defendants cite many articles and orders that "mischaracterizes the atmosphere" at the time of the deliberations. Cooper, 2020 WL 4474071, at *8; (see Defs. Joint Br. at 2-11.) With the benefit of hindsight, "it is difficult to imagine a time when COVID-19 was not at the forefront of everyone's minds." Cooper, 2020 WL 4474071, at *9. However, at the time of deliberations, "the facts were fast developing" and Defendants were "just as aware as anyone else," including the undersigned, "of the state of the COVID-19 pandemic." Id. at *9-10. This is underscored by Defendants' concession that they collectively failed "at each stage, to bring these issues to the Court's attention." (Defs. Joint. Br. at 28 n.31.)

Defendants also cite a host of remedies that the Court failed to sua sponte consider and implement during deliberations. (Defs. Joint Br. at 13-18, 28-30.)  However, Defendants' "failure to raise this issue while the jury was deliberating reflects the general lack of concern" for the effects of COVID-19 on deliberations at that time.  Cooper, 2020 WL 4474071, at *9.  Moreover, it is not appropriate to assess the safety measures implemented in mid-March 2020, during the very early stages of an unprecedented pandemic, against the safety measures implemented in the ensuing months (and year) as experts began to understand COVID-19 and the best precautions to mitigate its spread.  In any event, the Court did consider COVID-19 and its effect on deliberations and implemented a plan for greater social distancing.  Thus, the Court is not persuaded by Defendants' citations to reports and/or cases that (1) suspended trials or implemented precautions a month or more after March 18, 2020, the last day of trial here; or (2) discontinued or suspended trials at the parties' requests and/or where the trial at issue was far from completion and deliberations.

Therefore, a new trial is not warranted on this basis.

2.   Defendants Are Not Entitled to Question the Jurors
Regarding the Impact of the COVID-19 Pandemic

Defendants also request an evidentiary hearing, or to
question the jurors, to determine "if the COVID-19 pandemic
constituted an external" factor that "influenced the jury in their
deliberations" pursuant to Federal Rule of Evidence 606(b). (Defs.
Joint Br. at 35; id. at 31-38.)   The request is denied.

Rule 606(b)(1) bars jurors from testifying "about any
statement made or incident that occurred during the jury's
deliberations; the effect of anything on that juror's or another
juror's vote; or any juror's mental processes concerning the
verdict or indictment."   However, "the rule is not absolute and
will yield 'to the need for juror testimony in situations where
there is a reduced potential for harassment or embarrassment of
jurors, such as when evidence concerning objective facts is
sought.'"   Cooper, 2020 WL 4474071, at *6 (quoting United States
v. Moten, 582 F.2d 654, 664-65 (2d Cir. 1978)).   "[T]here must be
'reasonable grounds' to conduct any post-verdict inquiry of
jurors, which means 'clear, strong, substantial and
incontrovertible evidence, that a specific, nonspeculative
impropriety has occurred which could have prejudiced the trial of
a defendant.'"   Id. (quoting United States v. Moon, 718 F.2d 1210,
1234 (2d Cir. 1983)).   "Many of the same balancing considerations
underpinning Rule 606(b) also apply to post-verdict interviews of

153

jurors" and it is "well-settled" in this Circuit that "'where a full dress inquiry' of jurors post-trial is sought by a party, it 'must only be conducted under the strict supervision and control of the court, with inquiry restricted to those matters found by the court as both relevant and proper.'" Id. at *7 (quoting United States v. Brasco, 516 F.2d 816, 819 n.4 (2d Cir. 1975)) (collecting cases). Therefore, a defendant "should not be allowed to waste the time of a district judge or inconvenience jurors merely to conduct a fishing expedition." Moten, 582 F.2d at 667.

Defendants waived their right to seek a post-verdict inquiry of jurors because they were "aware of the alleged prejudicial outside influence before the jury finishe[d] deliberating" and failed "to ask for a more intensive voir dire of jurors during the trial." Cooper, 2020 WL 4474071, at *7 (quoting Moten, 582 F.2d at 667); (see Defs. Joint. Br. at 28 n.31.) Nonetheless, because the Court concludes that the allegations regarding the impact of COVID-19 on jury deliberations are wholly speculative, there are no "reasonable grounds" to conduct an evidentiary hearing or a post-verdict inquiry of jurors. Cooper, 2020 WL 4474071, at *10. Consequently, the Court joins its sister-court in declining to "resolve the issue of whether such an inquiry would run afoul of Rule 606(b)(1)." Cooper, 2020 WL 4474071, at *6 n.4; but see Dermen, 452 F. Supp. 3d at 1269-70 ("The court concludes that inquiring into jurors' views regarding the

154

coronavirus outbreak when no concern had been raised by any member of the jury would have constituted an improper intrusion into their deliberations in violation of" Rule 606(b)(1)).

***

To the extent not expressly addressed herein, the Court has considered the Defendants' remaining arguments and finds that they are without merit.

CONCLUSION

For the reasons stated, **IT IS HEREBY ORDERED** that Chartier's Motion (ECF No. 887) for a judgment of acquittal or, in the alternative, a new trial is GRANTED insofar as Chartier's conviction on Count Sixteen (16) is VACATED; Chartier's Motion is DENIED in all other respects; and

**IT IS FURTHER ORDERED** that Isen's motion (ECF No. 885) for a judgment of acquittal or, in the alternative, a new trial is DENIED in its entirety; and

**IT IS FURTHER ORDERED** that Defendants' joint motion (ECF No. 886) for a new trial is DENIED in its entirety; and

**IT IS FURTHER ORDERED** that the Government's opposition brief shall remain under seal; and

**IT IS FURTHER ORDERED** that the Probation Department is directed to prepare and file Presentencing Reports for Chartier and Isen on or before October 25, 2021; and

155

**IT IS FURTHER ORDERED** that the sentencing hearing for Chartier shall be held in-person on November 3, 2021 at 11:00 a.m., in Courtroom Number 1030 of the Central Islip Courthouse; and

**IT IS FURTHER ORDERED** that the sentencing hearing for Isen shall be held in-person on November 4, 2021 at 11:00 a.m., in Courtroom Number 1030 of the Central Islip Courthouse.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: August   26  , 2021
       Central Islip, New York